**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE AMERICAN HOME MORTGAGE SECURITIES LITIGATION | ) ) ) ) |
| | ) |
| THIS DOCUMENT RELATES TO ALL CLASS ACTIONS | ) ) ) ) |

07-MD-1898 (TCP)

Electronically filed

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP
Steven B. Singer (SS-5212)
Avi Josefson
Matthew C. Moehlman
1285 Avenue of the Americas, 38th Floor
New York, New York 10019
Telephone: 212-554-1400
Facsimile:  212-554-1444

BERMAN DEVALERIO PEASE TABACCO
BURT & PUCILLO
Jeffrey C. Block (JCB-0387)
Kathleen M. Donovan-Maher
Autumn W. Smith
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194

*Attorneys for Lead Plaintiffs and Co-Lead Counsel for the Class*

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ................................................................................ 1

II.    JURISDICTION AND VENUE ......................................................................... 6

III.   PARTIES ............................................................................................................ 6

IV.    CLASS ACTION ALLEGATIONS ................................................................ 13

V.     PLAINTIFFS' INVESTIGATION AND CONFIDENTIAL SOURCES .......... 17

VI.    AMERICAN HOME'S BUSINESS AND OPERATIONS ................................ 20

       A.    LOAN ORIGINATIONS .......................................................................... 21

       B.    AHM PORTRAYED ITSELF AS BEING A PRIME LENDER .............. 22

       C.    AMERICAN HOME WAS DEPENDENT ON ITS CREDIT FACILITIES ........... 23

       D.    LOAN SALES AND LOANS HELD FOR INVESTMENT ................... 24

VII.   FACTUAL ALLEGATIONS PERTINENT TO CLAIMS FOR RELIEF ......... 26

       A.    AMERICAN HOME DEVELOPED HIGHLY RISKY MORTGAGE
             PRODUCTS ............................................................................................ 27

             1.    Choice Loans: "Subprime Masked as a Prime Loan" ................... 28

             2.    Adjustable Rate Mortgages ............................................................. 37

             3.    American Home Improperly Underwrote ARM Loans ................... 40

       B.    AMERICAN HOME VIOLATED ITS UNDERWRITING GUIDELINES ............ 43

       C.    AMERICAN HOME PURCHASED MORTGAGES THAT IT COULD
             NOT SELL ............................................................................................. 50

       D.    AMERICAN HOME ACQUIRED "SWAMP LOANS" FROM WATERFIELD
             FINANCIAL CORPORATION .............................................................. 53

       E.    AMERICAN HOME DUMPED UNSALABLE LOANS INTO ITS
             QUALIFIED REIT SUBSIDIARY ......................................................... 54

       F.    AMERICAN HOME CLOSELY TRACKED LOAN REPURCHASES
             AND EARLY PAYMENT DEFAULTS .................................................. 60

       G.    THE MARKET FOR AMERICAN HOME'S LOANS COLLAPSED AS
             A RESULT OF THE POOR QUALITY OF ITS LOANS ........................ 61

VIII.  CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ............................. 69

       A.    THE UNDERWRITER DEFENDANTS WERE PRIVY TO INFORMATION
             CONCERNING THE QUALITY OF AMERICAN HOME'S LOANS .......... 70

       B.    THE 2005 OFFERING ............................................................................ 72

             1.    Untrue Statements In The 2005 Offering ...................................... 72

       C.    THE 2007 OFFERING ............................................................................ 85

1. Untrue And Misleading Statements In The 2007 Offering................................... 85

IX. GAAP VIOLATIONS ......................................................................................... 94

X. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT............................................ 115

XI. ADDITIONAL FALSE AND MISLEADING STATEMENTS ....................................... 116

XII. THE TRUTH IS REVEALED ............................................................................. 143

XIII. LOSS CAUSATION.......................................................................................... 149

XIV. PRAYER FOR RELIEF ..................................................................................... 163

XV. JURY TRIAL DEMAND .................................................................................. 164

Lead Plaintiffs, the Teachers' Retirement System of Oklahoma ("Oklahoma Teachers") and the Oklahoma Police Pension and Retirement System ("Oklahoma Police"), on behalf of themselves and all others similarly situated, by and through their undersigned counsel, Bernstein Litowitz Berger & Grossmann LLP and Berman DeValerio Pease Tabacco Burt & Pucillo, allege the following.

## I.        NATURE OF THE ACTION

1.        This is a case about a purportedly conservative mortgage lender that, without disclosure to its investors, abandoned its focus on high-quality prime loans and aggressively embarked into high-risk lending.  Despite portraying itself to investors as a "prime" mortgage lender, American Home Mortgage Investment Corp. ("American Home," "AHM" or the "Company") fueled spectacular growth by targeting borrowers with poor credit, violating Company guidelines for underwriting mortgages, and incentivizing employees to sell risky loans, regardless of the borrowers' creditworthiness.  As a result, the Company's net income more than tripled from less than $75 million in 2004 to more than $260 million in 2006, as American Home's share of the U.S. residential mortgage market rose from 0.56% to 2.31%.  By 2006, the Company had become one of the ten largest mortgage lenders in the United States.

2.        In stark contrast to the high-risk lending that propelled the Company's growth, in its filings with the Securities and Exchange Commission ("SEC"), American Home stressed its focus on issuing mortgages to borrowers with "good credit profiles."  For example, a prospectus issued in January 2005 and incorporated in two offerings pursuant to which the Company sold $400 million of stock to investors during the Class Period stated, "[g]enerally, loans we originate are high-credit-quality, prime loans."  When asked by analysts in July 2005 what percentage of the Company's loans were non-prime, American Home's founder and Chief Executive Officer, Defendant Michael Strauss, responded "we don't originate non-prime/subprime paper" and

specified that such loans amounted to "less than 1% of our production." Similarly, at an industry conference in September 2006, Strauss reiterated that "our borrowers are prime borrowers." Asked by an analyst a month later whether the Company was interested in entering the subprime market, Strauss responded "We are not focused on subprime opportunities." Indeed, as the subprime mortgage market was collapsing in early 2007, analysts, in reliance upon these assurances, repeatedly distinguished American Home from subprime lenders, reminding investors that "AHM IS NOT A SUB-PRIME LENDER."

3.     Lead Plaintiffs' investigation reveals that the Company's focus on quantity rather than quality drove it to abandon its public posture as a conservative, prime lender, as it developed mortgage products designed to qualify "anyone with a pulse" for an American Home mortgage. Indeed, in direct contrast to the Company's representations about its purportedly conservative lending practices, an internal American Home e-mail sent in November 2006 described the Company's business model as follows: "<u>At AHM we pride ourselves on having a loan for virtually any borrower</u>, regardless of whether or not they have the ability to verify their Income, Assets or Employment history." Thus, while true prime lenders typically denied more than 15% of loan applicants, and subprime lenders, who lend to persons with poorer credit, typically deny 45% of loan applicants, from 2004 through 2006, American Home denied less than 5% of the mortgage applications it received.

4.     Moreover, according to numerous witnesses and internal Company documents, American Home violated its loan underwriting standards by extending loans to high-risk borrowers without verifying their creditworthiness. Specifically, the Company extended loans that required no documentation of the borrower's income, employment or assets and failed to test the reasonability of borrowers' "stated" or claimed income, as required by its underwriting

guidelines. Similarly, in underwriting adjustable rate loans – which carried a low "teaser" rate that later adjusted upwards – the Company based its approval of loans on borrowers' ability to pay the teaser rates, rather than the full rates borrowers would ultimately be required to pay. In so doing, the Company failed to determine whether its borrowers could actually afford the loans. Moreover, when the Company's loan underwriters, who were responsible for ensuring that loans were only issued to qualified borrowers, questioned the issuance of a loan, their objections were consistently vetoed by loan officers who were compensated for closing sales. Also, underwriters were actually paid more for selling higher-risk loans that carried higher rates. As one former employee succinctly stated: "If the loan officer and operations managers wanted to get the loan out, it got out."

5.      As a result of targeting borrowers with poor credit and violating its underwriting guidelines, the Company's issuance of subprime loans increased dramatically. Indeed, undisclosed to investors, in 2006, more than 22% of the loans American Home originated were subprime. Yet the Company never accounted for the materially increased risk of lending money to borrowers with poor or unverified creditworthiness. Specifically, the Company overstated the value of its assets, which consisted primarily of loans and mortgage-backed securities ("MBS"). The Company also overstated its income and the gain it recorded from sales of loans and MBS by failing to account for the markedly heightened risk that the loans and MBS it sold would be returned to the Company due to their low quality and prevalence for early defaults. While the Company reported the growth in its loan and MBS sales, which exploded from $13.6 billion in 2004 to nearly $56 billion in 2006, it neither disclosed nor reserved for the growing number of those loans that it was forced to repurchase. According to witnesses, secondary market investors increasingly rejected loans and MBS originated by American Home or else returned them to the

Company as it became clear that the quality of the Company's loans was less than prime, and because such loans suffered from high rates of default.

6.    The loans returned to the Company by secondary market investors, known as "scratch and dent" loans, could not be re-sold at full value.  However, rather than sell its scratch & dent loans at a loss, the Company dumped them into a REIT to hold them for investment purposes without discounting them to reflect their impaired value.  Thus, American Home came to amass an over-valued, multi-billion dollar portfolio of mortgages and mortgage-backed securities containing scratch & dent loans.  Indeed, the former manager of the group charged with reviewing the rejected loans and transferring them into that subsidiary described the subsidiary as a "garbage pail; all the scraps went in there."  Former employees confirmed that Defendant Strauss refused to sell these troubled loans because he did not want to record the losses that would result, and so he instead ordered the loans to be dumped into the REIT, where they continued to be recorded as assets of the Company.  Further, Defendant Strauss was regularly kept apprised of these troubled loans throughout the Class Period.

7.    During the Class Period, American Home shares traded as high as $40 per share based on the Company's representations that it was a prime lender.  Indeed, even after the subprime mortgage industry collapsed in February and March of 2007, American Home successfully distinguished itself from the failing subprime lenders.  On April 30, 2007, American Home conducted a public offering pursuant to which it sold 4 million shares of stock at approximately $24 per share, realizing proceeds of nearly $100 million from unsuspecting investors.  That offering was conducted even as the Company faced a "tidal wave" of demands to repurchase the poor quality loans it had originated and then sold on the secondary market.  Those repurchase demands and the refusal of lenders to rely on American Home's loans as collateral

for the Company's credit lines reflected the fact that, contrary to American Home's public posturing, the Company had for years been issuing high-risk loans to borrowers with poor credit.

8.     Just three months after that April 30 Offering, the wheels came off American Home when the Company revealed on July 27, 2007 that its lenders had terminated its funding through a series of margin calls.  That disclosure followed weeks of denials by the Company that its credit lines were in jeopardy, even though lenders such as Lehman Brothers had started making margin calls on the lines in March 2007, shortly before the April 30 Offering.  The July 27 disclosure sent the Company into an abrupt tailspin that ended a week later with American Home in bankruptcy and its investors holding shares that were worthless.  The FBI and Department of Justice are now investigating American Home for accounting violations, with a focus on the origination of loans with low or no documentation of borrowers' creditworthiness.

9.     The Company's undisclosed foray into high-risk mortgages and misrepresentations as to the value of the assets it held on its books, among other things, gives rise to the claims herein on behalf of investors who purchased American Home common and preferred stock during the period from July 19, 2005 through August 6, 2007 on the open market, or who purchased American Home common stock on two offerings conducted during that period: an offering of 9 million shares on August 9, 2005 at $35.50 per share (the "2005 Offering") and an offering of 4 million shares on April 30, 2007 at approximately $24 per share (the "2007 Offering").[1]

10.     The claims on behalf of purchasers on those two offerings arise under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") and, pursuant to that statute, require no allegations of fraudulent intent by the Company's officers, directors,

---

[1]  The 2005 Offering was conducted pursuant to the Shelf Registration Statement, the January 2005 Prospectus and the 2005 Prospectus Supplement, and the 2007 Offering was conducted pursuant to the Shelf Registration Statement, the January 2005 Prospectus and the 2007 Prospectus Supplement Supplement, each of which is defined below.

underwriters or auditor named thereunder.  Those claims are set forth first below, and do not sound in fraud.  The claims on behalf of purchasers of American Home common and preferred shares on the open market arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  To assist the Court in distinguishing the allegations of fraud that underlie the Exchange Act claims, those allegations are set forth separately below following the Securities Act claims.

## II.      JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action under Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337.  The claims alleged herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77(l)(a)(2) and 77o, and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations of the SEC promulgated thereunder, including Rule 10b-5, 17 C.F.R. § 240.10b-5.

12.     Venue is proper in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391(c).  Many of the acts and transactions that give rise to the violations of law alleged herein, including the dissemination to the public of materially untrue and misleading press releases and filings with the SEC, occurred in this District.  During the Class Period, American Home maintained its headquarters at 520 Broadhollow Road, Melville, New York.

## III.      PARTIES

### Lead Plaintiffs

13.     The Teachers' Retirement System of Oklahoma ("Oklahoma Teachers") is a public pension fund established for the benefit of the current and retired employees of Oklahoma's local school districts, career technology schools, public colleges and universities.

6

Oklahoma Teachers provides retirement benefits to thousands of members and their beneficiaries and has over $7 billion in assets under management.  Among other purchases of American Home shares during the Class Period which are reflected on the Certification submitted in support of its motion for appointment as Lead Plaintiff, Oklahoma Teachers purchased 65,800 shares of AHM common stock at $35.50 per share on the 2005 Offering.

14.     The Oklahoma Police Pension and Retirement System ("Oklahoma Police") is a public pension fund established for the benefit of current and retired Oklahoma police officers and employees of Oklahoma's police departments.   Oklahoma Police provides retirement benefits to thousands of members and their beneficiaries and has over $1.8 billion in assets under management.  Oklahoma Police's purchases of American Home shares during the Class Period are reflected on the Certification submitted in support of its motion for appointment as Lead Plaintiff.

**Additional Named Plaintiffs**

15.     Dana Marlin is a resident and citizen of California.  Marlin purchased 17,200 shares of AHM common stock at $23.80 per share on the 2007 Offering.  Marlin purchased those shares directly from Defendant Citigroup Global Markets Inc.

16.     Ilene Karol is a resident and citizen of Illinois.  Through a joint account with Lindy Mika, Karol purchased 550 shares of AHM preferred stock during the Class Period.

17.     Lindy Mika is a resident and citizen of Illinois.  Through a joint account with Ilene Karol, Mika purchased 550 shares of AHM preferred stock during the Class Period.

18.     Lead Plaintiffs and Plaintiffs Marlin, Karol and Mika are referred to collectively herein as "Plaintiffs."

**Officer Defendants**

7

19.     Michael Strauss has served as the Chairman of the Board of Directors, Chief Executive Officer and President of the Company since its founding in 1988 and initial public offering in 1999.  He signed the Shelf Registration Statement in connection with the 2005 Offering and the 2007 Offering in his capacity as AHM's CEO, President and principal executive officer.

20.     Stephen A. Hozie was, at all relevant times, AHM's Chief Financial Officer.  He signed the Shelf Registration Statement for the 2005 Offering and the 2007 Offering in his capacity as AHM's CFO and principal financial officer.

21.     Defendants Strauss and Hozie are referred to collectively herein as the "Officer Defendants."

**Other Individual Defendant**

22.     Robert Bernstein was, at all relevant times, AHM's Controller.  He signed the Shelf Registration Statement for the 2005 Offering and the 2007 Offering in his capacity as AHM's Controller and principal accounting officer.

**Director Defendants**

23.     John A. Johnston was, at all relevant times, a Director of American Home. Johnston signed the Shelf Registration Statement in connection with the 2005 Offering and the 2007 Offering in his capacity as Director of American Home.

24.     Michael A. McManus, Jr. was, at all relevant times, a Director of American Home. McManus signed the Shelf Registration Statement in connection with the 2005 Offering and the 2007 Offering in his capacity as Director of American Home.

25.    <u>C. Cathleen Raffaeli</u> was, at all relevant times, a Director of American Home. Raffaeli signed the Shelf Registration Statement in connection with the 2005 Offering and the 2007 Offering in her capacity as Director of American Home.

26.    <u>Nicholas R. Marfino</u> was, at all relevant times, a Director of American Home. Marfino signed the Shelf Registration Statement in connection with the 2005 Offering and the 2007 Offering in his capacity as Director of American Home.

27.    <u>Kenneth P. Slosser</u> was, from March 2000 through June 20, 2006, a Director of American Home. He was a Managing Director of Friedman, Billings, Ramsey & Co., Inc., American Home's financial advisor and lead underwriter in connection with American Home's initial public offering. He became a Director of American Home in March 2000. Slosser signed the Shelf Registration Statement in connection with the 2005 Offering and the 2007 Offering in his capacity as Director of American Home.

28.    <u>Irving J. Thau</u> was, at all relevant times, a Director of American Home. Thau signed the Shelf Registration Statement in connection with the 2005 Offering and the 2007 Offering in his capacity as Director of American Home.

29.    <u>Kristian R. Salovaara</u> was, from June 20, 2006, until the end of the class period, a Director of American Home.  Accordingly, Salovaara was a Director of the Company at the time the 2007 Prospectus Supplement Supplement was filed.

30.    Johnston, Marfino, McManus, Rafaelli, Slosser and Thau all signed the Shelf Registration Statement in connection with the 2005 Offering and the 2007 Offering in their capacity as directors of American Home.  Defendant Salovaara was a Director of American Home at the time the 2007 Prospectus Supplement Supplement was filed as part of the Shelf Registration Statement.

31.     The Defendants listed in ¶¶ 19-28 are collectively referred to herein as the 2005 Offering Individual Defendants.

32.     The Defendants listed in ¶¶ 19-29 are collectively referred to herein as the 2007 Offering Individual Defendants.

### **Underwriter Defendants**

33.     <u>Citigroup Global Markets Inc.</u> ("CGMI"), based in New York City, is a subsidiary of Defendant Citigroup Inc., a financial services institution that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.  CGMI was the sole Book-Runner underwriting the 2005 Offering and represented Defendants Lehman Brothers Inc., Bear, Stearns & Co. Inc., Deutsche Bank Securities Inc., Stifel, Nicolaus & Company, Incorporated, Flagstone Securities, LLC and Ryan Beck & Co., Inc. (collectively, the "2005 Underwriter Defendants") as underwriters in the 2005 Offering.  CGMI sold 4,500,000 of the 9,000,000 shares of AHM common stock on the 2005 Offering.  CGMI was the sole underwriter of the 2007 Offering, and sold 4,000,000 shares of AHM common stock on that offering.

34.     <u>Citigroup Inc.</u>, an international financial services company based in New York City, is the corporate parent and 100% owner of defendant CGMI and reports CGMI's financial results in its consolidated financial statements.  Through its corporate control over its subsidiary, CGMI, Citigroup Inc. was able to control, and did control, the underwriting activities of CGMI at all relevant times.

35.     <u>Lehman Brothers Inc.</u>, based in New York City, is a financial services institution that, through its subsidiaries and/or affiliates, provides commercial and investment banking and

advisory services.  It was an underwriter for the 2005 Offering and sold 1,980,000 shares of AHM common stock issued in the 2005 Offering.

36.  <u>JPMorgan Chase & Co. ("JPMorgan")</u> is a financial services institution providing a range of financial services worldwide.  JPMorgan recently acquired Bear, Stearns & Co. Inc. ("Bear Stearns"), a New York City-based financial services institution that, through its subsidiaries and/or affiliates, provided commercial and investment banking and advisory services.  At a Bear Stearns special shareholders meeting held on May 29, 2008, Bear Stearns' shareholders approved an agreement and plan of merger between Bear Stearns and JPMorgan dated March 16, 2008, as amended.  Bear Stearns was an underwriter for the 2005 Offering and sold 810,000 shares of AHM common stock issued in the 2005 Offering.  JPMorgan as a successor to Bear Stearns' liabilities replaces Bear Stearns as a defendant in this action.

37.  <u>Deutsche Bank Securities Inc.</u>, also based in New York City, is a subsidiary of Defendant Deutsche Bank AG, that, through its subsidiaries and divisions, provides commercial and investment banking services and commercial loans to corporate entities.  It was an underwriter for the 2005 Offering and sold 810,000 shares of AHM common stock issued in the 2005 Offering.

38.  <u>Defendant Deutsche Bank AG</u>, a worldwide provider of investment banking products and services, is the corporate parent and 100% owner of defendant Deutsche Bank Securities Inc.  Through its corporate control over its subsidiary, Deutsche Bank Securities Inc., Deutsche Bank AG was able to control, and did control, the underwriting activities of Deutsche Bank Securities Inc. at all times relevant to the 2005 Offering.

39.     <u>Stifel, Nicolaus & Company, Incorporated</u>, a subsidiary of its parent holding company, St. Louis, Missouri-based Stifel Financial Corp., was an underwriter for the 2005 Offering and sold 450,000 shares of AHM common stock issued in the 2005 Offering.

40.     <u>Flagstone Securities, LLC</u>, based in St. Louis, Missouri, was an underwriter for the 2005 Offering and sold 225,000 shares of AHM common stock issued in the 2005 Offering.

41.     <u>Ryan Beck & Co., Inc.</u>, based in Florham, New Jersey was an underwriter for the 2005 Offering and sold 225,000 shares of AHM common stock issued in the 2005 Offering.

42.     Defendants CGMI, Citigroup, Inc., Lehman Brothers Inc., Bear, Stearns & Co. Inc., Deutsche Bank Securities Inc., Deutsche Bank AG, Stifel, Nicolaus & Company, Incorporated, Flagstone Securities, LLC and Ryan Beck & Co., Inc. are collectively referred to herein as the "2005 Underwriter Defendants."  Defendants CGMI and Citigroup, Inc. are collectively referred to herein as the "2007 Underwriter Defendants."

**Auditor Defendant**

43.     <u>Deloitte & Touche LLP</u> ("Deloitte") served as the Company's independent auditor throughout the Class Period.  Deloitte has global headquarters in New York City and maintains offices in this District at Two Jericho Plaza, Jericho, NY 11753-1683.  Deloitte issued reports as to the financial statements incorporated into the 2005 Prospectus Supplement and 2007 Prospectus Supplement Supplement.

44.     The 2005 Offering Individual Defendants, the 2005 Underwriter Defendants and Defendant Deloitte are collectively referred to herein as the 2005 Offering Defendants.

45.     The 2007 Offering Individual Defendants, the 2007 Underwriter Defendants and Defendant Deloitte are collectively referred to herein as the 2007 Offering Defendants.

**Relevant Non-Party**

46.    At all relevant times, non-party AHM was and is a Maryland corporation, operating as a real estate investment trust, in the business of investing in and originating residential mortgage loans.  The Company was founded in New York in 1988, and in 2006 was ranked the 10th largest lender in the nation with over $45.3 billion in annual loan volume.  Its operating offices were located at 520 Broadhollow Road, Melville, New York.  The company has not been named as a defendant herein because it filed for Chapter 11 bankruptcy protection on August 6, 2007.

## IV.    CLASS ACTION ALLEGATIONS

47.    Plaintiffs bring this action on their own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "Class") consisting of all persons or entities who purchased or otherwise acquired American Home common or preferred shares during the period from July 19, 2005 through August 6, 2007 on the open market, inclusive (the "Class Period"), including all persons who purchased or otherwise acquired American Home shares pursuant or traceable to the registration statements issued in connection with the 2005 Offering or the 2007 Offering.  Excluded from the Class are (i) Defendants; (ii) members of the immediate family of each Individual Defendant; (iii) any person who was an officer or director of American Home or any of the Underwriter Defendants (or any other underwriter of the 2005 Offering or the 2007 Offering) during the Class Period; (iv) any firm, trust, corporation, officer, or other entity in which any Defendant has or had a controlling interest; and (v) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

48.    The Class is so numerous that joinder of all Class members is impracticable. Throughout the Class Period, American Home stock was actively traded on the New York Stock Exchange, which is an efficient market.  While the exact number of Class members can only be

determined by appropriate discovery, Plaintiffs believe that Class members number in the thousands.  As of December 31, 2006, there were 50.030 million shares of American Home stock outstanding on a basic basis and 50.421 million shares outstanding on a fully diluted basis.  The 2005 Offering and 2007 Offering involved the sale of nine million shares and four million shares, respectively, of American Home stock.  American Home was followed by securities analysts employed by major brokerage firms who wrote reports that were disseminated to the sales force and to certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

49.    Plaintiffs' claims are typical of the claims of other Class members.  Plaintiffs and all Class members acquired their American Home shares pursuant to the 2005 Offering, the 2007 Offering or on the open market, and sustained damages as a result of Defendants' conduct complained of herein in violation of the federal securities laws.

50.    Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class action and securities litigation. Plaintiffs have no interests that are contrary to or in conflict with those of the Class members that Plaintiffs seek to represent.

51.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged herein.

52.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are:

    a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

    b)    whether documents, press releases and public statements made by the Defendants during the Class Period concerning the Company's financial and operational position, including statements concerning the Company's financial results, contained misstatements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    c)    whether the 2005 Offering Materials and/or 2007 Offering Materials contained material misstatements or omitted to state material information;

    d)    whether the Deloitte & Touche unqualified audit reports for the Company's consolidated financial statements for 2004 and 2006 contained material misstatements;

    e)    whether, with regard to claims under the Exchange Act, the Defendants named under such claims acted with the requisite state of mind in omitting and/or misrepresenting material facts in the documents filed with the SEC, press releases and public statements;

    f)    whether the market prices of American Home shares during the Class Period were artificially inflated due to the material misrepresentations complained of herein; and

    g)    whether the Class members have sustained damages and, if so, the appropriate measure thereof.

53.     Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

54.     The names and addresses of record owners of American Home shares purchased on or traceable to the 2005 Offering and 2007 Offering and during the Class Period are available from records maintained by American Home or its transfer agent.  Notice may be provided to

such record owners via first class mail, using techniques and a form of notice similar to that customarily used in securities class actions.

55.     In bringing these claims, with regard to claims under the Exchange Act, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the fraud-on-the-market doctrine. At all times relevant to this Complaint, the market for American Home shares was an efficient market for the following reasons, among others:

> a)     American Home shares traded on the New York Stock Exchange, which is a highly efficient market.  The average daily trading volume over two intervals during the Class Period was 575,841 shares from January 3, 2006 to December 29, 2006 and 2.033 million shares from January 3, 2007 to July 27, 2007;
>
> b)     As a regulated issuer, American Home filed periodic public reports with the SEC;
>
> c)     American Home shares were followed by numerous securities analysts employed by firms including Lehman Brothers Inc., Bear Stearns & Co. Inc., Citigroup, Inc., Flagstone Securities, LLC, and Deutsche Bank Securities Inc., among others, who wrote reports about the Company and the value of its shares that were publicly available and entered the public marketplace; and
>
> d)     American Home regularly issued press releases, which were carried by national and international news wires.  Each of these releases was publicly available and entered into the public marketplace.

56.     As a direct and proximate result of the Defendants' violations of the Securities Act and Exchange Act, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of American Home shares.  Had Plaintiffs and the other members of the Class known of the material adverse information not disclosed by Defendants, or been aware of the truth behind the material misstatements of the Defendants, they would not have purchased American Home shares at artificially inflated prices, if at all.

57.     The Exchange Act claims asserted herein were first asserted against American Home and certain of the Officer Defendants on July 31, 2007.  The Securities Act claims

asserted herein arising out of the 2007 Offering were first asserted against the 2007 Underwriter Defendants, Deloitte and certain of the Individual Defendants on August 27, 2007.  The Securities Act claims asserted herein arising out of the 2005 Offering were first asserted against the 2005 Underwriter Defendants, Deloitte and certain of the Individual Defendants on April 8, 2008.

### V.     PLAINTIFFS' INVESTIGATION AND CONFIDENTIAL SOURCES

58.     Plaintiffs' allegations are based upon the investigation of Lead Counsel which included, among other things: review of public filings with the SEC by American Home; press releases; publicly available trading information; articles in the general and financial press; and review and analysis of non-public, internal Company documents obtained by Lead Counsel.

59.     Plaintiffs' allegations are also based upon information provided by former employees of American Home with knowledge of the Company's underwriting, lending and accounting practices including, but not limited to, the following confidential witnesses:

> Confidential Witness 1 is a former AHM employee who served as Vice President, Post-Closing.  Confidential Witness 1 was in charge of AHM's loan workout department, which managed AHM's portfolio of nonperforming loans, between March 2006 and August 2007.  Confidential Witness 1 generated a weekly report that informed AHM's top management about the status of the company's delinquent or defective loans.

> Confidential Witness 2 is a former AHM employee who worked at AHM between January 2002 and April 2007.  Among other positions, Confidential Witness 2 served as Vice President and head of AHM's Loan Workout Group from September 2003 to April 2005.  Between approximately April 2005 and January 2006, Confidential Witness 2 served as a Trainer for all new employees at four of AHM's new operations centers.  Confidential Witness 2 had direct communications with many of AHM's top executives, including Defendant Strauss and Executive Vice President and Director of Capital Markets Robert Johnson.

> Confidential Witness 3 is a former AHM employee who served as District Manager responsible for approximately twelve branch offices in Texas and Arkansas between October 2005 and May 2007.

Confidential Witness 4 is a former AHM employee who served as a branch manager in charge of AHM's San Antonio, Corpus Christi, Houston (the Woodlands) and South Texas branches between April 2003 and October 2006.

Confidential Witness 5 is a former AHM employee who served as a mortgage planner and loan consultant for AHM between approximately March 2006 and August 2007.  Confidential Witness 5 worked directly with potential mortgage clients and completed mortgage applications.

Confidential Witness 6 is a former AHM employee who served as a Senior Underwriter, and was a member of a group of six to eight AHM underwriters who were brought to the Company's New York headquarters between July 16 and July 22, 2006 to review a group of approximately 700 loans that secondary market investors had demanded that the Company repurchase.

Confidential Witness 7 is a former AHM employee who served as Vice President in charge of Sales and Production for the Mid-Central and Upper Midwest regions between July 2004 and January 2007.

Confidential Witness 8 is a former AHM employee who served as a Quality Control Underwriter between November 2002 and August 2007.  Confidential Witness 8 audited loan underwriting, examining loans that had gone into default or that AHM had been forced to repurchase from secondary market investors.

Confidential Witness 9 is a former AHM employee who served as a staff member in AHM's repurchase area between November 6, 2004 and early August 2007.

Confidential Witness 10 is a former AHM employee who served as a Capital Markets Trade Manager between April 2006 and February 1, 2008.

Confidential Witness 11 is a former AHM employee who served as a sales manager who oversaw loan sales and underwriting between February and August 2007.

Confidential Witness 12 is a former AHM employee who served as an Associate in the Analytics Group within the Capital Markets division between June 2006 and August 2007.

Confidential Witness 13 is a former AHM employee who served as Vice President of Credit Risk Policy/Capital Markets between June 2006 and August 2007.  Confidential Witness 13 analyzed the credit quality of pools of mortgages that were presented to AHM for potential purchase and advised the top members of the Capital Markets team, including Robert Johnson, as to whether American Home should bid on the loans.

Confidential Witness 14 is a former AHM employee who served as an Assistant Vice President for Direct Consumer Lending in AHM's loan origination business segment between July 2006 and August 2007.  Confidential Witness 14 is also a

former Citigroup employee who worked in Citigroup's mortgage repurchase department between September 2007 and January 2008. In this position, Confidential Witness 14 participated directly in the review of loans purchased from and returned to AHM. Confidential Witness 14 also worked at Citigroup between 2001 and 2006.

Confidential Witness 15 is a former AHM employee who worked at AHM between 2002 and 2006 and who served as a Post Closing Loan Auditor in AHM's Post Closing Review Group between January 2005 and August 2005.

Confidential Witness 16 is a former AHM employee who worked at AHM between July 2005 and April 2007. Confidential Witness 16 worked in AHM's due diligence group and reviewed the underwriting of loans before they were sold to secondary market investors. Confidential Witness 16's group also reviewed loans acquired from Waterfield Financial Corporation when AHM purchased it in January 2006. Confidential Witness 16's group was directly overseen by Executive Vice President and Director of Capital Markets Robert Johnson, who reported directly to Defendant Strauss.

Confidential Witness 17 is a former AHM employee who worked at AHM between 2000 and August 2007 and served in several positions, including as a Wholesale Coordinator, Loan Sale Department. In this position, Confidential Witness 17 audited loans that were sold to investors in the secondary market.

Confidential Witness 18 is a former AHM employee who served as a Loan Sales Coordinator between 2005 and 2007 and worked directly with secondary market investors.

Confidential Witness 19 is a former AHM employee who served as an Investor Reporting specialist between November 20, 2006 and November 8, 2007.

Confidential Witness 20 is a former AHM employee who served as a credit supervisor in the Correspondent Division between January 2006 and August 2007.

Confidential Witness 21 is a former AHM employee who served as the head of the Post-Closing team in AHM's Correspondent Division between January 2006 and August 2007.

Confidential Witness 22 is a former AHM employee who served as a loan auditor in AHM's Correspondent Division between December 2006 and August 2007.

Confidential Witness 23 is a former AHM employee who served as a Team Leader in AHM's Correspondent Division between January 2006 and May 2007.

Confidential Witness 24 is a former AHM employee who worked in the Correspondent Division and monitored the Company's repurchase demands to correspondent lenders between 2006 and 2007.

Confidential Witness 25 is a former AHM employee who worked at AHM between 1999 and 2007 and served in several positions, including supervisor of AHM's appraisal department.

Confidential Witness 26 is a former AHM employee who worked at AHM between 1998 and 2007 and served in several positions, including Senior Vice President of Production and Sales Support.

Confidential Witness 27 is a former AHM employee who served as manager of AHM's Secondary Lock Desk for retail loans between November 2004 and August 2007.

Confidential Witness 28 is a former AHM employee who served as former Vice President, Capital Markets Secondary Trading between March 2006 and August 3, 2007.

Confidential Witness 29 is a former AHM employee who served as a Deal Manager, Trades/Loan Sales Division between December 2006 and April 1, 2007.

Confidential Witness 30 is a former AHM employee who served as a Hedging and Trading Analyst between October 2006 and August 2007.

Confidential Witness 31 is a former AHM employee who served as Vice President/Assistant Treasurer between January 2004 and July 2007.

Confidential Witness 32 is a former AHM employee who served as Senior Vice President, Capital Markets/Risk Management between December 2006 and August 2007.

Confidential Witness 33 is a former AHM employee who served as a Senior Underwriter between 2002 and 2007.

## VI.   AMERICAN HOME'S BUSINESS AND OPERATIONS

60.   American Home was founded in 1988 by Defendant Michael Strauss, who took the Company public in 1999.  In November 2003, following its acquisition of Apex Mortgage Capital, a mortgage investment company operating as a Real Estate Investment Trust, or REIT, American Home restructured itself as a REIT and, as of year-end 2003, AHM qualified as a REIT for federal tax purposes.[2]

---

[2] As a REIT, AHM realized federal income tax benefits in that it was generally not taxed at the corporate level for REIT taxable income that it distributed to its stockholders.  To qualify for treatment as a REIT, AHM was, among other things, required to distribute 90% of its REIT taxable income to investors.

61.     American Home described its business model as the origination of quality loans, the majority of which were then sold to secondary market investors as either whole loans or mortgage-backed securities, with a "select" portion of the Company's loans and MBS retained in its investment portfolio.  The Company managed its business in three segments: (1) Loan Origination, which issued loans and sold loans and MBS; (2) Mortgage Holdings, which managed the portfolio of securitized loans for investment; and (3) Mortgage Servicing, which earned fees for servicing both loans retained and sold by the Company.

## A.     LOAN ORIGINATIONS

62.     American Home originated loans through "retail" loan production offices operated by its own salaried loan officers, and originated "wholesale" loans through independent brokers who charged commissions for directing borrowers to the Company.  AHM also originated loans by purchasing them from other lenders through its Correspondent Division.

63.     During the Class Period, AHM increasingly obtained loans through correspondent channels.  Specifically, the percentage of the Company's loans originated from correspondents grew from just 1% in 2005 to 10% in 2006 and 25% in the first quarter of 2007.  At the same time, the Company's wholesale loans dropped from 54% in 2005 to 48% in 2007, while retail loans declined from 54% of the Company's originations in 2005 to just 27% in 2007.  As discussed below, the increased reliance on correspondent lenders was significant because the Company did not verify the credit quality of those loans, many of which were high-risk loans.

64.     The Company's loan officers – effectively the Company's salesmen – were compensated based on the volume of loans they sold, and were paid more for selling riskier loans, which carried higher rates.  While the loan officer's goal was to make the sale, it was the Company's loan underwriters who were purportedly responsible for deciding whether to approve a loan, based on factors such as the borrower's income, employment, assets, other outstanding

debt and credit history, including facts such as whether the borrower had ever filed for bankruptcy. The underwriter was also supposed to consider the borrower's "FICO" score, a statistical measure of creditworthiness provided by the Fair Isaac Corporation. FICO scores range from 300 to 850, with lower numbers signifying poorer credit quality.

65.     In making the decision whether to approve a loan, American Home underwriters also considered two ratios that compare the amount of the loan to the value of the property: the Loan to Value Ratio ("LTV") and Combined Loan to Value Ratio ("CLTV"). LTV is calculated as the mortgage amount divided by the appraised value of the property. The CLTV was used in cases where the borrower was applying for more than one mortgage, and the second loan is known as a second lien mortgage. Thus, in a traditional loan where the borrower provides a down-payment of 20%, the LTV is 80%. If the down-payment is borrowed through a second lien mortgage, the CLTV would be 100%. A loan with a high LTV or CLTV represents a higher risk of loss to the lender.

## B.     AHM PORTRAYED ITSELF AS BEING A PRIME LENDER

66.     American Home styled itself as a "prime" mortgage lender, creating the impression that it made loans to the most credit-worthy borrowers who were eligible for the lowest monthly rate, called the prime rate. Prime borrowers are usually able to fully document such critical elements of their financial condition as income, employment history and assets. Loans to prime borrowers are generally "conforming" loans, meaning that they meet certain funding and credit guidelines established by Fannie Mae and Freddie Mac, and do not exceed a dollar limit set by the Office of Federal Housing Enterprise Oversight ("OFHEO").[3] Being a

---

[3] A loan to a "prime" borrower for an amount greater than the OFHEO limits is known as a "Jumbo" loan, and is not considered subprime.

prime lender of conforming loans is thus an indicator both of the quality of the Company's loan

and the existence of a ready secondary market for those loans.

67.    While American Home also originated loans that were non-conforming, it

represented that the majority of these loans were high-quality "Alternate-A" or "Alt-A" loans,

which it described as:

> primarily of mortgage loans that are first lien mortgage loans made to
> borrowers whose credit is generally within typical Fannie Mae or Freddie
> Mac guidelines, but have loan characteristics that make them non-
> conforming under these guidelines.   From a credit risk standpoint,
> alternate "A" loan borrowers present a risk profile comparable to that of
> conforming loan borrowers, but entail special underwriting considerations,
> such as a higher loan to value ratio or limited income or asset verification.

> (Emphasis added.)

68.    The reports of equity analysts who followed the Company reflected the

assurances offered by management as to the prime quality of American Home's loans.  For

example, in its reports on American Home, Citigroup noted that, "[American Home's] closest

competitors in terms of sheer origination capacity and branches would have to be some of the

public sub-prime originators… However, as previously noted, [American Home] targets prime

quality loans."  (Emphasis added).  Indeed, as late as March 2007, after the bottom had begun to

drop out of the subprime market, analysts at RBC Capital Markets distinguished American Home

due to the purported quality of the Company's loans.  RBC's March 6, 2007 report gave

investors "A Friendly Reminder: AHM IS NOT A SUB-PRIME LENDER.  Less than one

percent of its origination volume is sub-prime, and there is negligible sub-prime exposure on

AHM's balance sheet."  (Emphasis in original).

## C.    AMERICAN HOME WAS DEPENDENT ON ITS CREDIT FACILITIES

69.    The loans American Home originated were funded with money the Company

borrowed through a variety of credit facilities, including warehouse lines of credit and

"repurchase agreements" – complex financing transactions whereby the Company sold loans that it agreed to later repurchase. As a report by RBC Capital Markets summarized on August 1, 2007, after the Company announced the collapse of its credit facilities, "Warehouse lines are the linchpin of every mortgage production business – if they go away, the business ceases to function, so this represents an extremely damaging turn of events." Confidential Witness 2 stated that Defendant Hozie was charged with overseeing the lines of credit, along with Defendant Strauss.

70. The Company's credit facilities were collateralized by the Company's own loans, and the quality of those loans was therefore critical to the maintenance of the Company's lines of credit. Warehouse lines used to originate new loans had to be repaid once those loans were sold, a requirement that impacted the Company's liquidity as American Home's loans were increasingly rejected by secondary market investors or returned to it. According to Confidential Witness 2, in cases where the Company was forced to repay a warehouse lender for an unsold loan, American Home employees referred to it internally as a "capital loan," because it was being financed by Company capital rather than by one of AHM's warehouse credit lines.

## D.     LOAN SALES AND LOANS HELD FOR INVESTMENT

71. Prior to organizing as a REIT at the end of 2003, the Company profited almost entirely from gains on the sale of "whole" loans, i.e., unsecuritized loans, into the secondary market. As the Company's 2005 Form 10-K stated, "Prior to our conversion into a Real Estate Investment Trust ('REIT') in December 2003, our business strategy was to sell substantially all of the loans that we originated and recognize gains on sales of such loans." By early 2004, however, the Company began to dispose of the loans it originated in three ways:  selling pools of loans into the secondary market; selling MBS; and retaining loans and MBS for investment purposes. After shifting its strategy, the Company's assets exploded from less than $6 billion at

the start of the Class Period to over $18 billion at the end of 2006.  By March 31, 2007, the Company had over $6 billion worth of mortgage loans held for investment.

72.     Significantly, American Home's sales of whole loans and MBS were conditioned on the right of secondary market investors to have the Company repurchase those loans if they violated the Company's representations and warranties regarding the quality of the loans, or if the loans defaulted or became delinquent during the first 90 days following origination (an "Early Payment Default" or "EPD").

73.     Secondary market investors were entitled to and did conduct varying degrees of diligence on the loans, but were also entitled to rely upon the representations and warranties regardless of whether they identified violations through their own diligence.  As discussed below, American Home attempted to limit the due diligence secondary market purchasers could conduct before purchasing its loans.

74.     Critically, if an investor determined that AHM had violated its representations and warranties, the investor could demand that the Company repurchase the loan any time after purchasing the loan.  The same was true of the right to return loans that defaulted or became delinquent within 90 days of origination:  according to Confidential Witness 1, secondary market investors could demand that American Home repurchase loans long after the early default or delinquency occurred.

75.     While the Company was required to account for its liability to repurchase loans sold on the secondary market, throughout most of the Class Period, the Company represented that liability to be "immaterial" due to the quality of its underwriting program.  According to the Company, its repurchase liability did not significantly increase even as the volume of loans it sold multiplied.  For example, for the fourth quarter of 2006, the extent of the disclosed liability

for repurchases was just $6.9 million, during a period when the Company sold over $14 billion in new mortgages – more loans than American Home sold during all of 2004.

76.     The loans American Home did not sell were transferred to its non-taxable "Qualified REIT subsidiary" or "QRS" – which was referred to by Company employees as "the REIT" – where they were held in an investment portfolio.  By retaining a portion of the loans it originated, the Company supplemented its profits from selling loans and MBS with an income stream based on interest payments.[4]  In AHM's January 12, 2006 conference call with analysts, Defendant Strauss explained that, "we create a pool of loans; we carry the cost, but we put them into the REIT, and it produces those high income streams."

77.     In addition to its loan and MBS portfolio, the Company retained mortgage servicing rights ("MSRs"), i.e., the rights to service the whole and securitized loans that it sold. American Home claimed an impressive asset value for its loan servicing business.   As of December 31, 2004, the carrying value of its MSRs was $151.4 million, which increased to $319.7 million as of December 31, 2005 and to $506.3 million a year later.  By March 31, 2007, the carrying value of its MSRs had reached $525.5 million.

**VII.     FACTUAL ALLEGATIONS PERTINENT TO CLAIMS FOR RELIEF**

78.     The Defendants named below in Counts I-VI are liable for violations of the Securities Act arising out of the sale of American Home shares on the 2005 Offering and/or 2007 Offering pursuant to the registration statements and prospectuses, defined below, which contained untrue statements of material fact.  The Defendants named below in Counts VII and VIII are liable for violations of the Exchange Act arising out of the sale of American Home common and preferred shares during the Class Period.

---

[4] Net interest income is the difference between the interest income AHM earned on its mortgage loans and MBS and the interest it paid to its financers, plus expenses.

## A.   AMERICAN HOME DEVELOPED HIGHLY RISKY MORTGAGE PRODUCTS

79.     Despite portraying itself as a prime lender focused on high-quality borrowers, the Company instead provided loans to virtually all applicants – regardless of the borrowers' creditworthiness or their ability to document income, assets, employment or the other factors that AHM purported to evaluate in underwriting loans.  Indeed, the Company developed and marketed to consumers highly risky loan products that were designed to ensure that any borrower – regardless of creditworthiness – would be able to qualify for an American Home loan.  These included the Company's "Choice" loan products and its use of adjustable rate mortgages ("ARMs"), including "Pay Option ARMs" that allowed borrowers to make minimal monthly payments.  The loose underwriting standards for these loans enabled the Company to expand its underwriting program by targeting borrowers who could not qualify for prime rates.

80.     AHM's compensation system encouraged the issuance of these risky loans for large dollar amounts.  Confidential Witness 3 explained that loan officers were made to push borrowers into Choice loans and Pay Option ARMs because they were far more profitable.  The fact that American Home pressured employees to sell Pay Option ARMs was corroborated by Confidential Witness 4, a former branch manager, who explained that he was pushed to sell Pay Option ARM loans.  Confidential Witness 5, a loan consultant for AHM who worked directly with potential mortgage clients and completed mortgage applications, confirmed that the Company's commission structure rewarded employees for generating riskier loans.

81.     The Company's incentive commission structure was designed to encourage a high volume of closed loans, rather than scrutiny of the underwriting and quality of the loans.  For example, as an internal presentation entitled "Incentive Compensation" that discussed new incentive compensation measures to be implemented in 2005 made clear, underwriters were required to review and approve a certain number of loans – 5 per day and 100 per month – in

27

order to qualify for incentive compensation. Loan "Validators" and "Closers" were similarly paid by volume, with minimum closed loans of 18 and 80, respectively, required in order to qualify for bonuses for each additional loan closed.

### 1.   Choice Loans: "Subprime Masked as a Prime Loan"

82.   Despite its public assurances that it was a prime lender, the Choice loans were high-risk loans that were, in many respects, not distinguishable from the loans issued by subprime lenders. According to Confidential Witness 2, Choice was designed so that "anyone with a pulse" would qualify for a loan. Confidential Witness 2 described the Choice loans as the "motherload of crap," explaining that, under the Choice guidelines, underwriters could approve "subprime-type crap, subprime-type risk." According to Confidential Witness 2, these loans were "really subprime masked as a prime loan." This was confirmed by Confidential Witness 6, a Senior Underwriter, who described the Choice products as "theoretically subprime" and said the Company "got into real garbage loans."

83.   Critically, the Choice loans required little or no documentation beyond the borrower's FICO credit score, enabling the loan officers to issue loans based solely on third party data with no verification by the Company of the borrower's income, assets or employment. Confidential Witness 6 described these as "liar poker loans" because a borrower could state any level of income or assets and be approved for a loan.

84.   Indeed, an internal AHM e-mail sent on November 2, 2006, from Steve Somerman, an AHM Senior Vice President of Product and Sales Support in California and co-creator of the Company's "Choice Point Loans" program, to the Company's loan officers nationwide, stated that the Company would make a loan to virtually any borrower, regardless of the borrower's ability to verify his income, assets or even employment. That e-mail specifically

encouraged loan officers to make a variety of loans that were inherently risky and extremely susceptible to delinquencies and default, including (1) stated income loans, where both the income and assets of the borrower were taken as stated on the credit application without verification; (2) "NINA" or No Income, No Asset loans, which allowed for loans to be made without any disclosure of the borrower's income or assets; and (3) "No Doc" loans, which allowed for loans to be made to borrowers who did not disclose their income, assets or employment history:

> <u>At AHM we pride ourselves on having a loan for virtually any borrower, regardless of whether or not they have the ability to verify their Income, Assets or Employment history</u>.  With In-house programs that are able to cover 98% of all borrowers' documentation situations, the key to closing a loan is the ability to understand and utilize the proper doc type to fit the circumstances.   Review the AHM program summaries for the loan document types they allow and move forward successfully, meeting your borrowers needs.
>
> • **Full Doc ("FIFA")**
> Income, Assets, and a 2 year Employment history are listed on the 1003 and verified.  For borrowers who can provide standard verifications, this will typically provide the lowest cost pricing.  With Choice programs your borrower has the opportunity to take advantage of many additional and more flexible qualifying criteria such as a 1yr employment history, income verification using bank statements, or No Reserve requirements.
>
> • **Standard Income / Full Asset ("NIV" or "SIFA")**
> Occasionally, a borrower with stable income may not be able to prove it. This application type allows the borrowers to "state" their level of income on the 1003.  As long as the amount stated is reasonable relative to the borrower's verified job title, <u>the income does not need to be verified</u>. Employment history and Assets are still verified as usual.
>
> • **Full Income / States Assets ("FISA")**
> Employment history and Income are verified using standard methodology, but <u>this documentation option waives the need for bank statements or VOD forms to verify assets</u>.
>
> • **No Ratio ("No Ratio")**
> <u>With this application type, a borrower doesn't even need to list their monthly income on the 1003</u>.  Employment history and Assets are verified, but <u>there is no Debt-to-Income Ratio calculated and no way to</u>

impose a "reasonability" test or compare the loan amount to the
borrower's job title.

• **Stated Income / Stated Assets ("SISA")**
Only a two-year continuous employment history needs to be verified with
this documentation type.  Both Income (if reasonable) and Assets are
taken as they are stated on the borrower's credit application.  Employment
history is verified as normal.

• **NINA (No Income and No Asset)**
Based on the borrower's good credit history and credit scores only, this
application type allows for financing without disclosing any Income or
Assets on the 1003 whatsoever but the Employment information on the
1003 must be disclosed and verified.

• **No Doc ("No Doc")**
Based on the borrower's good credit history and credit scores only, this
application type allows for financing without disclosing any Income,
Assets or Employment information on the 1003 whatsoever.

(Emphasis added.)

85.     That e-mail concluded with the instruction that American Home's "objective" in

making loans was to "approve virtually every borrower loan profile."

86.     The "Choice" loans were described by Confidential Witness 7, the Vice President

in charge of Sales and Production for the Mid-Central and Upper Midwest, as "ridiculous" and

"really, really out there."   Similarly, Confidential Witness 4, a former American Home branch

manager, said that the Company was "right in the forefront with risky loans" and had been since

2004.   Confidential Witness 4 explained that, during internal conference calls to discuss the

Choice loan products, Sumerman stressed to American Home employees that the Company did

not want to see documentation concerning borrowers' income or creditworthiness – it just

wanted to make the loans.

87.     This is corroborated by an internal American Home presentation entitled "Credit

Update" dated October 2005.   That presentation included "Policy Statement Guidelines" that

reflected the Company's policy of ignoring indications that its borrowers were not creditworthy

by instructing underwriters not to examine documentation or the borrowers' ability to repay their mortgages. Those "Guidelines" included the admonition that loan officers should "Obtain the least amount of documentation required" and "Always accept copies of documents vs. originals (Gov't loans excluded)."

88.     Confidential Witness 8, a Quality Control Underwriter who examined loans that went into default or were returned to American Home by secondary market investors, stated that:

> Most of the borrowers who applied for SIFA or SISA loans lied about their income or the nature of their employment. American Home offered a lot of stated income and no documentation loan programs. In fact, even if you had a 620 or 640 credit score, you could get a no-doc loan.

89.     Confidential witnesses Confidential Witness 6 and Confidential Witness 9 confirmed that the Company's reliance on credit scores was problematic because those scores reflected primarily the borrower's credit history, and <u>not</u> his ability to make the monthly payments for the mortgage at issue. The fact that a borrower had never previously defaulted on a loan, which might result in a high FICO score, said nothing about how his current employment, income, assets and other debt obligations would impact his ability to make the monthly payments on the mortgage for which he was applying.

90.     According to Confidential Witness 9, a Senior Risk Analyst who reviewed loan files for underwriting compliance and fraud, the Company's reliance on FICO scores was misplaced.

> Almost anyone could get a loan from American Home if you had a high FICO score. But a high FICO score doesn't mean much. You could have a high FICO score because you have no past credit track record or because your credit cards have low limits.

91.     Indeed, the Company's own internal underwriting guidelines for the Choice loans explicitly conceded that borrowers with FICO credit scores between 620 and 640 presented a

high degree of risk, and that borrowers with FICO scores below 620 – the very borrower the

Company was targeting – had a "statistically very high" likelihood of default:

> The following is how FICO Score rank-orders default risk:
>
> **FICO Scores of 720 and above:**  The risk of default is statistically very low for applicants who have credit scores in this range.
>
> **FICO Scores Between 660 and 719:**  The risk of default is low for applicants who have credit scores in this range.
>
> **FICO Scores Between 620 and 659:**  From a statistical perspective, applicants who have credit scores in this range begin to represent a higher degree of default risk.
>
> **FICO Scores Below 620:**  The risk of default is statistically very high for applicants who have credit scores in this range.  Although these applicants account for a relatively small percentage of the total population of potential borrowers who have credit histories on file at a major repository, research shows that they account for a disproportionate percentage of the eventual defaults.
>
> In no case may a loan be approved with a FICO score less than 500.

92.     Internal Company documents detailing the underwriting guidelines for the Choice

program demonstrate that American Home geared its loans to borrowers with poor credit.  For

example, those guidelines permitted the issuance of no document loans to borrowers with FICO

scores of just 620 for up to $1 million.  Indeed, no document loans were available for borrowers

with FICO scores of 600, and even borrowers with FICO scores as low as 580 could obtain loans

with additional documentation.

93.     Communications between the "Choice Support" staff assigned to assist loan

officers with the sales of the Choice products and the loan officers originating the loans further

demonstrate that Choice was designed to enable the Company to issue loans to borrowers with

poor credit.  For example, an internal "Program Overview" for the Company's Choice loans

stated that "The Choice Spectrum Series consists of a broad range of programs to meet almost

any financing situation."   Indeed, those internal documents made clear that American Home willingly loaned to – and in fact targeted – borrowers with "serious credit issues," including borrowers who had <u>recently</u> filed for bankruptcy, experienced foreclosure, or had no credit history.   In fact, the Program Overview specifically encouraged loan officers to make loans to those borrowers who had extremely poor credit:

### <u>*Choice Grade I: Choice Expanded<sup>TM</sup> 1st / Choice Platinum<sup>TM</sup> 2nd*</u>

Our premium level Alternative product, ***Choice Expanded & Choice Platinum*** offer 100% financing on all doc types from Full Doc to No Doc, with pricing that rivals A-paper rates.

### <u>*Choice Grade II: Choice "A"<sup>TM</sup> 1st / Choice Platinum<sup>TM</sup> 2nd*</u>

***Choice "A" & Choice Premiere*** permit 100% financing on all doc types and offer the flexibility to finance borrowers with minor credit problems, as well as the opportunity to build alternative credit.

### <u>*Choice Grade III: Choice Flex<sup>TM</sup> 1st / and 2nd TDs*</u>

With extremely relaxed credit criteria, ***Choice Flex*** is a FICO based program that allows for 100% financing on Full and Reduced doc types with No Seasoning requirements for Assets, Bankruptcies, and most other major derogatory items.

### <u>***Choice Investor Series: Investor CSB, Investor XX and Investor LLL***</u>

Collectively offering financing <u>for borrowers with more serious credit issues</u>, these programs provide solutions for multiple mortgage lates, <u>recent bankruptcies or foreclosures, little or no traditional credit, and FICO scores as low as 500</u>.  These programs also offering 100% financing on all doc types <u>for borrowers who do not meet the credit criteria</u> of the standard Choice programs.

### <u>***Choice High CLTV: AH-Home Solutions***</u>

With financing options of up to 107%, the ***Home Solutions*** program allows borrowers to finance closing costs and pay off debt, with no down payment and no Mortgage Insurance required.

(Emphasis added.)

94.    Significantly, other internal documents confirm that American Home was providing loans to borrowers who had recently filed for bankruptcy or experienced "other major derogatory items."  For example, in response to an inquiry from an American Home loan officer about the Choice products, Kenneth Hefner, a Product Support executive in the Choice Support division sent an e-mail on May 27, 2005 touting the benefits of the Choice Investor loans described above.

> We use Investor XX for a number of different reasons:
>
> Pricing is generally better than Choice A (but not as good as Choice Expanded)
> 100% CLTV 1st / 2nd combos on FIFA and SIFA (sometimes with lower 2nd TD rates than Choice 2nds)
> Can use primary wage earner FICO on FIFA and SIFA
> 6% combined seller concession / gift funds allowed even on 100% financing
> No "current" credit needed
> Soft PPP available
> FICOs down to 500 with a sliding scale for Mtg lates, BK seasoning, and other derog credit
> 100% D/I guideline in same situations
> The list goes on…
>
> (Emphasis added.)

95.    In concluding that e-mail, Hefner noted "there are many instances where Choice programs can yield better pricing than A-paper and close loans with much less documentation than what might be needed for a conventional loan."  Notably, the e-mail "signature" with Hefner's name and contact information included the following plug for another Choice product, Choice Flex:  "Choice Flex is here!  This program offers 100% financing down to a 580 FICO score (full doc only), requires no BK seasoning, disregards all mortgage lates less than 120 days and has minimal asset verification requirements."

96.     Indeed, the underwriting standards for Choice Flex were incredibly lax.   A January 11, 2005 e-mail from Robert Trahan, a Senior Vice President in Product Support, touted the benefits of Choice Flex for "clients with issues":

> If your clients have issues (from a credit documentation point of view), this new addition to the Choice Series is your answer.
>
> • Fico driven product
> • Automated Underwriting System decisioning
> • ARM and Fixed Product available – fully amortized and interest-only available
> • Further down the credit ladder from Choice A
> • FIFA, LITE, SIFA and No Doc income types
>
> ***Want More ???***
>
> How about this:
>
> • <u>Mortgage rating ignored less than 120 days late</u>
> • <u>One day from a Bankruptcy Discharge</u>
> • 6% seller concessions
> • No Mortgage Insurance
> • Bank Statement Program
> • FIFA: 100% LTV down to a 580 credit score
> • SIFA: 100% LTV down to a 620 credit score
> • SIFA: 100% CLTV down to a 600 credit score
> • 540 minimum FICO score

(Emphasis added.)

97.     Accordingly, American Home loan officers could sell mortgages to borrowers <u>one day out of bankruptcy</u> with <u>FICO scores as low as 580</u> for 100% of property value.  As a "FICO driven product" permitting stated income loans for the full property value, the Company was not testing the borrower's ability to afford his mortgage payments, and was placing itself on the hook for the full value of the property.  Therefore, any decrease in the property value would result in a loss in the event of a default.

98.     The Company's loan officers also had flexibility to switch between the various levels of documentation, described above, so that they could effectively see what (if any)

documentation the borrower could provide, and then find an application type that would allow them to close the loan.   An internal AHM e-mail sent from Melissa Johnston to Company managers, loan officers and underwriters on October 4, 2006, explained how loan officers could modify loan applications until they found a way to close the loan:

> Loan Soft was created to give the Loan Officers the ability to structure and restructure loans until they find a solution on how to do the loan.  The LO can play around with the loan all they want in Loan Soft as long as it has NOT been released to processing.   Once it has been released, we are extremely limited on what programs changes we allow to be made.

99.   The lax underwriting standards for the Choice loans are further established by an internal "Credit Update" presentation dated October 2005.   Under the heading "Guideline Interpretation," that presentation set forth <u>thirty pages</u> of revised credit factors which made clear that the Company's underwriting guidelines were to be either relaxed substantially or essentially rendered meaningless, in order to allow the Company to make loans to high-risk borrowers. Specifically, on each page, the Company set forth the previous "interpretation" of the underwriting guidelines under a heading entitled "What we observed in [our] prior history" alongside the new "interpretation" under a heading entitled "Where We Are Now."   These new "guideline interpretations" included:

- not requiring verification of income sources on stated income loans;

- reducing the time that need have passed since the borrower was in bankruptcy or credit counseling;

- reducing the required documentation for self-employed borrowers; and

- broadening the acceptable use of second and third loans to cover the full property value.

100.   That same document also set forth the Company's "Quality Control Philosophy" regarding the Company's lending practices.   As that document made clear, underwriters and loan

officers were to adhere to a philosophy that "Very few things are actually NIQ's [Not Investment Quality]" when making and approving loans.

101.    Similarly, an internal "Risk Management Update" presentation from October 2005 reflected a similar loosening of underwriting standards for the Choice loans, including:

- permitting borrowers with no housing history;

- reducing the time period during which the borrower's credit history is reviewed;

- decreasing the time since the borrower has been in bankruptcy or credit counseling;

- reducing acceptable debt-to-income ratios; and

- eliminating the need for a second home appraisal.

102.    Confidential Witness 33, a Senior Underwriter at AHM, stated that, until November 2006, the majority of the loans being originated by the Company were low documentation, no documentation or stated income loans, which were made with LTV ratios of up to 100%.

103.    While borrowers with comparable FICO scores might qualify for prime loans if they could document appropriate levels of income and assets, thus qualifying their mortgages for sale to Fannie Mae or Freddie Mac, the Company's decision to not document income and assets meant that the borrowers' true creditworthiness was never known.  The Company described loans to these borrowers as low-risk Alt-A mortgages when, in fact, there was little to distinguish them from the loans being issued by subprime lenders.

### 2.    Adjustable Rate Mortgages

104.    The Company also used adjustable rate mortgages, or "ARMs" to extend loans to borrowers who could not afford them.  While an ARM loan is not necessarily a problematic product, or one tied to borrowers with poor credit, witnesses explained that American Home used

these loans to target high-risk borrowers.  Specifically, as discussed below, in issuing ARM

loans American Home did not determine whether the borrower was qualified to afford the actual

cost of the loan, but rather, only ensured that the borrower could afford the much lower initial

"teaser" rates that are the primary feature of ARMs.  During the Class Period, ARMs were the

largest category of loans originated by AHM, representing 42.1% of loans originated in 2005 and

49.6% in 2006.

106.    ARMs are mortgage loans with a variable interest rate that fluctuates over the life

of the loan.  ARMs can be enticing to borrowers because they feature an initial teaser rate,

typically set below market, which subsequently increases to the fully indexed rate.

106.    Interest only ARMs, or IOs, are a type of ARM which permits the borrower to

repay a fixed interest rate for a predetermined initial period, without repaying any principal.

Following that period, the payments begin to increase, amortizing so that the principal is paid off

by the time the loan matures.  This sudden increase can produce a tremendous payment shock.

107.    A variant of the interest only ARM is a Pay Option ARM.  A Pay Option ARM is

a mortgage that gives the borrower a choice of four payment methods: fully amortizing over 30

years; fully amortizing over 15 years; interest-only payments; or a payment based on a below-

market "payment rate" that fails to cover even the interest which is due.  If borrowers choose to

pay less than the interest only rate, the principal balance of the loan grows over time instead of

declining, a condition called "negative amortization."  Thus, use of the monthly minimum

payment feature can cause the borrower to wind up owing more principal than was owed when

he or she took out the loan.  Moreover, as the principal increases, the monthly payment owed by

the borrower will also increase, meaning that the unpaid portion of the monthly payment will

grow larger and larger, and the principal will increase at an accelerating rate.  Although there

may be legitimate uses for Pay Option ARMs, such as a borrower whose monthly income fluctuates and may occasionally need to make a smaller monthly payment, many borrowers can only afford the minimum monthly payment, and are unable to afford even the full teaser rates, let alone the adjusted index rate.  Accordingly, Pay Option ARMs carry a high risk of borrower default when the minimum payment period ends.

108.    As Confidential Witness 11, a former American Home sales manager who oversaw loan sales and underwriting, explained it, a negative amortization loan "bets that the collateral you're lending against will keep appreciating in value," and, when the property values fail to appreciate, "you're left with a piece of collateral that has gone down in value and a loan balance that has gone up."  According to Confidential Witness 11, the Company "wrote too many of those and wrote too aggressively."

109.    Confidential Witness 2 was told by Dena Kwaschyn, the Executive Vice President and Director of Operations, and Laura Ogden, a Vice President of Corporate Operations Support, that Defendant Strauss wanted American Home to begin offering Pay Option ARMs but lacked the expertise to develop a Pay Option ARM product.  At Confidential Witness 2's suggestion, the Company obtained copies of materials being used by Washington Mutual concerning that bank's Pay Option ARM product and used it to develop its own competing product.

110.    Confidential Witness 2 explained that the Pay Option ARMs, while risky, were originally intended to be used as a product to attract borrowers who were buying investment properties.  Such buyers were expected to maintain their mortgages for only a short time, until the investment property could be re-sold, and would hopefully not encounter the typical trap of a Pay Option ARM, in which the loan principal increases because the minimum payment – below the interest only payment – is being made.  However, what actually happened is that American

Home used the Pay Option ARM to help borrowers finance extravagant home purchases that were beyond their means. Confidential Witness 2 stated that the Pay Option ARMs were even riskier than the Choice loans, stating "They were poison. They were horrible."

111.     Another adjustable loan sold by American Home was the Monthly Treasury Average index or "MTA" loan, also known as "cash flow option ARMs." MTA loans are a variant of Pay Option loans that were offered with initial teaser rates set far below market rate. That teaser rate would expire after a short period – one to three months – at which time the interest rate on the loan adjusted to the Monthly Treasury Average index, plus an additional margin. For example, Confidential Witness 9 described one of the Company's most popular products as a loan with an initial teaser rate of just 1.4% which jumped after only one month to a rate between 6% and 8%. According to Confidential Witness 12, the Company was unable to sell its MTA loans in the secondary market.

### 3.     American Home Improperly Underwrote ARM Loans

112.     American Home exponentially increased the risk associated with its ARM loans by failing to properly underwrite them. According to Confidential Witness 2, in issuing ARMs, the Company improperly underwrote the loans based upon the minimum rate being paid, which was far lower than the minimum principal payment or even the interest only payment. This was corroborated by Confidential Witness 13, who stated that, in 2005 and 2006, the Company underwrote ARMs at the low initial teaser rate, rather than at the "fully-indexed rate." Thus, borrowers were evaluated based on their purported ability to pay the short-term teaser rates, rather than the actual rate the borrower would pay for the life of the loan. In other words, borrowers who would not have qualified for a loan based on their ability to pay the actual rates were nevertheless approved based on the consideration of teaser rates, and American Home was

able to continue to report growth without accounting for the significant risk that such borrowers would default once the rate adjusted.

113.   According to Confidential Witness 14, borrowers could be approved for a Pay Option ARM based on their ability to pay teaser rates of as low as 1%, regardless of their ability to afford the adjusted rate that they would be subject to once the teaser expired:

> It always blew my mind that you could qualify a borrower based on a 1% teaser rate when there was no way that the borrower could make the payments once the loan reset to the fully amortizing rate.  You could look at these loans and see that the payments were going to consume 60% of the borrower's gross income once the rate reset.  The borrowers who took out these loans had a kind of desperation. They were praying that over the next 12 months something would change in their lives.

114.   Confidential Witness 14 said that it was not until early 2007 that the Company began to tighten its underwriting of ARMs, by adding a slight margin to the teaser rate for underwriting purposes, so that loan approval would be based on the borrower's ability to afford the teaser rate plus a margin of 1.5 to 2%.  "AHM didn't start to qualify people based on a fully amortizing rate until they had a huge number of loans they couldn't sell," Confidential Witness 14 said.  Confidential Witness 13 confirmed that the Company didn't underwrite ARMs by qualifying borrowers at the fully-indexed rate until early 2007.  According to Confidential Witness 13, by the time American Home made this change, it was too late – the Company already held large quantities of ARMs that were vulnerable to default once the fully-indexed rate went into effect.  Confidential Witness 14 further explained that the Company was forced to tighten its underwriting of second lien mortgages because it was unable to sell those loans on the secondary market based on its then-current underwriting guidelines.

115.   As with the Choice loans, ARM loans could be underwritten with stated income, stated assets or no documentation.  According to Confidential Witness 11, the combination of ARM loans and the failure to verify income, assets or employment was exceptionally risky.  The

Company "got so aggressive in their product types, selling these Option ARMs and allowing people who couldn't [prove] job or income [to get loans]."

116.    During the Class Period, AHM's management increasingly pushed Pay Option ARMs.  In AHM's April 26, 2006 earnings call, Strauss said, "We are still very much believers in Pay Option ARMs.  We like them, as you know, because they offer a relatively high return[.]"  Moreover, in a September 21, 2006 presentation at RBC Financial Institutions Conference, Strauss dismissed concerns that borrowers did not understand the risk of payment shock carried by Pay Option ARMs, saying, "I believe that in a very large part, the consumer does understand what they're buying.  I think where was [sic] this product is most prevalent, especially in California and Florida, consumers have come to know this product over the years."

117.    AHM's loan production numbers corroborate management's growing enthusiasm for Pay Option ARMs.  On AHM's October 26, 2005 earnings call, Strauss stated that between 10 and 12 percent of the Company's $13.7 billion in third quarter loan production consisted of Pay Option ARMs.  On the call, Strauss added that the Company retained rather than sold these loans.  Less than a year later, on AHM's April 26, 2006 earnings call, Strauss stated that in the first quarter of 2006, 38% of the $970 million in self-originated loans that the Company had retained in its investment portfolio consisted of Pay Option ARMs.

118.    By the end of the Class Period, AHM's portfolio consisted in large part of Pay Option ARMs.  AHM's 2006 Form 10-K stated that, as of December 31, 2006, Pay Option ARMs were 25% of the Company's investment portfolio.  AHM's Form 10-Q for the first quarter of 2007 stated that, as of March 31, 2007, Pay Option ARMs were 32.7% of the Company's portfolio.

**B.      AMERICAN HOME VIOLATED ITS UNDERWRITING GUIDELINES**

119.    Contrary to its public representations that the Company had "implemented strict procedures to ensure quality control and conformity to underwriting standards and minimize the risk of being required to repurchase loans," throughout the Class Period, American Home issued loans in violation of the Company's underwriting guidelines.   Former American Home employees described underwriters being consistently overruled by sales staff when they challenged questionable loans, and stated that exceptions to the Company's underwriting guidelines were routine.   The failure to properly underwrite loans exacerbated the already high risk associated with the Choice loans and ARMs.

120.    According to Confidential Witness 33, a former Senior Underwriter at AHM, underwriters' objections to loans were frequently vetoed.   Confidential Witness 33 stated that underwriters would "say[] 'no way' on a lot of things, 'I would never give a borrower a loan like this,'" but the loans would be approved nonetheless.   According to Confidential Witness 33, loans would be approved over the underwriter's objection if he refused to put his name on a loan. "It happened more than it should have."

121.    Confidential Witness 33's account is corroborated by another Senior Underwriter, Confidential Witness 6, who explained that underwriters "were told not to decline the loan." Moreover, according to Confidential Witness 6, other employees would simply approve loans over the underwriter's objection, even after being informed of fraud in the loan application. According to Confidential Witness 2, senior management, including Defendants Strauss and Hozie, pressured the underwriters to approve loans.

122.    Such practices resulted in a huge number of defaults and concomitantly, repurchase demands by secondary market purchasers.   For example, Confidential Witness 6 was part of a group of 6-8 American Home underwriters who were brought to the Company's New

43

York headquarters from July 16-22, 2006, to review a group of approximately 700 loans that secondary market purchasers had demanded that the Company repurchase.  Confidential Witness 6 stated that none of those loans should have been issued in the first place.  According to Confidential Witness 6, the loan files evidenced missing documentation of creditworthiness and included numerous examples of loans that had been in default for months.  Confidential Witness 6 added that the other underwriters working with him found similar problems with the loans they reviewed.  At the time of that review, the Company had not yet taken any action to repurchase those loans, and Confidential Witness 6 stated that American Home was getting "under water" with such repurchase demands and lacked the liquidity to repurchase so many loans at the same time.

123.    Moreover, the Company permitted numerous "exceptions" to its underwriting standards.  Confidential Witness 14 explained that exceptions were always being made to the underwriting guidelines so that loans could be closed.  When Confidential Witness 14 staff raised concern with the sales department about loans that did not meet the underwriting guidelines, the sales department would contact the Company's Melville, New York headquarters to approve an exception to those guidelines so that the loan could be completed.  Examples of such exceptions included reducing the required credit score or increasing the loan to value ratio.  Confidential Witness 14 stated that, when the exception at issue involved accepting a reduced credit score, it was commonplace to overrule the objections of the underwriters in order to complete the loan.

124.    Confidential Witness 15, who audited loan files in American Home's Post Closing Review Group from January 2005 through August 2005, confirmed that underwriters were frequently vetoed when they objected to loan originations.   Confidential Witness 15

explained that loan officers frequently "went around" Andrew Valentine, the Senior Vice President of Post Closing, if he refused to approve a loan. Loan officers would disregard Valentine's veto and instead obtain approval from Lucille Favarro, Operations Manager for the Company's Wholesale Lending Division. According to Confidential Witness 15, Defendant Strauss ultimately replaced Valentine with Favarro. "They put Favarro over Valentine because Valentine wouldn't override loans." Confidential Witness 15 later learned from colleagues that Favarro terminated several employees who refused to close loans that lacked proper documentation.

125. Confidential Witness 15 also said that when loans were rejected by an underwriter, settlement agents would go over their heads to have the loan approved. Indeed, Confidential Witness 15 stated that the Company's underwriters were overridden by the loan officers and operations managers "all the time" because the latter were under "intense pressure" to close loans. "If the loan officer and operations managers wanted to get the loan out, it got out." Confidential Witness 15 explained that loan officers at American Home even had the authority to schedule loan closings before underwriters had even reviewed the loan files – a practice that was "unheard of" in the industry.

126. Similarly, according to Confidential Witness 16, whose job at American Home from July 2005 through April 2007 was to review the underwriting of loans before they were sold to secondary market investors, exceptions to underwriting guidelines were made "all the time." For example, borrowers who claimed to be self employed were not required to prove that they had been in business for a specified period of time, as required by the underwriting guidelines. Confidential Witness 16's group was directly overseen by Executive Vice President and Director of Capital Markets Robert Johnson, who reported directly to Defendant Strauss.

127.     Indeed, finding "exceptions" to the underwriting standards was so pervasive that, in late 2004, the Company expanded the Credit Risk Management Group into what became known as the "Exceptions Desk."  The Exceptions Desk was staffed with Senior Underwriters authorized to approve underwriting exceptions.  According to Confidential Witness 2, Defendant Strauss established the Company's policy for granting exceptions and the guidelines were very loose.  Confidential Witness 2 stated that "exceptions were rampant" and that it was "very rare" when the Exceptions Desk declined a loan.

128.     The October 2005 "Credit Update" presentation discussed above – which stated that American Home's number one policy statement guideline was to "obtain the least amount of documentation" from the borrower – also addressed the exceptions process and the need to "enhance our exception process."  That presentation made clear that underwriters and validators now had "discretion" to "interpret" the guidelines in such a way to approve exceptions "without requiring an exception form to be completed."  The "Policy Statement Guidelines" in that presentation stated that "Level 5" Senior  Underwriters would "clear the conditions in question" with "no re-underwriting of loan required," meaning that the Senior Underwriter would focus solely on granting the requested exception and not digging into the loan file to review the underwriting and verify its accuracy.

129.     Indeed, even when misstatements were discovered in the loan files, Company executives would still approve the loans.  Confidential Witness 4, a former branch manager, explained that when underwriters in his office identified fraud in loan files, regional managers would assign those loans to another underwriter so that they would be approved – a situation that he said occurred repeatedly in 2005 and 2006.

130.    The Company did not even comply with the minimal requirement that the claimed income supporting a "Stated Income" loan be subjected to a reasonability test, as indicated in the above-cited e-mail from Somerman describing the Choice loans.  According to Confidential Witness 14, an AHM Vice President for Direct Consumer Lending, the Company never had a reasonability test for its Alt-A or other non-conforming loans.  Confidential Witness 14 stated that, rather than verifying that a borrower's claimed income was consistent with his purported employment and experience level, as the guidelines required, the Company simply accepted the borrower's stated income without verification.  Confidential Witness 15 confirmed that when he began reviewing loan files in the Post Closing Division in January 2005, the Company was not conducting a reasonability test.  Confidential Witness 14 stated that the Company was in the process of implementing a reasonability test in the final months of its existence, but that it was never fully implemented.

131.    Confidential Witness 14 explained that, even if an underwriter questioned the reasonability of a borrower's stated income, "a sales manager would have gotten on the horn and called someone higher in rank and the loan would get done."  Moreover, Confidential Witness 14 stated that, if a borrower's salary did not appear sufficient to qualify him for a given loan, the Company would simply place him into a loan that required no documentation of income in lieu of a stated income loan.  Thus, rather than an application with an implausible, unverified stated income, the Company would have an application with no income and, therefore, nothing to which a reasonability test could even be applied.

132.    Moreover, the Company provided stated income loans to borrowers who could have easily documented their income.  According to Confidential Witness 9, the Company even issued stated income loans to W-2 wage earners – borrowers whose income could be easily

verified by simply submitting their employer-generated W-2 form to American Home.  The only reason to provide such a borrower with a stated income loan was to permit him to claim an income greater than actually earned so as to qualify for a larger loan.

133.   Confidential Witness 17, who audited American Home loans that were sold to investors, corroborated that this occurred.  Specifically, Confidential Witness 17 explained that, in reviewing files of repurchased loans, he identified loans that had been closed as stated income loans where the borrower clearly did not qualify for such loan, as evidenced by certain documentation of the borrower's income in the loan file.  According to Confidential Witness 17, in such cases the loan officer had changed the loan application type after determining that the borrower's income was too low to qualify for a stated income loan, and changed the application to a no documentation loan but simply forgotten to "clean out the loan file."

134.   Confidential Witness 8, who audited loan underwriting, confirmed that the reasonability test was not applied because loan officers wanted to close loans in order to earn their commissions.  Confidential Witness 8 further explained that "A lot of the problem lies with the salespeople.  Greed just took over.  The salespeople wanted to get loans in the door in any way that they could."

135.   The Company also did not have appropriate controls in place to monitor and enforce compliance with underwriting guidelines.  According to Confidential Witness 9:

> As of November 2006, we were a new group at the company [which] didn't get the support [we] needed from upper management and the sales managers.  The salespeople didn't want us to ask questions about the loans they were originating. There was an attitude that if investors were still buying crap, why stop originating these loans?  If no one is slapping your hand, you will keep doing what you were doing before.  The underwriters didn't do their jobs.  They were lax, very lax. They didn't do verbal verification of deposit (VOD) and verification of employment (VOE) like they were supposed to.  People saw what was going on, but no one said anything.

136.   Beyond failing to properly underwrite files to determine borrowers' creditworthiness, loans originated by American Home suffered from a host of documentary and other problems that rendered them unsalable, and which should have been identified and corrected during the underwriting and closing process.  Proper documentation and regulatory compliance is essential when loans are intended to be sold to secondary market investors, who frequently reject even conforming, properly underwritten loans that lack documentation or do not conform to controlling regulations.  Given that American Home intended the majority of its loans to be sold on the secondary markets, ensuring that all loans were closed properly and with the required documentation was critical to its business and operations.

137.   For example, Confidential Witness 15 stated that American Home consistently failed to comply with the Truth In Lending Act by understating the fees charged to borrowers. Confidential Witness 15 explained that this was a "major problem" for the Company, resulting in the payment of fines.  "If you understated [fees] on the Truth-In-Lending statement and on the final HUD form, you were in violation."

138.   According to Confidential Witness 2 who, as discussed in depth below, was in charge of the group that worked with unsalable loans, loans were rejected or returned to American Home by investors because the Company had charged improper fees to borrowers. Confidential Witness 2 identified similar problems that should have been identified by the Company's underwriters, such as false social security numbers provided by borrowers, that led to loans being rejected or returned to the Company.  According to Confidential Witness 2, American Home simply did not investigate whether social security numbers were legitimate before issuing a loan.

139. The statements of the above witnesses are further corroborated by allegations set forth in a complaint, and counter-claims set forth in an answer, filed in an action between American Home and Triad Guaranty Insurance Corp. ("Triad"), which provided mortgage insurance for certain American Home loans. Specifically, according to those pleadings, Triad identified numerous defaulted American Home mortgages with missing documentation, misstatements of borrowers' income and improper property appraisals and, consequently, terminated insurance coverage for those loans.

## C. AMERICAN HOME PURCHASED MORTGAGES THAT IT COULD NOT SELL

140. As noted above, an increasing percentage of the loans American Home "originated" were actually purchased from other lenders. These loans were handled by American Home's Correspondent Division, which handled nearly $6 billion in loans in 2006 alone. The goal of the Correspondent Division was to acquire loans from other lenders and quickly package and resell those loans to investors, together with the other loans the Company originated. Those loans would be purchased in pools from lenders such as Franklin American Mortgage, Baltimore American Mortgage and New York Mortgage.

141. The Company did not, however, oversee the underwriting of the loans acquired by the Correspondent Division. According to Confidential Witness 20, a credit supervisor in the Correspondent Division, and Confidential Witness 21, the head of the Post-Closing team in the Correspondent Division, the majority of the institutions from which the Correspondent Division purchased loans had "delegated underwriting authority," meaning that American Home itself did no underwriting on those loans. Confidential Witness 21 explained that, rather than test the underwriting of the loans purchased through the Correspondent Division, AHM instead chose to simply rely upon the representations and warranties provided by the institutions selling the loans, stating "they put a lot of faith in the correspondents' reps and warranties."

142.    Indeed, the Company purchased "stated income" loans through its Correspondent Division without taking steps to verify the borrowers' income, or even to perform a "reasonability test" that was the industry standard.  According to Confidential Witness 22, a loan auditor in the Correspondent Division, AHM was one of the only lenders that did not test the reasonability of the un-verified income of borrowers whose stated-income loans it acquired. This was corroborated by Confidential Witness 23, a Team Leader in the Correspondent Division, who stated that he performed no due diligence on the loans the Division purchased.

> Bank of America or Wells Fargo would never buy those high-risk stated-income loans, which is why they are still in business today and we are not. We had tons of those loans – and I mean tons – that we had purchased from correspondents and no one else would touch them, even if they were not in default.

143.    According to Confidential Witness 15, the Correspondent Division was supposed to purchase loans from lenders who conformed to American Home's guidelines, but instead purchased loans that it knew did not conform.  "We were buying dozens and dozens of loans on a weekly basis that we knew we couldn't sell to investors."

144.    Confidential Witness 22 was hired by Confidential Witness 21 to deal with the increasing volume of problematic loans acquired by the Correspondent Division.  According to Confidential Witness 21, the volume of nonconforming loans tripled in late 2006 and early 2007. While many of those loans might be subject to repurchase agreements, Confidential Witness 21 explained that American Home retained many nonconforming loans for too long – as much as eight months in some cases – and thereby made it impossible to force the correspondent lenders to repurchase loans.

145.    The loans American Home purchased through its Correspondent Division included high risk Pay Option ARMs.  According to Confidential Witness 13, the Company continued to aggressively purchase Pay Option ARMs in 2007 despite the fact that American

Home already held billions of dollars worth of such loans. Indeed, the Company knew that the Pay Option ARMs were defaulting at a high rate, and were not salable to investors. Confidential Witness 13 explained that pay-option ARMs were performing badly in the secondary mortgage market, and a high percentage of borrowers were making only the minimum payment, which meant that their principal balance was growing and their equity in the property was shrinking.

> Our loan servicing department in Texas told me that hundreds of borrowers using this type of loan were mailing the bank the keys to their homes. In early 2007, we were buying this same product over and over again – these ARMs that offered the four payment options. The company's traders were being told to bid aggressively for this stuff. What we were trying to buy was absurd. I kept asking [Executive Vice President and Director of Capital Markets] Bob Johnson why we were continuing to buy a product that was defaulting in the marketplace, but my concerns fell on deaf ears. These hybrid ARMs can make you a lot of money, but they are also very risky.

146. Confidential Witness 13 stated that he warned AHM Capital Markets executives Robert Johnson, Douglas Adair and Rick Pishalski that American Home should reduce its purchases of Pay Option ARMs, but that Johnson ignored this advice. Confidential Witness 13 also observed that American Home's main competitors were buying half the quantity of Pay Option ARMs that American Home was buying in early 2007.

147. Just as American Home could be required to repurchase the loans it sold on the secondary market that defaulted early or violated the Company's representations and warranties, so too could American Home request that its correspondent lenders repurchase loans from the Company. According to Confidential Witness 24, who worked in the Correspondent Division and monitored the Company's repurchase demands to correspondent lenders, AHM's repurchase demands to its correspondent exploded at the end of 2006. Previously, the Company had only requested that correspondents repurchase approximately 150 loans per months but, beginning in January 2007, the number increased to well over 500 repurchase demands per months.

Confidential Witness 24, who reviewed these loans, described them as loans with high LTV ratios to borrowers with poor credit.  At the same time that the Company more than tripled its repurchase demands, Confidential Witness 24 the Company continued to purchase more of the same caliber loans from the correspondent lenders, according to Confidential Witness 24.

**D.    AMERICAN HOME ACQUIRED "SWAMP LOANS" FROM WATERFIELD FINANCIAL CORPORATION**

148.    On January 20, 2006, American Home acquired Waterfield Financial Corporation ("Waterfield"), a mortgage lender owned by Union Federal Bank of Indianapolis.  Waterfield specialized in loans for manufactured housing.  In AHM's January 26, 2006 earnings call, Strauss touted the "experience and quality of the Waterfield origination franchise."  Strauss further averred that Waterfield "is one of the most established businesses in mortgage lending and is led by a highly skilled – by highly skilled managers, including strong loan officers and account executives."  Strauss concluded that "the Waterfield acquisition" (which, he noted, "includes Waterfield's inventory of recently originated loans pending sale, its loan application pipeline, and the fixtures associated with the operation of its origination business") "meets our Company's criteria of acquiring franchises that offer similar competitive propositions to the marketplace and our existing businesses."

149.    In truth, however, the loans AHM acquired from Waterfield were not salable because they were extremely old and, in many cases, predicated on improper underwriting. Confidential Witness 21, who worked at Waterfield until she joined American Home through the acquisition, described Waterfield's loans as "swamp loans" saying "they were extremely old loans" – as old as 24 months – "that we couldn't fix."  Confidential Witness 21 explained that secondary market investors were reluctant to purchase loans for "manufactured housing" – essentially, mobile homes – because such loans have higher default rates.

150.    The problems with the Waterfield loan portfolio were corroborated by Confidential Witness 16, whose group reviewed those loans before sales to secondary market purchasers were attempted.   Confidential Witness 16 described the loans acquired from Waterfield as "a mess" and "a fiasco," such that no one believed the Company would be able to close on sales of those loans.

## E.    AMERICAN HOME DUMPED UNSALABLE LOANS INTO ITS QUALIFIED REIT SUBSIDIARY

151.    Contrary to the Company's repeated representations that it was highly selective in the loans it held in its investment portfolio, that portfolio – held in American Home's Qualified REIT Subsidiary ("QRS"), which was referred to by employees as "the REIT" – became a dumping ground for poor quality loans.  Specifically, beginning in mid-2004, the Company dumped into the REIT the loans it was forced to repurchase from secondary market investors which could not be resold for full value.  Significantly, rather than sell those loans for a loss, the Company dumped them into the REIT and publicly reported their value at full value.  According to Confidential Witness 2 Defendant Strauss directed that non-performing loans be dumped into the REIT, and Strauss refused to sell any loans at any sort of a discount from face value.  By holding those loans at full value rather than marking them down to reflect their impairment, the Company overstated the value of its assets in its press releases and SEC filings, specifically, its loans held for investment and its MBS portfolio.  According to Confidential Witness 2 the loans in the REIT had become extremely problematic for the Company by early 2006.

152.    In September 2003, Defendant Strauss formed American Home's Loan Workout Group ("LWG") to address loans that the Company had been forced to repurchase but was unable to resell.   At that time, Confidential Witness 2 met with Defendant Strauss and Kwaschyn, who reported directly to Strauss.  Defendant Strauss informed Confidential Witness 2

at that meeting that he was aware of such problem loans, and that the Company simply did not have a handle on them.  Those loans were considered "scratch & dent" or "kitchen sink" loans, industry terms that referred to loans with incurable defects that could not be sold for full value in the secondary market.  Defendant Strauss made Confidential Witness 2 a Vice President in charge of the LWG, telling him that the Company needed someone "sharp" to form a workout group like other mortgage companies had.

153.    Confidential Witness 2's account is corroborated by an internal American Home document entitled "Back Office Operations Project Plan" dated September 23, 2003, which listed Dena Kwaschyn and Ken Alverson as responsible for the creation of a "Post-Closing Department" to "Flow of closing to 'scratch & dent' for sale."

154.    In December 2003, Confidential Witness 2 issued the first of the LWG's weekly reports, known as "Dashboard Reports," that tracked the loans being handled by his group.  The Dashboard Reports included two reports:  one that listed all of the nonperforming loans held by the Company, and a second listing the loans processed that week by the LWG.  According to Confidential Witness 2, that first Dashboard Report in December 2003 included problem loans dating back to 1999 that had been simply held by American Home for years after they proved unsalable.  Confidential Witness 2 concluded that only 15% were curable with a potential of being resold at full value.  Confidential Witness 2 explained that the remaining 85% were considered scratch & dent.  A December 11, 2003 report by the Loan Workout Group identifies 357 loans being reviewed, including numerous loans issued in 1998, 1999 and 2000.

155.    Confidential Witness 2 initially understood from Defendant Strauss that the purpose of the LWG was to "get a handle" on the unsalable loans AHM was holding, and to package and sell at a discount those "scratch & dent" loans that could not be cured.  According

to internal e-mails Confidential Witness 2 sent to his direct supervisors, Kwaschyn and Kenneth Alverson, the Chief Administrative Officer of LWG, secondary market investors were all valuing the scratch & dent loans offered by the LWG at less than full value.  For example, in an April 2, 2004 e-mail to Kwaschyn and Alverson, Confidential Witness 2 wrote:

> We have compiled a pool of 41 "Scratch and Dent" loans that I have put out to bid this week.  The initial offering was too low at 80.474%.  The offer came back from Security National Principal Acquisitions.  I have spoken to them again, and asked that they revisit the pool to see if they could come up on at least some of the loans to a more reasonable offer.  They have indicated to me an interest in a few of them at an estimated price of 95.000.

156.   Similarly, in a subsequent e-mail to Kwaschyn and Alverson discussing the April 30, 2004 Dashboard Report, Confidential Witness 2 wrote

> I have been working with a few different "scratch and dent" investors on the $3.6 million pool of "banged up" loans.  The bids I have been receiving have been low (70% to 80.74) until today.  Bayview Financial has offered us a bid of 98.5 for the entire pool, contingent upon their due diligence.   I have called and am negotiating back and forth on the conditions of the offer, trying to persuade them to accept the loans in as-is condition due to their nature.

157.   On May 18, 2004, Confidential Witness 2 e-mailed Kwaschyn and Alverson regarding a possible sale of scratch & dent loans to Global Portfolio Trading.

> I have been shopping a pool of Scratch and Dent loans in the amount of $3.7 million.  These loans are in bad shape and non-salable to anyone that we have tried.

> Pricing has been very low at 92-95.[5]

> Today, I received a bid of 97.119 on the entire pool in AS-IS condition.  The loss would be $113,084.  BUT, these are underperforming and most are owned with Capital[6] and going nowhere fast.

---

[5]  Confidential Witness 2 explained that pricing for the loan pool was discussed in terms of a percentage of full value.  Here, the offers referenced were for 92% to 95% of the full value of the loan.  The subsequent offer Confidential Witness 2 obtained was for 87.119% of the full value of the loans.

[6]  Confidential Witness 2 explained this reference to mean that the warehouse lines of credit used to issue the loans had been repaid, and that the loans were now accounted for as owned by American Home.

158.    In response, Kwaschyn wrote that "Ken and I are in agreement that you should move forward.  Great job, especially knowing that this quote represents files as is with no further due diligence," meaning that the buyer would not have the opportunity to review the loans in the pool and change his mind or offer price.  Alverson responded and instructed Confidential Witness 2 to "hit that bid if it really is 'as is.'"

159.    However, Confidential Witness 2 explained that, before the proposed sale could close, he was required to obtain the personal approval of Defendant Strauss.  Significantly, Defendant Strauss ultimately rejected the proposed sale of scratch & dent loans to Global, because he refused to take any loss on American Home's loans.  According to Confidential Witness 2, no scratch & dent loans were ever sold at a loss by American Home.  This left the Company holding the 85% of the loans processed by LWG that could not be sold at full value.

160.    As discussed above, the Company's solution was to transfer those scratch & dent loans to the REIT.  AHM employees confirmed that, at all relevant times, the Company used the REIT as a dumping ground for unsalable loans.  According to Confidential Witness 25, when AHM was required to repurchase loans from investment banks as non-conforming, the Company would attempt to salvage the loan by working with the borrower to place them into another loan program.  If the loan could not be salvaged, AHM would place it into the REIT rather than sell the loan at a discount.  In addition, according to Confidential Witness 21, the "swamp loans" obtained from Waterfield were simply placed into the REIT when they could not be sold.  Confidential Witness 2 estimated that 70% of the loans ultimately dumped into the REIT were those that had initially been approved by the Exceptions Desk in violation of the Company's underwriting guidelines.

161.    Confidential Witness 9, who handled loan repurchases for American Home, confirmed that loans the Company was forced to repurchase were held in its investment portfolio (the REIT), even when those loans were delinquent or in default.

162.    Internal Company e-mails confirm that the loans being placed into the REIT were highly problematic loans that could not be sold on the secondary market.  For example, on August 27, 2004, Johnson e-mailed Executive Vice President and Chief Administrative Officer Richard Loeffler, Executive Vice President and Chief Investment Officer Thomas McDonagh, Schmitz and Confidential Witness 2 about transferring loans to the REIT.  That e-mail, which had the subject line "Distressed Loan Transfer to REIT," directed the recipients to bring lists of loans to a meeting the following week "so that we can review and decide which ones will go to the the [sic] REIT and which ones will remain at the mortgage company.  Please note if the loans are current or not.  Please come prepared with reasons as to why each particular loan cannot be sold (at a reasonable price) if not a regular REIT product."

163.    Confidential Witness 2's own internal e-mails to Kwaschyn and Alverson documented the volume of loans being transferred to the REIT from the LWG.  For example, the April 2, 2004 e-mail discussed above stated "Total Loans Flagged to go to the REIT:  62 = $14,522,000."   An April 13, 2004 e-mail from Confidential Witness 2 to Kwaschyn and Alverson stated "Total loans flagged to go to the REIT:  51 = $10,192,070."  The April 30, 2004 e-mail discussed above stated "Total loans flagged to go to the REIT:  34 = $5,247,960."  Thus, in April 2004 alone, American Home transferred nearly $30 million in "garbage" loans to the REIT.  According to Confidential Witness 2, 25-30% of the loans handled by the LWG were dumped into the REIT.

164.     According to Confidential Witness 2, at the time of that August 2004 e-mail, Johnson took an active role in the LWG.  Specifically, Johnson began to run his own Dashboard Reports and would personally transfer scratch & dent loans from the LWG to the REIT without the involvement of Confidential Witness 2.  Upon examining the LWG's records, Confidential Witness 2 saw that certain scratch & dent loans were designated as "Sold to REIT."  Other loans simply disappeared, causing Confidential Witness 2 to inquire and learn that Johnson was accessing the loan files electronically and transferring some to the REIT, and bundling others with pools of loans to be sold on the secondary market.  According to Confidential Witness 2, Johnson was simply hoping that those non-conforming scratch & dent loans would not be identified by the secondary market investors that purchased the loan pools.

165.     Confidential Witness 14 confirmed that loans that American Home had been forced to repurchase and which it knew could not be resold for full value were often placed into pools of loans being sold to investors in the hopes that the investors simply would not locate the non-conforming loans.  According to Confidential Witness 14, American Home would include loans in loan pools that investors had not agreed to purchase, in the hopes that the limited review done by investors would not identify the non-conforming loans.  Such loans, which had already been rejected once, had an extremely high risk of being returned to the Company again.

166.     According to an August 12, 2007 article in Newsday that cited former American Home employees, the LWG increased dramatically in size in the Company's last six months as American Home was flooded with repurchase demands.

F.  **AMERICAN HOME CLOSELY TRACKED LOAN REPURCHASES AND EARLY PAYMENT DEFAULTS**

167.    The Company closely tracked default rates through a number of regular reports generated by several different groups within American Home.  Confidential Witness 1, a Vice President in the Post-Closing Department, described the Company as "report happy."

> I generated about 15 different workout reports for distribution each week to senior execs.  My Senior VP [Tim Neer] presented the reports to Strauss every Monday.  They broke down the inventory into every possible category such as all correspondent loans, all retail loans, all wholesale loans, all delinquency (including trend reports), all repurchases, all second liens, all available unsold inventory, etc.  Strauss was a data junky and was extremely critical of having accurate reports each Monday for discussion during his staff meeting.

168.    Confidential Witness 1 added that Don Pace, who handled incoming loan repurchases, also presented "a very thorough report every Friday morning to Strauss" that included all investor repurchase requests and the status of all existing repurchases in progress.  While Pace presented those written reports weekly, Confidential Witness 1 stated that Pace was on the phone daily to discuss new repurchase demands from the secondary market investors.  According to Confidential Witness 2, the weekly reports that were provided to Strauss and others in senior management provided information on <u>every</u> loan that passed through the LWG.  All loans in the LWG were troubled loans, and ones that could not be sold in the secondary market were dumped into the REIT.  With regard to the performance of loans acquired through the Correspondent Division, Confidential Witness 24 stated that he created reports for Defendant Strauss that tracked the non-performing loans that American Home had purchased and was seeking to return to its correspondent lenders.  According to Confidential Witness 24, Strauss requested multiple versions of those reports that reflected delinquencies on the loans at 30, 60, 90 and 120 days after origination.  Many of the loans that American Home sought to return to its

60

correspondent lenders remained on Confidential Witness 24's reports for 3-4 months without being repurchased.

169.    Confidential Witness 25 stated that the Company's Loan Workout Group created monthly reports that tracked the number of EPDs both by number of loans and dollar value. According to Confidential Witness 25, those reports were regularly distributed to AHM's senior management.   The Loan Workout Group also generated weekly reports referred to as "Dashboard Reports" that were personally prepared by Confidential Witness 2 during his tenure at the LWG.  The Dashboard Reports were also circulated to senior AHM management including Defendant Strauss, who frequently called Confidential Witness 2 to discuss the defaults reported in the Dashboard Reports.  Confidential Witness 26, a Senior Vice President of Products and Sales Support, stated that he received quarterly reports that compared American Home's delinquency position in relation to the national average by product line.

## G.    THE MARKET FOR AMERICAN HOME'S LOANS COLLAPSED
##         AS A RESULT OF THE POOR QUALITY OF ITS LOANS

170.    As alleged above, American Home's loans were subject to repurchase in the event of early payment defaults or violations of the Company representations and warranties.  The Company also used its loans as collateral for its credit facilities.  Ultimately, the Company's poor lending practices detailed above led to American Home's demise as it was flooded with repurchase demands and subjected to margin calls by creditors who determined that the Company's loans provided insufficient collateral for its credit facilities.

171.    Confidential Witness 15, who reviewed loan files in the Post Closing Division, described the Company as being in an ongoing financial crunch as it sought to find cash to fund new loans, with an increasing number of returned loans occupying the warehouse lines of credit. "They had a problem with the warehouse lines in the spring of 2005."  Confidential Witness 15

estimated that at least 8,000 returned loans were being held on the warehouse lines in August 2005. Confidential Witness 15 recounted conversations with Mark Trafficonda, an executive in the Company's Treasury department, and Confidential Witness 17, an executive in the Retail Lending Division, concerning the Company's inability to fund new loans. Confidential Witness 15 explained that loans waiting to be closed could not be funded until pending sales of loans to secondary market investors were completed, due to lack of funds. According to Confidential Witness 15, Confidential Witness 17 was told "countless times" by the Treasury Department that American Home lacked the money to fund the new loans.

172. Confidential Witness 15 stated that the number of loans being returned to American Home by secondary market investors increased dramatically in March and April of 2005. A quarter of the loans that American Home sold each month were being returned, and the majority of these were non-conventional loans. "The number of loans being kicked back was tremendous. It was every interest-only, no-asset, nothing up front loan." Confidential Witness 14 corroborated that early payment defaults increased markedly in 2005.

173. Similarly, large banks that purchased loans from American Home began to see very high delinquency rates in the loans they were buying from the Company in mid-2006, much earlier than they saw them from the other lenders. For example, the loans Washington Mutual purchased from American Home in early 2006 experienced problems right away. Delinquencies on American Home-originated loans averaged 5-10% of the loan pools, while delinquencies for other lenders were generally only 1-2%. The Company was also reluctant to buy back delinquent loans, even though it was obligated to do so under its loan sales contracts. For example, while those contracts provided for the loans to be bought back in 30-60 days, the

Company frequently took more than 120 days to repurchase loans, and did not respond to repeated requests for repayment.

174.    To prevent the discovery of high-risk loans and loans that violated the Company's representations and warranties, American Home also placed restrictions on the due diligence that purchasers could conduct on the loans they sought to purchase.  For example, while it was industry practice for a secondary market investor to diligence (or "sample") 20% of the loans it was purchasing, American Home would allow certain banks to only sample 10% or less of the loans – a very onerous due diligence provision.  Moreover, while standard industry practice was that the purchaser of the mortgage had the right to return the loan to the originator if the borrower defaulted on one of the first three payments due to the purchaser, in 2006 American Home sought to change this provision because of the poor quality of its loans.  Specifically, AHM would only sell the loans if the purchaser agreed to a "one-month rule," meaning that the borrower only had to make the first month's payment for the loan to become nonreturnable.

175.    American Home's loans were of such poor quality that, by late 2006, Washington Mutual stopped buying loans from the Company.  Similarly, in 2006 Wells Fargo rejected blocks of loans that the Company tried to sell it.  Confidential Witness 16, whose group was supposed to check loans for conformity prior to sale to secondary market investors, stated that the group decreased its review of loans after her group was restructured in early 2006.  Confidential Witness 16 said that, in particular, loans obtained through the Correspondent Division were not reviewed.  "They'd just pull loans out of the portfolio, do no due diligence on them and shove them off to Wells Fargo and hope they wouldn't reject them."  Such loans posed a very high risk of being returned to American Home.

176.    Confidential Witness 18, who worked directly with the secondary market investors, explained the repurchase negotiations with those investors as follows:

> They would send back loans that fell outside of their normal guidelines or ones where they didn't believe the stated income of the borrower. We then tried to point out compensating factors, such as the fact that the borrower had never missed a payment in their previous credit history. Sometimes the investors would refuse to buy loans for dumb reasons, but a lot of times they were 100% right. And sometimes when I was reviewing the loan with them, I would spot problems that the investors hadn't found. At some point, when you try to defend these loans, you lose your credibility. American Home lost it much sooner than I thought they would.

177.    Confidential Witness 14, who was also employed in the mortgage repurchase department at Citigroup, and participated directly in the review of loans purchased from, and returned to, American Home, stated that Citigroup consistently identified nonconforming loans and loans suffering from early payment defaults in the pools purchased from American Home. As a result, Citigroup increased the percentage of loans it reviewed in pools acquired from American Home such that, by May 2006, Citigroup was reviewing 100% of the loans it purchased from American Home. Faced with increased repurchase demands from Citigroup, the Company briefly convinced Citigroup to scale back its review of loans. However, Confidential Witness 14 stated that Citigroup returned to reviewing all loans purchased from American Home by October 2006.

178.    American Home sought to deceive secondary market investors and avoid repurchases by secretly making payments on delinquent mortgages to so that the EPD provisions would not be triggered. Specifically, according to Confidential Witness 19, in late 2006 the Company was itself making payments on a "large group" of loans that had been delinquent since 2005. Despite the fact that American Home had not received payments on those loans from its borrowers, the Company continued to make payments to holders of its securitizations as though

the borrowers were making timely payments.  Paying out on loans that were generating no income created a shortfall which, according to Confidential Witness 19, the Company covered by using payments from mortgages that pre-paid.  As delinquencies increased in May and June 2007, the Company lacked the liquidity to maintain this Ponzi scheme and Confidential Witness 19 was directed to stop advancing payments so that the Company could preserve liquidity.

179.   By early 2007, the escalating disclosures by subprime lenders of mounting defaults, delinquencies and liquidity problems were threatening to pull down American Home. The Company responded by vigorously distinguishing itself from the rapidly failing subprime market.  Even in the wake of the February 2007 implosion of New Century Financial Corp., one of the nation's largest subprime lenders, American Home was successful in distinguishing itself from those failed lenders and maintaining its share price above $25, even as one subprime lender after another collapsed into bankruptcy.

180.   In contrast to the Company's assurances that its risk profile was distinct from subprime lenders and that it was not at risk for the same level of defaults and delinquencies that brought down such lenders, according to Confidential Witness 1, in January and February 2007, American Home was "hit hard" by forced repurchases from secondary market investors. Confidential Witness 1 added that 70% of the loans the Company was forced to buy back were higher-risk products, including stated-income loans and loans with a high LTV ratio.

181.   Confidential Witness 9 confirmed that the Company was being forced to repurchase "thousands" of loans each week when she was brought in to assist with repurchases in February 2007, and that half those loans were delinquent and on the verge of foreclosure. According to Confidential Witness 9, the Company "had tons of repurchases in the pipeline" and

repurchase demands accelerated during 2007.  Among the repurchases were high-risk loans that American Home had initially obtained through its Correspondent Division.

182.    According to Confidential Witness 28, American Home's margins for sales of Alt-A loans contracted dramatically in February 2007.  "Sometimes we didn't get any bids on pools or we got a ridiculously low bid.  Someone might bid 300 basis points below origination cost, not really expecting to win anything.  Those bids seemed absurdly low at the time, but, looking back on it, maybe they were not so absurd."

183.    Confidential Witness 28 explained that, at that time, the Company increased the transfer of high-risk loans to the REIT.  "We were transferring Alt-A loans, MTAs, seconds, and option-ARMs to the REIT and the REIT would then securitize them."

184.    Critically, according to Confidential Witness 18, Citigroup markedly tightened its purchasing guidelines in March 2007 – immediately prior to the 2007 Offering – making it more difficult for the Company to sell loans to Citigroup.  For example, Confidential Witness 18 stated that, after March 2007, Citigroup refused to buy loans from American Home with 100% loan-to-value ("LTV") ratios, meaning that the loan covered 100% of the property's value.

185.    Confidential Witness 29 confirmed that American Home had increasing trouble selling loans at this time because secondary market investors had increased their due diligence review of the Company's loans.  "It absolutely became more difficult to sell the loans in March and April."  Specifically, according to Confidential Witness 29 the Company's "sell-through rate" – the percentage of the loans it offered for sale that were purchased on the secondary market – fell from 90% in early 2007 to just 80% in March and April.

186.    On March 16, 2007, Lehman Brothers made its first margin call on American Home, subject to the terms of a Master Repurchase Agreement it had entered into with the

Company.   Specifically, Lehman asserted that the value of certain instruments backed by mortgages issued by American Home had fallen 7.73%, such that those instruments were worth just 92.27% of their face value.   Through the margin call, Lehman demanded that American Home pay Lehman, in cash, the difference between the face value of those instruments and their actual value.   The Company satisfied this margin call, and did not disclose it to investors.   That first demand by Lehman was a harbinger of things to come.

187.   Despite mounting pressure from creditors and secondary market investors, the Company maintained its public profile as a stable, prime mortgage lender.   Indeed, on April 30, 2007, in the midst of the subprime meltdown, American Home successfully sold $100 million in stock to investors pursuant to the 2007 Offering.

188.   The market for the Company's high-risk loans, however, continued to tighten. According to Confidential Witness 10, "The buyers were doing much more due diligence.  By May 2007, it was a nightmare to close trades.  Nothing was selling. The investors just didn't like the loans. They didn't like the way the loans were prepared – the documentation."

189.   On June 28, 2007, less than two months after the 2007 Offering, the Company announced that it would take "substantial charges" due to forced loan repurchases resulting from early payment defaults ("EPDs").   The Company specifically cited "stated income loans with high loan to value ratios" as the source of those EPDs.  Despite Defendant Strauss' attempts to mitigate the impact of that disclosure, American Home stock fell more than $2 per share – nearly 10% – in response to the Company's announcement.

190.   Throughout July 2007, Lehman continued to make additional margin calls on the Company, in each instance demanding cash to cover the declining value of instruments backed by American Home's mortgages.   At the same time, the Company was faced with mounting

repurchase demands – including a demand that American Home repurchase $72 million in low quality loans sold to Countrywide.

191.    Throughout July 2007, in response to widespread speculation that the Company's credit facilities, on which it was dependent to continue originating mortgages, were at risk, American Home insisted to analysts that its credit lines were secure, and pointedly failed to disclose Lehman's margin calls.  Nonetheless, the price of American Home shares fell from $21.43 per share on June 27, 2007, to $10.63 per share on July 26, 2007.

192.    Lehman's margin calls culminated in a July 26, 2006 demand by Lehman for a cash payment of nearly $7 million.  The Company could not satisfy that margin call.  Thus, on July 27, 2007, just three months after the 2007 Offering, the Company disclosed that it needed to "preserve liquidity" as a result of margin calls and repurchase demands.  Trading in American Home shares was halted with the stock at $10.47 per share and, when trading reopened on July 31, the stock opened at $5.51 and quickly collapsed to close at just $1.04 per share.  On August 6, 2007, with the stock trading for pennies, the Company announced that it would file for bankruptcy.

193.    The acute deterioration in the quality of American Home's loans is demonstrated in data the Company filed with the Department of Housing and Urban Development ("HUD") after the Class Period, which confirms that in 2006 the Company originated a significant number of mortgages that were comparable to subprime loans.  Specifically, the Company was required to report to HUD under the Home Mortgage Disclosure Act of 1975, 12 U.S.C. §§ 2801-2810 ("HMDA"), data concerning loans it issued that carried rates more than 300 basis points, or 3%, higher than the rate of a comparable U.S. Treasury instrument for first lien loans, or 500 basis points (5%) higher than the Treasury rate for second lien loans.  Because lenders charge such

high rates to reflect the higher risk of lending to borrowers with poor credit, a loan with such rate spreads above Treasury rates that are reportable under HMDA is characteristic of a subprime loan.[7]

194.    The Company's HMDA data for 2006, which became publically available in September 2007, shows that 22% of the first lien loans the Company originated in 2006 were subprime.  Even more striking, more than 62% of the Company's second lien loans were subprime.

195.    The HMDA data also corroborates the fact that, rather than being selective in its retention of loans for its investment portfolio, American Home was holding its riskiest loans, which it could not sell on the secondary market.  Specifically, the Company retained over 45% of the subprime first lien mortgages it originated in 2006, and retained nearly 60% of the subprime second lien mortgages originated that year.  In contrast, other major "prime" lenders typically retained only 20% percent of the subprime loans they originated, opting to sell the remainder on the secondary market.

## VIII.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

196.    The 2005 Offering Defendants and 2007 Offering Defendants are liable for violations of the Securities Act arising out of the sale of American Home shares pursuant to the 2005 Offering Materials and 2007 Offering Materials, respectively, which were materially untrue and misleading.  As set forth above, American Home issued high-risk loans and consistently violated the Company's underwriting guidelines to maintain growth.  The Company also acquired poor quality loans that it could not sell.  As a result, the Company's mortgages were

---

[7]   "[Annual percentage rate] spread reportable loan volume is often taken to be a proxy for subprime, or nonprime, lending, since subprime loans carry rates that are generally several hundred basis points higher than conventional conforming or prime loans." LaCour-Little, Michael, "Economic Factors Affecting Home Mortgage Disclosure Act Reporting" (May 18, 2007), available at http://ssrn.com/abstract=992815 (internal citation and footnotes omitted).

rejected by secondary market investors, and a large number of loans were returned to the Company due to early payment defaults or violations of representations and warranties. The Company's portfolio of retained mortgages consisted of high-risk loans, including loans that proved salable only at a significant discount. These undisclosed deficiencies directly impacted the financial results reported in the 2005 Offering Materials and the 2007 Offering Materials, rendering them untrue as discussed below in greater detail.

A. THE UNDERWRITER DEFENDANTS WERE PRIVY TO INFORMATION CONCERNING THE QUALITY OF AMERICAN HOME'S LOANS

197. Several of the Underwriter Defendants did extensive business with American Home as purchasers of the Company's loans and mortgage-backed securities on the secondary market. As such, those Underwriter Defendants had the opportunity to conduct due diligence of the quality of the Company's loans. Moreover, many of the Underwriter Defendants – acting as secondary market investors – rejected blocks of American Home loans due to their poor underwriting.

198. Specifically, according to Confidential Witness 16, Bear Stearns purchased American Home loans on the secondary market, and was among the least stringent of the investors she dealt with. While other investors, such as Wells Fargo, would reject blocks of loans as failing to meet their guidelines, Bear Stearns would purchase such loans. Confidential Witness 18, a Loan Sales Coordinator, agreed that Bear Stearns was always easy to sell to. Moreover, Bear Stearns entered into complex transactions with American Home pursuant to which Bear Stearns purchased loans from American Home that were then held in trust by a third party depository, which issued instruments backed by those loans and sold by Bear Stearns.

199. Similarly, Confidential Witness 27 stated that, as far back as 2004, Deutsche Bank had purchasing guidelines that were the most liberal of the investors he dealt with.

Confidential Witness 27 explained that Deutsche Bank had an appetite for riskier loans that most other banks would not purchase from American Home, and was willing to purchase loans to borrowers with FICO credit scores as low as 580 even when their income was not verified – loans that most other banks would not buy from American Home.

200.    In addition to purchasing loans from American Home, certain of the 2005 Underwriter Defendants also served as warehouse lenders to the Company.   Specifically, according to the Company's 3Q2005 Form 10-Q, American Home's $3.3 billion "Secured Liquidity Note Program" included a facility of $1.5 billion with Bear Stearns and a facility of $500 million with Lehman Brothers.  As warehouse lenders whose lines of credit were secured by the Company's loans – and who depended for timely repayment of those credit lines on the Company's ability to sell those loans – Lehman and Bear Stearns knew or were in a position to know that American Home was facing mounting repurchase demands from secondary market investors prior to the 2005 Offering.  Moreover, after the third quarter of 2005 – the quarter when the 2005 Offering was completed – Lehman ceased to serve as a warehouse lender to the Company.

201.    Citigroup, the sole underwriter of the 2007 Offering, was intimately familiar with the truth about the poor quality of the Company loans as a major purchaser of American Home loans on the secondary market.  As set forth above, Citigroup increased its review of Company loans to 100% prior to the 2007 offering due to the low quality of those loans.  Confidential Witness 14 explained that American Home was "by far the largest culprit for selling bad loans to Citi" and that Citigroup had experienced problems with loans it had purchased from AHM for several years.

> I am almost positive that American Home was the largest problem
> CitiMortgage had to deal with.  Even in 2004 and 2005, Citi made a large

volume of repurchase demands to American Home.  American Home was the number one problem child on Citi's list.

**B.      THE 2005 OFFERING**

202.     On August 9, 2005, the Company conducted a secondary offering of 9 million shares of American Home common stock at a price of $35.50 per share.

203.     The 2005 Offering was conducted pursuant to a shelf registration statement dated December 15, 2004 (the "Shelf Registration Statement") and a prospectus supplement filed on Form 424B5 and dated August 9, 2005 (the "2005 Prospectus Supplement"), which included a Prospectus dated January 6, 2005 (the "January 2005 Prospectus").  The Shelf Registration Statement, January 2005 Prospectus and the 2005 Prospectus Supplement are referred to collectively as the "2005 Offering Materials."  Because the 2005 Offering was pursuant to a shelf registration statement, the August 9, 2005 date of the 2005 Prospectus Supplement – and not the prior date of the December 15, 2004 Registration Statement – is the "effective date" of the Shelf Registration Statement for purposes of Section 11 liability under 17 C.F.R. § 230.415 and 17 C.F.R. § 229.512(a)(2).

**1.      Untrue Statements In The 2005 Offering**

204.     The 2005 Prospectus Supplement provides that it is "part" of the Shelf Registration Statement.  According to the 2005 Prospectus Supplement, "[t]his prospectus supplement is part of a registration statement and does not contain all of the information included in the registration statement."  Furthermore, information in the 2005 Prospectus Supplement supersedes inconsistent or conflicting information in the January 2005 Prospectus: "[t]o the extent any inconsistency or conflict exists between the information included in this prospectus supplement and the information included in the accompanying prospectus, the information

included or incorporated by reference in this prospectus supplement updates and supersedes the information in the accompanying prospectus."

205.   The 2005 Prospectus Supplement incorporated by express reference American Home's report on Form 10-K/A for the year ended December 31, 2004, filed with the SEC on April 22, 2005, and its reports on Form 10-Q for the quarters ended March 31, 2005, and June 30, 2005.[8]

### The 2005 Offering Materials Misstated The Quality Of The Company's Loans

206.   The 2005 Offering Materials contained a series of materially untrue and misleading statements concerning the credit quality of the loans originated by American Home and the creditworthiness of its borrowers.  Specifically, the January 2005 Prospectus stated, "We are in the business of investing in mortgage-backed securities resulting from the securitization of primarily prime-quality, residential mortgage loans that we originate and service…  Generally, loans we originate are high-credit-quality, prime loans that are either eligible for sale to Fannie Mae or Freddie Mac, or are jumbo loans for borrowers with high FICO credit scores, typically 680 or above."  (Emphasis added).  The January 2005 Prospectus further stated that:

> We offer a broad array of mortgage products, but primarily make high-credit-quality loans; more than 54% of our originations are eligible for Fannie Mae, Freddie Mac or Ginnie Mae programs, while most of the balance of our loans consists of jumbo loans for borrowers with high FICO credit scores, typically 680 or above.  (Emphasis added).

207.   The 2005 Prospectus Supplement reiterated the quality of the Company underwriting and the strong credit of the borrowers to whom it extended loans:

---

[8] On April 22, 2005, American Home filed an amended Form 10-K/A that corrected an accounting for a securitized transaction in December 2004, as well as fixed errors of improperly recorded financials, including $1.6 billion of mortgage-backed securities, $40.5 million of Mortgage Servicing Rights, $3.6 billion of mortgage loans held for sale, $2.0 billion of collateralized debt obligations, and addressed internal control weaknesses within the Company. As explained in a press release, the corrections to the accounting resulted in a reduction of the Company's 2004 revenue and income by approximately $71.4 million, while its first quarter 2005 revenue and income were increased by an equivalent amount.

Our origination business seeks to utilize a combination of skilled loan officers, advanced technology, a broad product line and a high level of customer service to successfully compete in the marketplace. We offer a broad array of mortgage products and primarily make loans to borrowers with good credit profiles. The weighted-average FICO score for our $18 billion of total originations in the first half of 2005 was 716. (Emphasis added.)

208.    American Home's 2004 Form 10-K/A further stressed the quality of the Company's loan originations and the credit scores of its borrowers:

The Company offers a broad array of mortgage products and primarily makes loans to borrowers with good credit profiles. The weighted-average FICO score for our $23.1 billion of total originations in 2004 was 714. … The Company offers a broad and competitive range of mortgage products that aim to meet the mortgage needs of primarily high-credit-quality borrowers. (Emphasis added.)

209.    The 10-K/A specifically, and falsely, represented that the Company's Alt-A and second lien loans were of high quality, stating that American Home's second lien loans "are designed for borrowers with high-quality credit profiles" and that "From a credit risk standpoint, alternate 'A' loan borrowers present a risk profile comparable to that of conforming loan borrowers, but entail special underwriting considerations, such as a higher loan to value ratio or limited income verification."

210.    Moreover, the 2004 10-K/A specifically represented that "non-prime" loans represented just 2% of the Company's total originations for 2004, by dollar amount, with such loans defined as loans to borrowers who "may have impaired or limited credit profiles, high levels of debt service to income, or other factors that disqualify them for conforming loans."

211.    The statements in the 2005 Offering Materials set forth in ¶¶206-10 regarding the credit quality of the loans originated by American Home were materially untrue and misleading because:

a.    as alleged above at ¶¶79-118, American Home did not "aim to meet the mortgage needs of primarily high-credit-quality borrowers," but

74

instead targeted borrowers with poor credit, including borrowers with FICO scores that presented a "statistically very high" likelihood of default;

b.  as alleged above at ¶¶79-103, the Company did not primarily make "high-credit-quality loans," but instead made loans to "virtually any borrower" regardless of their creditworthiness, as reflected in American Home's application rejection rate of just 5%;

c.  as alleged above at ¶¶82-103, 119-39, American Home employed extremely relaxed and deficient underwriting standards that, among other things, encouraged loan officers to obtain as little documentation as possible;

d.  as alleged above at ¶¶84, 88, 97-99, 102, 115 the Company issued no documentation loans and stated income and stated asset loans without proper verification;

e.  as alleged above at ¶¶112-13, the Company improperly underwrote ARMs at the low, initial teaser rates without determining whether the borrower could afford the loan's adjusted rate;

f.  as alleged above at ¶¶130-34, the Company routinely violated its underwriting guidelines, including by not conducting reasonability tests or otherwise verifying the income, employment or assets of borrowers taking low or no documentation loans;

g.  as alleged above at ¶¶193-95, "non-prime" loans represented a materially higher percentage of the Company's loan originations;

h.  as alleged above at ¶¶171-72, by mid-2005 the Company was facing dramatically increased demands to repurchase its loans due to their poor quality;

i.  as alleged above at ¶¶123-29, exceptions to the Company's underwriting guidelines were rampant, and underwriters who objected to the issuance of loans were routinely vetoed by loan officers; and

j.  as alleged above at ¶¶140-47, the Company failed to underwrite or verify the underwriting of loans acquired through its Correspondent Division, and obtained extremely poor quality loans from its correspondent lenders.

**The 2005 Offering Materials Misstated The Quality Of The Company's Portfolio**

212.    With regard to the loans and MBS retained by the Company, which included loans American Home originated and MBS backed by its own loans, the January 2005 Prospectus stated:

> A substantial portion of the securities we hold are either obligations of Fannie Mae or Freddie Mac or are rated AAA by Standard & Poor's. Finally, substantially all of our securities are backed by ARM loans. Because we are focused on holding ARM loans rather than fixed-rate loans, we believe we will be less adversely affected by prepayments due to falling interest rates or a reduction in our net interest income due to rising interest rates.

213.    The January 2005 Prospectus further represented that the Company benefited from competitive advantages over other REITS that enabled it to "reduce … our credit risk, by focusing on highly rated assets" and to select for retention "high-credit-quality ARM loans."

214.    The 2005 Prospectus Supplement reiterated the purportedly high quality of the loans the Company retained, stating "Most of our portfolio consists of securitized adjustable-rate mortgage loans, or ARM loans, that are of prime quality."  (Emphasis added.)  The 2004 Form 10-K/A, incorporated by reference into the 2005 Prospectus Supplement, also stressed the quality of the Company's MBS portfolio, which included securitizations of its own loans, stating "approximately 95% of the securities we hold are either agency obligations or are rated AAA or AA by Standard & Poor's."

215.    The statements in the 2005 Offering Materials concerning the quality of the Company's portfolio of MBS were materially untrue and misleading because most of the Company's portfolio did not consist of ARM loans that were of "prime quality," but were instead high-risk loans to borrowers with poor credit as set forth above in ¶¶79-118.  Given the underlying deficiencies in the underwriting of those loans, the credit ratings touted by the Company were misleading and did not represent the true credit risk of the portfolio.  In addition, the statements concerning the lower risk of holding ARMs was misleading in that it failed to

disclose the significant risk of delinquency and default presented by rising interest rates, a risk exacerbated by the fact that the Company improperly underwrote its ARM loans.  The Company also retained at full value in its portfolio scratch & dent loans that were not salable at full value. Moreover, the Company did not have competitive advantages over other mortgage REITS but, rather, exposed itself to greater, undisclosed risk by originating high risk loans.

### The 2005 Offering Materials Misstated The Company's Underwriting Process

216.     The 2005 Offering Materials contained a series of untrue statements concerning the quality control and underwriting procedures the Company purportedly implemented to facilitate the sale of its loans on the secondary market.  Specifically, with regard to the Company's underwriting of loans, the 2004 Form 10-K/A stated that:

> The Company's primary goal in making a decision whether to extend a loan is whether that loan conforms to the expectations and underwriting standards of the secondary mortgage market.  Typically, these standards focus on a potential borrower's credit history (often as summarized by credit scores), income and stability of income, liquid assets and net worth and the value and the condition of the property securing the loan.

217.     The 2004 Form 10-K/A further represented that the Company had in place quality control systems sufficient to ensure that its underwriting guidelines were being enforced, including "monthly quality control testing" that included "checks on the accuracy of the borrower's income and assets and the credit report used to make the loan, reviews whether the loan buyer's underwriting standards were properly applied and examines whether the loan complies with government regulations."  Significantly, that 10-K/A further stated that "[t]o date, those reports have not identified any material quality control concerns…"  The 2004 10-K/A also stated that the Company's "loan origination enterprise system … assures that the Company's underwriting policies are adhered to."

218.    The quality of the Company's underwriting had a direct impact on the accuracy of the representations and warranties made to secondary market investors that purchased American Home's loans.  Accordingly, in discussing its liability under those representations and warranties the Company reassured investors as to the quality of the underwriting.    Specifically, the Company's first quarter 2004 Form 10-K/A stated:

> We have implemented strict procedures to ensure quality control and conformity to underwriting standards and minimize the risk of being required to repurchase loans. From time to time we have been required to repurchase loans that we sold; however, the liability for the fair value of those obligations has been <u>immaterial</u>.  (Emphasis added).

The representation that the Company's repurchase liability was "immaterial" was repeated in the Company's Forms 10-Q for the first and second quarters of 2005, each of which is incorporated by reference into the 2005 Prospectus Supplement.

219.    The statements in the 2005 Offering Materials concerning American Home's underwriting guidelines and the enforcement thereof were materially untrue and misleading.  The Company did not follow underwriting procedures designed to ensure that its loans conformed to the expectations of the secondary mortgage market, and, among other things, underwrote highly risky loans without applying the required (and industry standard) "reasonability test" to verify that a borrower's income was consistent with his purported employment and experience level. Low and no documentation loans that did not require verification of income, assets or employment were provided to borrowers who did not qualify for such loans.  Further, the Company made exceptions to its underwriting guidelines as a matter of course.  Underwriters were frequently overruled in their determinations as to credit quality.  The Company also failed to underwrite or verify the underwriting of the high-risk loans it acquired from correspondent lenders.  As a result, many of the loans originated by the Company did not conform to the

expectations of the secondary mortgage market, and were either unsalable or salable only at a discount.

220.    Moreover, as discussed in greater detail below, the statements in the 2005 Offering Materials that the Company's liability under its representations and warranties was "immaterial" was materially untrue and misleading because, in light of the Company's loan origination and underwriting practices described above, the liability for loan repurchases was materially greater than disclosed.

221.    As to the ultimate disposition of loans that the Company was required to repurchase, the 2004 Form 10-K/A represented that such loans were generally salable, and that the repurchase of unsalable loans "is a rare occurrence and that the Company can usually sell the loans directly to a permanent investor."    In truth, as alleged above, the Company's Loan Workout Group handled hundreds of loans totaling millions of dollars in unsalable "scratch & dent" loans.   The Company refused to sell such loans at a discount, and instead held them in its qualified REIT subsidiary.

### The 2005 Offering Materials Contained Untrue Financial Results

222.    The 2005 Offering Materials also contained materially misstated financial results for American Home for 2004 and the first half of 2005.  These included material understatements of the Company's liability for loan repurchases and material overstatements of the Company's net income, "gain on sale" and assets that resulted directly from the undisclosed deterioration in the quality of American Home's loans.

223.    Specifically, the 2004 Form 10-K/A and the Forms 10-Q for the first and second quarters of 2005 stated that the Company's repurchase liability – referred to as "recourse liability as a percentage of loans sold" – was "immaterial."  This statement was materially untrue and

misleading because, as set forth above, the Company faced a significant risk that it would be forced to repurchase its loans.  To reflect the possibility that loans would be returned to it by secondary market investors, American Home was required to establish a reserve for the expected losses associated with its repurchase liability.  As the quality of the loans originated by the Company decreased, that reserve should have increased to reflect the increased risk that the Company would be required to repurchase its loans.  Moreover, the increase in the total volume of the Company's loan sales should have resulted in a similar increase in the reserve for loan repurchases.

224.    As set forth above, the Company abandoned its purportedly conservative lending posture and, in 2004 and 2005, issued increasingly high-risk loans to borrowers with poor credit. The Company's underwriters were routinely overruled by loan officers, and exceptions to the Company's underwriting guidelines were rampant.  Indeed, as set forth above, the Company began experiencing increasing defaults and repurchase demands as early as March and April 2005.  In addition, the volume of the Company's loans more than doubled from 2004 to 2005, increasing from $13.7 billion to $28.5 billion.  Accordingly, the Company's actual liability for loan repurchases was material and increasing.

225.    The 2005 Offering Materials also materially overstated the Company's gain on sale income, which is the difference between the sale price and the book value of the loan, less any additional costs expected to be borne by the seller.  Specifically, the 2004 Form 10-K/A reported gain on sale of loans and MBS of $174.3 million for 2004, the first quarter 2005 Form 10-Q reported gain on sale of loans and MBS of $111.3 million, and the second quarter 2005 Form 10-Q reported gain on sale of loans and MBS of $182.4 million.

226.    The Company's gain on sale figures contained in the 2005 Offering Materials were materially overstated because they failed to account for the Company's repurchase liability. In calculating gain on sale, which was recorded each time the Company sold a loan through a whole loan sale or through a securitization structured as a sale, the Company was required to account for its repurchase liability by offsetting the gain on sale.  Because the Company materially understated its repurchase liability, deeming it "immaterial," American Home overstated its reported gain on sale.

227.    The 2005 Offering Materials also materially overstated the Company's net income.  Specifically, the 2004 Form 10-K/A reported net income of $74.9 million, the first quarter 2005 Form 10-Q reported net income of $125 million, and the second quarter 2005 Form 10-Q reported net income of $65 million.  Those figures were materially untrue and misleading because the Company's net income should have been reduced to reflect a reserve for repurchase liability as well as impairments to the Company's assets.

228.    In addition to its repurchase liability for loans it sold, American Home was required to establish a reserve to reflect the risk of loss, whether as a result of default, delinquency, or other contingencies, for loans and securitizations that the Company continued to hold.  That reserve would also offset net income.  Similarly, for other assets that the Company held, such as mortgage backed securities or the rights to service mortgages for a fee (known as "mortgage servicing rights" or "MSRs"), the Company was required to assess whether the value of those assets was impaired, and whether that impairment was "other than temporary" – an analysis that included consideration of the default risk, which flowed directly from the quality of the loan and the borrower.  All of these elements – repurchase liability, loan loss reserves and "other than temporary" impairments to the Company's assets –a  are accounted for by reducing

the Company's reported income.  Because the Company failed to account for the heightened risks that flowed from relaxing and violating its underwriting guidelines in order to target borrowers with poor credit, the Company overstated its net income.

229.    For the same reasons, the 2005 Offering Materials materially overstated the value of several classes of the Company's assets, including its loans held for sale, loans held for investment and MBS.  Specifically, the 2004 Form 10-K/A reported $6 billion in MBS and $4.9 billion in mortgage loans held for sale (net) as of December 31, 2004.  The first quarter 2005 Form 10-Q reported MBS of $7.2 billion and $1.6 billion in mortgage loans held for sale (net) as of March 31, 2005.  The second quarter 2005 Form 10-Q reported MBS of $6.9 billion, $2 billion in mortgage loans held for sale (net), and $134.6 million in mortgage loans held for investment as of June 30, 2005.

230.    The same failure to account for the "other than temporary" impairment caused the reported value of those assets in the 2005 Offering Materials to be materially overstated.  Specifically, by not accounting for the increased risk that the low-quality loans it originated and held (as either whole loans or securitizations) would default, and not recording the impairment of those loans, the Company overstated the value of its loans held for sale, loans held for investment and its mortgage backed securities.  Moreover, as set forth above, the loans and MBS held by the Company in the REIT included "scratch & dent" loans that American Home repurchased, and which it held at full value despite the fact that the loans could not be resold for full value.

231.    The 2005 Offering Materials also materially overstated the value of the Company's MSRs.  Specifically, the 2004 Form 10-K/A reported MSRs of $151.4 million as of December 31, 2004, the first quarter 2005 Form 10-Q reported MSRs of $228.4 million as of

March 31, 2005, and the second quarter 2005 Form 10-Q reported MSRs of $261.8 million as of June 30, 2005. As noted above, MSRs are the rights the Company retained to continue to service, for a fee, mortgages it had sold (whether as whole loans or securitizations). The Company was required to reflect in the value of its MSRs the risk of default, recorded as an "other than temporary impairment." By failing to account for the increased risk that the loans it originated would default – and that the right to service those loans would evaporate – the Company overstated the value of its MSRs.

232.  The 2005 Offering Materials similarly overstated the value of the Company's residual assets – a residual interest in the MBS it sold.[9] Specifically, the 2004 Form 10-K/A reported residual assets of $108 million as of December 31, 2004, the first quarter 2005 Form 10-Q reported residual assets of $249.8 million as of March 31, 2005, and the second quarter 2005 Form 10-Q reported residual assets of $333.8 million as of June 30, 2005.

233.  The residual tranche, which experiences the first losses when a default occurs, only generates cash flow to its owner if the securitization performs well enough to fully pay all of the more senior tranches first and as such is considered the most risky tranche of a securitization. In valuing its residual assets, the Company represented that it took into account the risk of default. But, as discussed above, because the Company understated the overall risk profile of its loans, and because it violated its underwriting guideline by failing to actually verify the creditworthiness of its borrowers, the Company overstated the value of those assets.

234.  Finally, because the above assets were materially overstated, the 2005 Offering Materials also materially overstated the reported value of the Company's total assets.

---

[9]  Securitizations are divided into different "tranches" that reflect different levels of risk. Junior tranches agree to accept the first losses incurred by the securitization in exchange for higher consideration, while the senior tranches are considered to be more insulated from the risk of non-payment of the underlying obligations, but receive less consideration. When the Company securitized and sold pools of loans, it often retained the most junior "tranche" of the securitization, called the residual tranche.

Specifically, the 2004 Form 10-K/A reported total assets of $11.6 billion as of December 31, 2004.  The first quarter 2005 Form 10-Q reported total assets of $9.6 billion as of March 31, 2005.  The second quarter 2005 Form 10-Q reported total assets of $9.8 billion as of June 30, 2005.

235.   Deloitte, American Home's auditor, audited the Company's year-end 2004 financial statements contained in the 2004 Form 10-K/A and issued a report on the consolidated statement of financial condition as of December 31, 2004, and the related consolidated statements of income, cash flows and changes in stockholders' equity for the year ended December 31, 2004 (as restated) of the Company.

236.   Deloitte's report provided in relevant part:

> We have audited the accompanying consolidated balance sheets of American Home Mortgage Investment Corp. and subsidiaries (the "Company") as of December 31, 2004 and 2003, and the related consolidated statements of income, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2004…. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).

> In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of the Company and its subsidiaries as of December 31, 2004 and 2003, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2004, in conformity with accounting principles generally accepted in the United States of America.

237.   Also filed with the 2004 10-K/A was a consent form signed by Deloitte to incorporate by reference into the Shelf Registration Statement Deloitte's reports relating to the financial statements of American Home.  The 2005 Prospectus Supplement incorporated by reference Deloitte's report, stating that it was "so incorporated in reliance upon the report of [Deloitte] given upon their authority as experts in accounting and auditing."

238.    Deloitte's report included in the 2004 10-K/A, including its unqualified audit opinion, was materially untrue and misleading because, for the reasons set forth above, the Company's consolidated financial statements did not fairly present the Company's financial condition and were not prepared in accordance with GAAP.

## C.    THE 2007 OFFERING

239.    On April 30, 2007, the Company conducted a secondary offering of 4 million shares of American Home common stock at a price of approximately $24 per share.

240.    The 2007 Offering was conducted pursuant to the "Shelf Registration Statement" and to a prospectus supplement dated April 30, 2007 (the "2007 Prospectus Supplement Supplement").    The 2007 Prospectus Supplement Supplement included the January 2005 Prospectus, defined above.    The 2007 Prospectus Supplement Supplement, January 2005 Prospectus and the Shelf Registration Statement are referred to collectively herein as the "2007 Offering Materials".    Because the 2007 Offering was pursuant to a shelf registration statement, the April 30, 2007 date of the 2007 Prospectus Supplement Supplement – and not the prior date of the December 15, 2004 Registration Statement – is the "effective date" of the Shelf Registration Statement for purposes of Section 11 liability under 17 C.F.R. § 230.415 and 17 C.F.R. § 229.512(a)(2).

### 1.    Untrue And Misleading Statements In The 2007 Offering

241.    The 2007 Prospectus Supplement Supplement provides that it is "part" of the Shelf Registration Statement (as previously described in ¶203).    According to the 2007 Prospectus Supplement Supplement, "[t]his prospectus supplement is part of a registration statement and does not contain all of the information included in the registration statement."    Furthermore, information in the 2007 Prospectus Supplement Supplement supersedes inconsistent or conflicting information in the January 2005 Prospectus: "[t]o the extent any

inconsistency or conflict exists between the information included in this prospectus supplement and the information included in the accompanying prospectus, the information included or incorporated by reference in this prospectus supplement updates and supersedes the information in the accompanying prospectus."

242.   The 2007 Prospectus Supplement Supplement incorporated by reference:

- American Home's annual report on Form 10-K for the year ended December 31, 2006, filed with the SEC on March 1, 2007;

- portions of American Home's Definitive Proxy Statement on Schedule 14A filed with the SEC on April 27, 2007, and incorporated into the 2006 Form 10-K; and

- American Home's current report on Form 8-K/A dated April 30, 2007.

243.   Plaintiffs repeat and reallege herein by reference American Home's statements in its January 2005 Prospectus and the documents incorporated by reference therein, that contained untrue statements and omissions as set forth above in paragraphs ¶¶206, 212-13.

**The 2007 Offering Materials Misstated The Quality Of The Company's Loans**

244.   The 2007 Offering Materials contained a series of materially untrue and misleading statements concerning the credit quality of the loans originated by American Home, the creditworthiness of its borrowers and the Company's risk mitigation strategies.  Specifically, the 2007 Prospectus Supplement Supplement stated "We offer a broad array of mortgage products and <u>primarily make loans to borrowers with good credit profiles</u>."  (Emphasis added).

245.   The 2006 10-K similarly stressed the quality of the Company's loans, stating:

We offer a broad array of mortgage products and primarily make loans to borrowers with good credit profiles. The weighted-average FICO score for our \$58.9 billion of total originations in 2006 was 716…. We offer a broad and competitive range of mortgage products that aim to meet the mortgage needs of primarily high-credit-quality borrowers.   (Emphasis added.)

246.     The 2006 10-K also falsely represented that the Company's Alt-A and second lien loans were of high quality, stating that American Home's second lien loans "are designed for borrowers with high-quality credit profiles" and that "From a credit risk standpoint, alternate 'A' loan borrowers present a risk profile comparable to that of conforming loan borrowers, but entail special underwriting considerations, such as a higher loan to value ratio or limited income or asset verification."

247.     Moreover, the 2006 10-K specifically represented that "non-prime" loans represented "0.0%" of the Company's total originations for 2006, by dollar amount, with the Company having originated just $28.8 million in non-prime loans, defined as loans to borrowers who "may have impaired or limited credit profiles, high levels of debt service to income, or other factors that disqualify them for prime loans."

248.     The statements in the 2007 Offering Materials set forth in ¶¶244-47 regarding the credit quality of the loans originated by American Home were materially untrue and misleading for the reasons set forth above in ¶194.  In addition, those statement were materially untrue and misleading because:

> a.   as alleged above at ¶¶173-77-__, in 2006, 22% of the Company's first lien loans and 62% of the Company's second lien loans were subprime;
>
> b.   as alleged above at ¶180, by late 2006 major secondary market investors had ceased purchasing American Home's high risk loans due to their poor quality;
>
> c.   as alleged above at ¶¶84-103, American Home was "hit hard" by forced repurchase demands in January and February 2006 due to the poor quality of its loans;
>
> d.   as alleged above at ¶¶93-97, the Company's underwriting guidelines permitted the issuance of no documentation loans to borrowers with low credit scores, the issuance of loans to borrowers with credit scores as low as 500;

    e.    as alleged above at ¶¶93-97, the Company's underwriting guidelines targeted borrowers with "serious credit issues" including recent bankruptcies or foreclosures and borrowers with no prior housing history;

    f.    as alleged above at ¶87, the Company encouraged loan officers to obtain minimal documentation of borrowers' credit worthiness; and,

    g.    as alleged above at ¶100, the Company's "Quality Control Philosophy" was that very few loans were not investment quality.

### The 2007 Offering Materials Misstated The Company's Underwriting Process

249.    The 2007 Offering Materials also contained materially untrue and misleading statements concerning the Company's underwriting practices and quality control, which the Company purportedly implemented to facilitate the sale of its loans on the secondary market. Specifically, the 2006 Form 10-K stated with regard to the underwriting of loans that:

> Our primary goal in making a decision whether to extend a loan is whether that loan conforms to the expectations and underwriting standards of the secondary mortgage market. Typically, these standards focus on a potential borrower's credit history (often as summarized by credit scores), income and stability of income, liquid assets and net worth and the value and the condition of the property securing the loan.

250.    The 2006 10-K represented that the Company enforced its underwriting standards in order to ensure quality and minimize the repurchase demands once its loans had been sold, stating "We have implemented strict procedures to ensure quality control and conformity to underwriting standards and minimize the risk of being required to repurchase loans. From time to time we have been required to repurchase loans that we sold."

251.    The 2006 10-K specifically represented that the Company's quality control systems included "monthly quality control testing" that included "checks on the accuracy of the borrower's income and assets and the credit report used to make the loan, reviews whether the loan buyer's underwriting standards were properly applied and examines whether the loan complies with government regulations." Significantly, that 10-K further stated that "[t]o date,

those reports have not identified any material quality control concerns…"  Moreover, the 2006 10-K claimed that the Company's computer system "assures that the Company's underwriting policies are adhered to."

252.    The statements in the 2007 Offering Materials concerning American Home's underwriting guidelines and the enforcement thereof were materially untrue and misleading.  The Company did not follow its underwriting guidelines, and, among other things, underwrote highly risky loans without applying the required (and industry standard) "reasonability test."  Low and no documentation loans were provided to borrowers who did not qualify for such loans.  Further, the Company made exceptions to its underwriting guidelines as a matter of course, and underwriters were frequently overruled in their determinations as to credit quality.   The Company also failed to underwrite or verify the underwriting of loans obtained through its Correspondent Division.  As a result, many of the loans originated by the Company did not conform to the expectations of the secondary mortgage market, and were either unsalable or salable only at a discount.  Accordingly, the statement that the Company had been required to repurchase loans "from time to time" was untrue because, in fact, repurchase demands were significant and increasing.

253.    Both the 2007 Prospectus Supplement Supplement and the 2006 10-K stated with regard to the Company's loan and MBS portfolio that "Most of our portfolio consists of securitized [ARM loans] that are of prime and alternate 'A' quality."  The 2006 10-K stated that the MBS held by the Company were "primarily either agency obligations or were rated AAA or AA by Standard & Poor's."  Those statements were untrue because the Company's portfolio in fact consisted of low-quality loans it had originated, including loans originated in violation of its own underwriting guidelines and high-risk loans obtained from correspondent lenders and from

Waterfield.  In addition, the portfolio included scratch & dent loans that American Home could not resell for full value.

254.    Despite the fact that the demand for the Company's loans in the secondary market had collapsed prior to the 2007 Offering, the 2007 Offering Materials contained materially untrue and misleading statements about those sales.  Specifically, the April 30, 2007 Form 8-K/A, as amended, stated "It does appear that the secondary market is stabilizing.  During April, more loan buyers have been bidding to buy our loan pools."  In truth, the demand for the Company's loans had collapsed and the prices being offered for American Home loans in the secondary market had fallen precipitously.

255.    The 8-K/A also stated that the delinquency rate on the Company's loans, which was causing the Company to repurchase loans, would decrease as a result of the Company's determination to cease originating certain stated income loans.  Specifically, the 8-K/A stated "[O]ur company is now in a 'tail' period that will include repurchasing loans that were recently sold and are still inside the period in which our sale is subject to repurchase, which is usually three months. As the tail period winds down, our company's delinquency related charges should begin to diminish."  This statement was materially untrue and misleading because the products being terminated were not the sole cause of delinquencies or repurchases, and the continued origination of other high risk loans, and the volume of previously originated high risk loans, would continue to generate high delinquencies and result in repurchases by American Home.

**The 2007 Offering Materials Contained Untrue Financial Results**

256.    The 2007 Offering Materials also contained materially untrue and misleading statements concerning the Company's credit facilities.  Specifically, the 2006 10-K stated:

> The facilities are secured by mortgage loans and other assets of the
> Company. The facilities contain various covenants pertaining to

maintenance of net worth, working capital and maximum leverage. At December 31, 2006, the Company was in compliance with respect to the loan covenants.

257.   That statement was materially untrue and misleading because the Company had already received a margin call from Lehman immediately preceding the 2007 Offering and it was extremely likely that additional margin calls based on the same grounds would follow. Specifically, because the loans and MBS used to collateralize the Company's credit facility were highly risky loans to borrowers with poor or unverified creditworthiness, the Company's creditors were highly likely to demand cash as additional collateral.

258.   For those same reasons, the statements included in the 2006 10-K that purported to warn investors as to the risk of a potential margin call were materially untrue and misleading. Specifically, the 2006 10-K stated:

> Our credit facilities are subject to margin calls based on the lender's opinion of the value of our loan collateral.  An unanticipated large margin call could harm our liquidity.  The amount of financing we receive under our credit facilities depends in large part on the lender's valuation of the mortgage loans that secure the financings. Each such facility provides the lender the right, under certain circumstances, to reevaluate the loan collateral that secures our outstanding borrowings at any time. In the event the lender determines that the value of the loan collateral has decreased, it has the right to initiate a margin call.

259.   The 2007 Prospectus Supplement Supplement was similarly untrue and misleading in making statements concerning the Company's credit facilities that failed to disclose the recent margin call from Lehman, or the true quality of the collateral for the Company's credit facilities.  Specifically, the 2007 Prospectus Supplement Supplement stated "Cash could be required to meet margin calls under the terms of our borrowings in the event that there is a decline in the market value of our loans that collateralize our debt, the terms of our debt become less attractive or for other reasons."  Similarly, with regard to the Company's repurchase agreements, the 2007 Prospectus Supplement Supplement stated "our repurchase borrowings are

collateralized by the value of our portfolio of mortgage assets.  If the value of the assets falls, we could face margin calls that we are unable to meet, in which case our assets would be liquidated on unfavorable terms."  Those statements were materially untrue and misleading in light of the undisclosed margin call the Company had already received from Lehman in March 2007, and the poor quality of the collateral for the warehouse lines and assets backing the repurchase agreements.

260.   The 2007 Offering Materials also contained a series of untrue statements concerning American Home's financial results.  As set forth above with regard to the 2005 Offering, the Company's origination of high-risk loans, abandonment of underwriting guidelines and refusal to take losses on scratch & dent loans directly impacted its financial condition.  Specifically, because the Company employed weak underwriting standards and failed to account for the concomitant rise in credit and default risk, the Company materially understated its liability for loan repurchases, and materially overstated its gain on sale, net income, and assets, including its MBS, loans held for sale and investment, MSRs and residual assets.

261.   Specifically, the 2006 10-K reported reserves for loan repurchases of just $6.9 million.  In light of the deterioration in the quality of the Company's loans and the marked increase in repurchases noted by its employees, as set forth above, that reserve was materially understated.  Accordingly, because the Company did not fully account for the true risk profile of its loans, the other key financial results included in the 2007 Offering Materials were materially untrue and misleading.

262.   The 2006 10-K reported net income of $263.5 million, gain on sale of mortgage loans and MBS for the previous year of $822.3 million, and total assets of $18.8 billion, including MBS of $9.3 billion, $1.5 billion of loans held for sale (net), $6.3 billion of loans held

for investment, residual assets of $206.1 million and MSRs of $506 million.  Those figures were materially untrue and misleading.

263.    The April 30, 2007 Form 8-K/A, incorporated by reference into the 2007 Prospectus Supplement Supplement reported net income for the first quarter of 2007 of $30.7 million, three month gain on sale of mortgage loans and MBS of $122.6 million, and total assets of $20.6 billion, including MBS of $7.6 billion, $955.5 million of loans held for sale (net), $6 billion of loans held for investment, residual assets of $182.9 million and MSRs of $525.6 million.  Those figures were materially untrue and misleading.

264.    Deloitte, American Home's auditor, audited the Company's year-end 2006 financial statements contained in the 2006 10-K and issued a report on the consolidated statement of financial condition as of December 31, 2006.

265.    Deloitte's report provided in relevant part as follows:

> We have audited the accompanying consolidated balance sheets of American Home Mortgage Investment Corp. and subsidiaries (the "Company") as of December 31, 2006 and 2005, and the related consolidated statements of income, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2006… We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).

> In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of American Home Mortgage Investment Corp. and subsidiaries at December 31, 2006 and 2005, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2006, in conformity with accounting principles generally accepted in the United States of America.

266.    Also filed with the 2006 10-K was a consent form signed by Deloitte to incorporate by reference into the Shelf Registration Statement Deloitte's report relating to the financial statements of American Home appearing in the 2006 10-K.  The 2007 Prospectus Supplement Supplement incorporated by reference Deloitte's report, stating that it was "so

incorporated in reliance upon the report of [Deloitte] given upon their authority as experts in accounting and auditing."

267.   Deloitte's report included in the 2006 10-K, including its unqualified audit opinion, was materially untrue and misleading because, for the reasons set forth above, the Company's consolidated financial statements did not fairly present the Company's financial condition and were not prepared in accordance with GAAP.

## IX.   <u>GAAP VIOLATIONS</u>

268.   The Company's financial statements during the Class Period were also materially untrue due to their failure to comply with Generally Accepted Accounting Principles ("GAAP"). GAAP are those principles recognized by the accounting profession as conventions, rules and procedures necessary to define accounting practices at a particular time.   The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board.   SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC which are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

269.   As alleged herein, the Company failed to properly account for the material increase in credit risk associated with its issuance of low and no documentation loans, its failure to properly underwrite such loans, and its refusal to sell scratch & dent loans at a loss.   By concealing the Company's true risk profile and representing the Company to be focused on high-quality borrowers, American Home overstated its financial results, including its net income, gain on sale and the value of its assets.   The Company therefore violated GAAP, thereby resulting in the misstatement of its financial statements.   The Company's representations that its financial statements were prepared in accordance with GAAP were, therefore, materially untrue and

misleading. Each of these misrepresentations standing alone was a material violation of GAAP, applicable SEC regulations and the Company's own accounting policies.

270. By presenting untrue and misleading financial results for American Home as represented above, the Company violated the following GAAP provisions:

a. the Company's method of determining the value of its residual assets violated SFAS No. 140, SFAS No. 157 and SFAS No. 159;

b. the Company's method of determining the value of its investment portfolio violated SFAS No. 115, SFAS No. 157, SFAS No. 159 and SAB Topic 5M;

c. the Company's method of reporting its gain on sale of whole mortgage loans and mortgage loan securitizations violated SFAS No. 140 and SFAS No. 65;

d. the Company's method of determining the value of its mortgage servicing rights violated SFAS No. 156 and SFAS No. 140;

e. the Company's method of determining the value of its mortgage backed securities violated SFAS No. 115, SFAS No. 140, SFAS No. 157, SFAS No. 159, SAB Topic 5M; and

f. the Company's method of establishing its repurchase liability violated SFAS 5, SFAS 114, SAB 102 and FRR 28.

## **Deloitte Failed To Audit American Home In Accordance With GAAS**

271. In certifying American Home's 2004 and 2006 financial statements, Deloitte falsely represented those financial statements were prepared in accordance with GAAP and that Deloitte's audits were conducted in accordance with Generally Accepted Auditing Standards ("GAAS").10  When an auditor represents that a company's financial statements conform in all

---

[10]  The Public Company Accounting Oversight Board ("PCAOB"), established by the Sarbanes-Oxley Act of 2002, is responsible for the development of auditing and related professional practice standards that are required to be followed by registered public accounting firms. On April 16, 2003, the PCAOB adopted as its interim standards GAAS as described by the AICPA Auditing Standards Board's SAS No. 95, *Generally Accepted Auditing Standards*, and related interpretations in existence on that date. Accordingly, an auditor's reference to "the standards of the Public Accounting Oversight Board (United States)" includes a reference to GAAS in existence as of April 16, 2003. All references to GAAS hereinafter include the standards of the PCAOB.

material respects with GAAP, the auditor "indicates [his] belief that the financial statements taken as a whole are not materially misstated." AU § 312.11  Indeed, "[f]inancial statements are materially misstated when they contain misstatements whose effect, individually or in the aggregate, is important enough to cause them not to be presented fairly, in all material respects, in conformity with [GAAP]." AU § 312.

272.    Deloitte's statements were untrue because its audits did not conform to GAAS and, therefore, Deloitte had no reasonable basis to represent that American Home's financial statements fairly presented the Company's financial position and results of operations in conformity with GAAP.  In issuing unqualified audit opinions on American Home's financial statements, Deloitte failed to comply with the professional standards dictated by GAAS.

273.    GAAS General Standard No. 3 requires an auditor to exercise due professional care in the performance of the audit and preparation of the report.  (AU §150.01). Also, the AICPA Audit & Accounting Guide ("A&A") for lending institutions specifically identifies "[h]igh rate of growth in loan portfolio" as a high-risk area for material misstatements.  Deloitte violated General Standard No. 3 by, among other things, disregarding American Home's drastic growth and the abandonment of the Company's underwriting guidelines that facilitated that growth, all of which necessitated the establishment of additional reserves.  Had Deloitte complied with GAAS, the only reasonable professional conclusion it could have drawn was that the Company's reserves were insufficient and, consequently, the Company had overstated its net income, gain on sale, and the value of its assets in violation of GAAP.

274.    GAAS Standard of Fieldwork No. 1 requires an auditor to plan the audit, which "involves developing an overall strategy for the expected conduct and scope of the audit," AU

---

[11] GAAS includes Statements on Auditing Standards ("SAS") issued by the Auditing Standards Board of the American Institute of Certified Public Accountants ("AICPA"), which are codified in *AICPA Professional Standards* under the prefix "AU."

§311.03, which requires understanding the entity's business sufficiently to identify areas of risk. AU §311.06.  Deloitte violated Standard of Fieldwork No. 1 by, among other things, failing to plan and conduct an audit that would review American Home's areas of risk, specifically, the quality of its loan originations and the performance of its loans in the secondary market.  Had Deloitte complied with GAAS, the only reasonable professional conclusion it could have drawn was that the Company was originating high risk loans in violation of its underwriting guidelines and that those loans were frequently, and increasingly, rejected and returned by secondary market investors due to their poor quality.

275.    GAAS Standard of Fieldwork No. 2 requires that an auditor have a sufficient understanding of the company's internal controls to properly plan the audit, assess audit risk, and to determine the nature, timing and extent of the tests performed.    Further, while it is management's responsibility to establish and maintain internal controls, AU §110.03, the independent auditor is responsible for rendering an opinion on management's assessment of the effectiveness of the company's internal control over financial reporting.  PCAOB Auditing Standards ("AS") No. 2, An Audit of Internal Control Over Financial Reporting Performed in Conjunction with an Audit of the Financial Statements, ¶ 4.

276.    Deloitte violated Standard of Fieldwork No. 2 and the requirements of AS No. 2 by disregarding the fact that American Home routinely violated its underwriting guidelines. GAAS, specifically, AICPA A&A Guide for Depository and Lending Institutions, Ch. 8, ¶ 132 required that Deloitte review loan origination files to determine the Company's compliance with those guidelines.   Had Deloitte complied with GAAS, the only reasonable professional conclusion it could have drawn was that American Home's internal controls were so ineffective that the Company's financial statements were not fairly presented in accordance with GAAP.

277.    GAAS Standards of Fieldwork Nos. 2 and 3 require that an independent auditor obtain, through inspection, observation, inquiries and confirmations, competent, sufficient evidential matter to afford a reasonable basis for its opinion.  AU § 150.02.  Deloitte violated Standard of Fieldwork Nos. 2 and 3 by, among other things, failing to obtain evidence that American Home had adequately reserved for its repurchase liability or accounted for the heightened risk of default that resulted from the abandonment of the Company's underwriting guidelines.  Had Deloitte complied with GAAS, the only reasonable professional conclusion it could have drawn was that American Home's reported repurchase liability was insufficient and that the Company had failed to account for the high-risk loans it issued, in violation of GAAP.

278.    Deloitte also negligently failed to fulfill its responsibilities under Standard of Fieldwork No. 3 to evaluate whether there was substantial doubt about American Home's ability to continue as a going concern for a reasonable period of time, not to exceed one year beyond the date of the financial statements being audited.  AU §341.02.  Given the events that transpired between the date of Deloitte's opinion on American Home's 2006 financials and the Company's August 2007 bankruptcy, if Deloitte had complied with GAAS, the only reasonable professional conclusion it could have reached, particularly when reviewing the Company's financial statements for fiscal year 2006, would have been that there was substantial doubt about American Home's ability to continue as a going concern for a reasonable period of time.

279.    GAAS also requires an auditor to evaluate "the reasonableness of accounting estimates made by management in the context of the financial statements taken as a whole," AU § 342.04, thus requiring Deloitte to review the assumptions and estimates concerning, among other things, the risks of default, delinquency and repurchase attendant to American Home's high-risk loan originations.  Deloitte violated this duty by, among other things, disregarding

American Home's failure to take into account its aggressive origination practices and accompanying increase in the Company's risk of default, delinquency and loan repurchase. Had Deloitte complied with GAAS, the only reasonable professional conclusion it could have reached was that the estimates underlying American Home's accounting were unreasonable.

280.    Standard of Reporting No. 4 requires an auditor to express an opinion on the financial statements of a company taken as a whole, or an assertion to the extent that an opinion cannot be expressed. AU §150.02. As a result of Deloitte's violation of GAAS set forth above, it also violated the Standard of Reporting No. 4 because Deloitte had an insufficient basis to express an unqualified opinion on its 2004 and 2006 audits of American Home. Accordingly, Deloitte's public statements concerning those audits were untrue, and contained omissions of material facts.

## COUNT I

### AGAINST THE 2005 OFFERING INDIVIDUAL DEFENDANTS, THE 2005 UNDERWRITER DEFENDANTS AND DELOITTE FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT

281.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein. This Count is asserted against Defendants Strauss, Hozie, Bernstein, Johnston, Marfino, McManus, Rafaelli, Slosser and Thau (the "2005 Offering Individual Defendants"), CGMI, Citigroup, Inc., Lehman Brothers Inc., Bear, Stearns & Co. Inc., Deutsche Bank Securities Inc., Deutsche Bank AG, Stifel, Nicolaus & Company, Incorporated, Flagstone Securities, LLC and Ryan Beck & Co., Inc. (the "2005 Underwriter Defendants") and Deloitte for violations of Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of all members of the Class who purchased or otherwise acquired the American Home shares issued in the 2005 Offering.

282.    Defendants' liability under this Count is predicated on the participation of each Defendant in conducting the 2005 Offering pursuant to the 2005 Registration Statement, which contained untrue statements and omissions of material fact.  This Count does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.  For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that the Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

283.    The 2005 Registration Statement contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts as described above in ¶¶204-38.

284.    Defendants Strauss, Hozie and Bernstein were executive officers and representatives of the Company who were responsible for the contents and dissemination of the 2005 Registration Statement.  Further, Defendants Strauss, Hozie and Bernstein signed the 2005 Registration Statement.  As such, Defendants Strauss, Hozie and Bernstein issued, caused to be issued, and participated in the issuance of the 2005 Registration Statement, which contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts as described above in ¶¶204-38.  By reasons of the conduct alleged herein, each of these defendants violated Section 11 of the Securities Act.

285.    As officers of American Home, Defendants Strauss, Hozie and Bernstein owed to the purchasers of the securities issued in the 2005 Offering the duty to make a reasonable and diligent investigation of the statements contained in the 2005 Registration Statement at the time it became effective to ensure that said statements were true and that there were no omissions of material fact which rendered the statements therein materially untrue and misleading.

Defendants Strauss, Hozie and Bernstein did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the 2005 Registration Statement were true and without omissions of any material facts and were not misleading.  Accordingly, Defendants Strauss, Hozie and Bernstein acted negligently and are therefore liable to Plaintiffs and the other members of the Class who purchased American Home shares issued in the 2005 Offering pursuant to the 2005 Registration Statement.

286.    The remaining 2005 Offering Individual Defendants were directors of American Home at the time the 2005 Registration Statement became effective, and signed the 2005 Registration Statement.  Specifically, Defendants Johnston, Marfino, McManus, Rafaelli, Slosser and Thau were directors of American Home at the time the 2005 Registration Statement became effective and each signed the 2005 Registration Statement.  As such, these Defendants issued, caused to be issued, and participated in the issuance of the 2005 Registration Statement, which contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts as described above in ¶¶204-38.

287.    As directors of American Home, Defendants Johnston, Marfino, McManus, Rafaelli, Slosser and Thau owed to the purchasers of the securities issued in the 2005 Offering the duty to make a reasonable and diligent investigation of the statements contained in the 2005 Registration Statement at the time it became effective to ensure that said statements were true and that there were no omissions of material fact which rendered the statements therein materially untrue and misleading.  These Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the 2005 Registration Statement were true and without omissions of any material facts and were not misleading.  Accordingly, they acted negligently and are therefore liable to Plaintiffs and the other members

of the Class who purchased American Home securities issued in the 2005 Offering pursuant to the 2005 Registration Statement.

288.    As underwriters of the 2005 Offering, the 2005 Underwriter Defendants owed to the purchasers of the securities issued in the 2005 Offering the duty to make a reasonable and diligent investigation of the statements contained in the 2005 Registration Statement at the time it became effective to ensure that said statements were true and that there were no omissions of material fact which rendered the statements therein materially untrue and misleading.  The 2005 Underwriter Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the 2005 Registration Statement were true and without omissions of any material facts and were not misleading.  Accordingly, the 2005 Underwriter Defendants acted negligently and are therefore liable to Plaintiffs and the other members of the Class who purchased American Home securities issued in the 2005 Offering pursuant to the 2005 Registration Statement.

289.    Deloitte was the auditor of American Home throughout the Class Period and consented to being named in the 2005 Offering Registration Statement as a party who certified the audited financial statements contained or incorporated by reference therein.  Deloitte's audit report incorrectly stated that its audit of American Home's 2004 consolidated financial statements were performed in accordance with the Public Company Accounting Oversight Board, that those financial statements were prepared in accordance with GAAP and provided an unqualified opinion as to those financial statements.

290.    Plaintiffs and other members of the Class who acquired the securities in the 2005 Offering pursuant to the 2005 Registration Statement did not know of the negligent conduct

alleged herein or of the facts concerning the untrue statements of material fact and omissions alleged herein, and could not have reasonably discovered such facts or conduct.

291.    None of the untrue statements or omissions alleged here were forward looking statements but, rather, concerned existing facts.  Moreover, the Defendants named in this Count did not properly identify any of these statements as forward-looking statements and did not disclose information that undermined the validity of those statements.

292.    Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that the first complaint was filed asserting claims arising out of the falsity of the 2005 Registration Statement. Less than three years elapsed from the time that the securities upon which this Count is brought were bona fide offered to the public to the time that the first complaint was filed asserting claims arising out of the falsity of the 2005 Registration Statement.

293.    Plaintiffs and the other members of the Class have sustained damages.  The value of American Home's shares sold in the 2005 Offering has declined substantially subsequent to and due to Defendants' violations of Section 11 of the Securities Act.

294.    By reason of the foregoing, the Defendants named in this Count are liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Class who purchased or otherwise acquired American Home shares in the 2005 Offering pursuant to the 2005 Registration Statement.

## COUNT II

### AGAINST THE 2005 UNDERWRITER DEFENDANTS
### FOR VIOLATIONS OF SECTION 12(a)(2) OF THE SECURITIES ACT

295.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.  This Count is asserted against the 2005 Underwriter Defendants for violations of

Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of all members of the Class who purchased or otherwise acquired the American Home shares issued in the 2005 Offering.

296. The 2005 Underwriter Defendants were sellers, offerors, and/or solicitors of sales of securities offered pursuant to the 2005 Prospectus. The 2005 Prospectus contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth above in ¶¶204-38. The 2005 Underwriter Defendants' actions and solicitations included participating in the preparation of the materially untrue and misleading 2005 Prospectus.

297. The 2005 Underwriter Defendants are sellers within the meaning of the Securities Act because they: (a) transferred title to Plaintiffs and other members of the Class who purchased American Home shares; (b) transferred title of American Home shares to other underwriters and/or broker-dealers that sold those securities as agents for the 2005 Underwriter Defendants; and (c) solicited the purchase of American Home shares by Plaintiffs and other members of the Class, motivated at least in part by the desire to serve the 2005 Underwriter Defendants' own financial interest and the interests of American Home, including but not limited to commissions on their own sales of American Home securities and separate commissions on the sale of those securities by non-underwriter broker-dealers.

298. The 2005 Underwriter Defendants used means and instrumentalities of interstate commerce and the U.S. mails.

299. The 2005 Underwriter Defendants owed to Plaintiffs and all other purchasers or other acquirers of securities in the 2005 Offering the duty to make a reasonable and diligent investigation of the statements contained in the offering materials, including the 2005

Prospectus, to ensure that such statements were true and that there was no omission of material fact necessary to prevent the statements contained therein from being misleading.  The 2005 Underwriter Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the 2005 Registration Statement were true and without omissions of any material facts and were not misleading. Accordingly, the 2005 Underwriter Defendants are liable to Plaintiffs and the other members of the Class who purchased American Home securities in the 2005 Offering.

300.    Plaintiffs and other members of the Class purchased or otherwise acquired securities in the 2005 Offering pursuant to the materially untrue and misleading 2005 Prospectus and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the 2005 Prospectus.

301.    Plaintiffs and other members of the Class offer to tender to the 2005 Underwriter Defendants those Company securities that the members of the Class continue to own in return for the consideration paid for those securities, together with interest thereon.

302.    By virtue of the conduct alleged herein, the 2005 Underwriter Defendants violated Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiffs and other members of the Class who purchased in the 2005 Offering pursuant to the 2005 Prospectus have the right to rescind and recover the consideration paid for their securities, and hereby elect to rescind and tender their securities to the Underwriter Defendants.  Plaintiffs and the members of the Class who have sold their securities purchased in the 2005 Offering are entitled to rescissory damages.

## COUNT III

### AGAINST THE 2005 OFFERING INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT

303.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.   This Count is asserted against the 2005 Offering Individual Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of Plaintiffs and the other members of the Class who purchased or otherwise acquired the American Home shares issued in the 2005 Offering.

304.    At all relevant times, the 2005 Offering Individual Defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act.   Each of the 2005 Offering Individual Defendants served as an executive officer or director of American Home prior to and at the time of the 2005 Offering.   Specifically, Defendant Strauss served as American Home's Chairman, Chief Executive Officer and President; Defendant Bernstein served as American Home's Controller; Defendant Hozie served as American Home's Executive Vice President and Chief Financial Officer.   Defendants Johnston, Marfino, McManus, Rafaelli, Slosser and Thau each served as a director of American Home prior to and at the time of the 2005 Offering.

305.    Each of the Officer Defendants at all relevant times participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of American Home's business affairs. As officers of a publicly owned company, the Officer Defendants had a duty to disseminate accurate and truthful information with respect to American Home's financial condition and results of operations.   Defendants Johnston, Marfino, McManus, Rafaelli, Slosser and Thau participated in the preparation and dissemination of the 2005 Registration Statement, and otherwise participated in the process necessary to conduct the 2005 Offering.   Because of their positions of control and authority as senior officers of American

Home, the Officer Defendants were able to, and did, control the contents of the 2005 Registration Statement, which contained materially untrue financial information.

306.    As directors of a publicly owned company, Defendants Johnston, Marfino, McManus, Rafaelli, Slosser and Thau had a duty to disseminate accurate and truthful information with respect to American Home's financial condition and results of operations. Defendants Johnston, Marfino, McManus, Rafaelli, Slosser and Thau each signed the 2005 Registration Statement and thereby controlled its contents and dissemination, including the dissemination of the 2005 Prospectus contained therein.

307.    By reason of the aforementioned conduct, each of the Defendants named in this Count is liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as the Company is liable under Sections 11 and 12(a)(2) of the Securities Act, to Plaintiffs and the other members of the Class who purchased securities in the 2005 Offering.  As a direct and proximate result of the conduct of the 2005 Offering Individual Defendants, Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of Company stock.

## COUNT IV

### AGAINST THE 2007 OFFERING INDIVIDUAL DEFENDANTS, THE 2007 UNDERWRITER DEFENDANTS AND DELOITTE FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT

308.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.  This Count is asserted against Defendants Strauss, Hozie, Bernstein, Johnston, Marfino, McManus, Rafaelli, Slosser, Thau and Salovaara (the "2007 Offering Individual Defendants"), CGMI and Citigroup, Inc. (the "2007 Underwriter Defendants") and Deloitte for violations of Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of all members of the

Class who purchased or otherwise acquired the American Home shares issued in the 2007 Offering.

309.    Defendants' liability under this Count is predicated on the participation of each Defendant in conducting the 2007 Offering pursuant to the 2007 Offering Materials, which contained untrue statements and omissions of material fact.  This Count does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.  For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that the Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

310.    The 2007 Offering Materials contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts as described above.

311.    Defendants Strauss, Hozie and Bernstein were executive officers and representatives of the Company who were responsible for the content and dissemination of the 2007 Offering Materials.  Further, Defendants Strauss, Hozie and Bernstein signed the 2007 Offering Materials.  As such, Defendants Strauss, Hozie and Bernstein issued, caused to be issued, and participated in the issuance of the 2007 Offering Materials, which contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts as described above.  By reasons of the conduct alleged herein, each of these defendants violated Section 11 of the Securities Act.

312.    As officers of American Home, Defendants Strauss, Hozie and Bernstein owed to the purchasers of the securities issued in the 2007 Offering the duty to make a reasonable and diligent investigation of the statements contained in the 2007 Offering Materials at the time it

became effective to ensure that said statements were true and that there were no omissions of material fact which rendered the statements therein materially untrue and misleading. Defendants Strauss, Hozie and Bernstein did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the 2007 Offering Materials were true and without omissions of any material facts and were not misleading.  Accordingly, Defendants Strauss, Hozie and Bernstein acted negligently and are therefore liable to Plaintiffs and the other members of the Class who purchased American Home shares issued in the 2007 Offering pursuant to the 2007 Offering Materials.

313.    The remaining 2007 Offering Individual Defendants were directors of American Home at the time the 2007 Offering Materials became effective, and signed the 2007 Offering Materials.  Specifically, Defendants Johnston, Marfino, McManus, Rafaelli, Slosser and Thau were directors of American Home at the time the 2007 Offering Materials became effective and each signed the 2007 Offering Materials.  Defendant Salovaara was a Director of American Home at the time the 2007 Prospectus Supplement Supplement was issued and the 2007 Offering Materials became effective.  As such, these Defendants issued, caused to be issued, and participated in the issuance of the 2007 Offering Materials, which contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts as described above.

314.    As directors of American Home, Defendants Johnston, Marfino, McManus, Rafaelli, Slosser, Thau and Salovaara owed to the purchasers of the securities issued in the 2007 Offering the duty to make a reasonable and diligent investigation of the statements contained in the 2007 Offering Materials at the time it became effective to ensure that said statements were true and that there were no omissions of material fact which rendered the statements therein

materially untrue and misleading.  These Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the 2007 Offering Materials were true and without omissions of any material facts and were not misleading.  Accordingly, they acted negligently and are therefore liable to Plaintiffs and the other members of the Class who purchased American Home securities issued in the 2007 Offering pursuant to the 2007 Offering Materials.

315.   As underwriters of the 2007 Offering, the 2007 Underwriter Defendants owed to the purchasers of the securities issued in the 2007 Offering the duty to make a reasonable and diligent investigation of the statements contained in the 2007 Offering Materials at the time it became effective to ensure that said statements were true and that there were no omissions of material fact which rendered the statements therein materially untrue and misleading.  The 2007 Underwriter Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the 2007 Offering Materials were true and without omissions of any material facts and were not misleading.  Accordingly, the 2007 Underwriter Defendants acted negligently and are therefore liable to Plaintiffs and the other members of the Class who purchased American Home securities issued in the 2007 Offering pursuant to the 2007 Offering Materials.

316.   Deloitte was the auditor of American Home throughout the Class Period and consented to being named in the 2007 Offering Registration Statement as a party who certified the audited financial statements contained or incorporated by reference therein.  Deloitte's audit report incorrectly stated that its audits of American Home's consolidated 2005 and 2006 financial statements were performed in accordance with the Public Company Accounting

Oversight Board, that those financial statements were prepared in accordance with GAAP and provided an unqualified opinion as to those financial statements.

317.    Plaintiffs and other members of the Class who acquired the securities in the 2007 Offering pursuant to the 2007 Offering Materials did not know of the negligent conduct alleged herein or of the facts concerning the untrue statements of material fact and omissions alleged herein, and could not have reasonably discovered such facts or conduct.

318.    None of the untrue statements or omissions alleged here were forward looking statements but, rather, concerned existing facts.  Moreover, the Defendants named in this Count did not properly identify any of these statements as forward-looking statements and did not disclose information that undermined the validity of those statements.

319.    Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that the first complaint was filed asserting claims arising out of the falsity of the 2007 Offering Materials. Less than three years elapsed from the time that the securities upon which this Count is brought were bona fide offered to the public to the time that the first complaint was filed asserting claims arising out of the falsity of the 2007 Offering Materials.

320.    Plaintiffs and the other members of the Class have sustained damages.  The value of American Home's shares sold in the 2007 Offering has substantially declined subsequent to and due to Defendants' violations of Section 11 of the Securities Act.

321.    By reason of the foregoing, the Defendants named in this Count are liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Class who purchased or otherwise acquired American Home shares in the 2007 Offering pursuant to the 2007 Offering Materials.

## COUNT V

### AGAINST THE 2007 UNDERWRITER DEFENDANTS
### FOR VIOLATIONS OF SECTION 12(a)(2) OF THE SECURITIES ACT

322.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.  This Count is asserted against the 2007 Underwriter Defendants for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of all members of the Class who purchased or otherwise acquired the American Home shares issued in the 2007 Offering.

323.    The 2007 Underwriter Defendants were sellers, offerors, and/or solicitors of sales of securities offered pursuant to the 2007 Prospectus Supplement.  The 2007 Prospectus Supplement contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth above.  The 2007 Underwriter Defendants' actions and solicitations included participating in the preparation of the materially untrue and misleading 2007 Prospectus Supplement Supplement.

324.    The 2007 Underwriter Defendants are sellers within the meaning of the Securities Act because they: (a) transferred title to Plaintiffs and other members of the Class who purchased American Home shares; (b) transferred title of American Home shares to other underwriters and/or broker-dealers that sold those securities as agents for the 2007 Underwriter Defendants; and (c) solicited the purchase of American Home shares by Plaintiffs and other members of the Class, motivated at least in part by the desire to serve the 2007 Underwriter Defendants' own financial interest and the interests of American Home, including but not limited to commissions on their own sales of American Home securities and separate commissions on the sale of those securities by non-underwriter broker-dealers.

325. The 2007 Underwriter Defendants used means and instrumentalities of interstate commerce and the U.S. mails.

326. The 2007 Underwriter Defendants owed to Plaintiffs and all other purchasers or other acquirers of securities in the 2007 Offering the duty to make a reasonable and diligent investigation of the statements contained in the offering materials, including the 2007 Prospectus Supplement, to ensure that such statements were true and that there was no omission of material fact necessary to prevent the statements contained therein from being misleading. The 2007 Underwriter Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the 2007 Offering Materials were true and without omissions of any material facts and were not misleading. Accordingly, the 2007 Underwriter Defendants are liable to Plaintiffs and the other members of the Class who purchased American Home securities in the 2007 Offering.

327. Plaintiffs and other members of the Class purchased or otherwise acquired securities in the 2007 Offering pursuant to the materially untrue and misleading 2007 Prospectus Supplement and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the 2007 Prospectus Supplement.

328. Plaintiffs and other members of the Class offer to tender to the 2007 Underwriter Defendants those Company securities that the members of the Class continue to own in return for the consideration paid for those securities, together with interest thereon.

329. By virtue of the conduct alleged herein, the 2007 Underwriter Defendants violated Section 12(a)(2) of the Securities Act. Accordingly, Plaintiffs and other members of the Class who purchased in the 2007 Offering pursuant to the 2007 Prospectus Supplement have the right to rescind and recover the consideration paid for their securities, and hereby elect to rescind and

tender their securities to the 2007 Underwriter Defendants.  Plaintiffs and the members of the

Class who have sold their securities purchased in the 2007 Offering are entitled to rescissory

damages.

**COUNT VI**

**AGAINST THE 2007 OFFERING INDIVIDUAL DEFENDANTS
FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT**

330.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set

forth herein.   This Count is asserted against the 2007 Offering Individual Defendants for

violations of Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of Plaintiffs and the

other members of the Class who purchased or otherwise acquired securities on behalf of all

members of the Class who purchased or otherwise acquired the American Home shares issued in

the 2007 Offering.

331.    At all relevant times, the 2007 Offering Individual Defendants were controlling

persons of the Company within the meaning of Section 15 of the Securities Act.  Each of the

2007 Offering Individual Defendants served as an executive officer or director of American

Home prior to and at the time of the 2007 Offering.   Specifically, Defendant Strauss served as

American Home's Chairman, Chief Executive Officer and President; Defendant Bernstein served

as American Home's Controller; Defendant Hozie served as American Home's Executive Vice

President and Chief Financial Officer.   Defendants Johnston, Marfino, McManus, Rafaelli,

Slosser, Thau and Salovaara each served as a director of American Home prior to and at the time

of the 2007 Offering.

332.    Each of the Officer Defendants at all relevant times participated in the operation

and management of the Company, and conducted and participated, directly and indirectly, in the

conduct of American Home's business affairs. As officers of a publicly owned company, the

114

Officer Defendants had a duty to disseminate accurate and truthful information with respect to American Home's financial condition and results of operations.  Defendants Johnston, Marfino, McManus, Rafaelli, Slosser, Thau and Salovaara participated in the preparation and dissemination of the 2007 Offering Materials, and otherwise participated in the process necessary to conduct the 2007 Offering.  Because of their positions of control and authority as senior officers of American Home, the Officer Defendants were able to, and did, control the contents of the 2007 Offering Materials, which contained materially untrue financial information.

333.    As directors of a publicly owned company, Defendants Johnston, Marfino, McManus, Rafaelli, Slosser, Thau and Salovaara had a duty to disseminate accurate and truthful information with respect to American Home's financial condition and results of operations. Defendants Johnston, Marfino, McManus, Rafaelli, Slosser and Thau each signed the 2007 Offering Materials and thereby controlled its content and dissemination, including the dissemination of the 2007 Prospectus Supplement Supplement contained therein.

334.    By reason of the aforementioned conduct, each of the Defendants named in this Count is liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as the Company is liable under Sections 11 and 12(a)(2) of the Securities Act, to Plaintiffs and the other members of the Class who purchased securities in the 2007 Offering.  As a direct and proximate result of the conduct of the 2007 Offering Individual Defendants, Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of Company stock.

## X.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

335.    Plaintiffs further allege that Defendants Strauss and Hozie participated in an extensive fraud throughout the Class Period to manipulate American Home financial results for

purposes of maintaining growth and profits while exposing the Company and its investors to massive undisclosed risks.

336.    As alleged above, a comprehensive investigation by Lead Plaintiffs has uncovered specific facts demonstrating that American Home and its senior management knew and concealed the fact that the Company was, contrary to its public posturing, focused on expanding its growth by issuing high risk loans to borrowers with poor credit.  The Company and its officers closely tracked the performance of the loans American Home originated and purchased, and knew that it carried massive volumes of loans that were not salable.

## XI.    ADDITIONAL FALSE AND MISLEADING STATEMENTS

337.    Plaintiffs repeat and reallege each of the materially false and misleading statements set forth above in ¶¶204-38 and ¶¶243-67 as if fully set forth herein.  In addition to the false and misleading statements contained and incorporated in the 2005 Prospectus Supplement dated August 9, 2005, and in the 2007 Offering Materials, each of which was made with scienter by Defendants Strauss and Hozie during the Class Period and is actionable under the Exchange Act, the following false and misleading statements were made with scienter during the Class Period.

### The Company Touted The High-Quality Of Its Loans In 2005 Even As It Further Relaxed Its Underwriting Standards And Repurchases Increased

338.    On July 19, 2005, the Company issued a press release announcing financial results for the second quarter ended June 30, 2005, including net income of $65.5 million, a three month gain on sale of mortgage loans and MBS of $182.4 million and total assets of $9.8 billion, including MBS of $6.9 billion, loans held for sale of $2 billion (net), loans held for investment of $134.6 million and MSRs of $261.9 million.  The press release was filed that day with the SEC as an exhibit to a Form 8-K, which was signed by Defendant Hozie.

339.    In  the  press  release,  Defendant  Strauss  touted  American  Home's  loan originations, stating "[o]f special note in the quarter was the success of our origination business, which achieved loan production of $10.8 billion and an estimated market share of 1.58%, both records  for  our  company."    Strauss  again  emphasized  the  quality  and  selectivity  of  the Company's portfolio, stating

> Now that its portfolio is developed, American Home will become more
> selective about the types of adjustable, securitized loans it retains, and will
> concentrate on those loans which offer the best risk-to-return profile. …
> As it becomes more selective in the assets it retains, American Home will
> continue its focus on loans with high credit quality and limited exposure to
> convexity risk.

The  press  release  also  quoted  McDonagh,  the  Chief  Investment  Officer,  as  stating  that "American Home's portfolio is now developed to the point where we can more narrowly focus our retention on loans with advantaged risk-to-return profiles."

340.    That same day, the Company held a conference call with analysts to discuss quarterly results.  During that call, one analyst questioned the growth in the Company's loan originations and specifically asked Defendant Strauss whether that growth resulted from "strange products" such as "interest only, or maybe low doc, no doc, or any of these other somewhat more aggressive products."    In response, Strauss did not disclose the slew of low documentation products American Home's loan officers were pushing but, instead, stressed that the Company was a prime lender, stating "I think if you look at the cross-section of our production, you will see it very similar to other significant prime participants, and indeed market share leaders in the prime space."    Asked again to specify the Company's product mix, Strauss addressed only American Home's interest only and option ARM loans, and did not disclose the Company's reliance on low and no documentation loans to grow its originations.  During that call, Strauss

also reiterated that the Company was "increasing [its] selectivity about the types of loans we securitize and hold."

341.    On July 29, 2005, American Home filed with the SEC a Form 10-Q for the second quarter of 2005 and the period ending June 30, 2005.  The 2Q05 Form 10-Q was signed by Defendants Strauss and Hozie and contained certifications by Defendants Strauss and Hozie pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002.  The 2Q05 Form 10-Q repeated the quarterly financial results published in the July 19, 2005 press release.  Further, it stated that the Company's repurchase liability was "immaterial," and quoted a fair value of residual assets of $333.8 million.

342.    The statements contained in the Company's 2Q05 10-Q and July 19, 2005 press release were materially false and misleading because, for the reasons set forth above, the Company's net income, gain on sale and assets were materially overstated, and its repurchase liability was understated.  As set forth above in ¶¶79-118, the Company specifically targeted borrowers with poor credit, as evidenced by the January 11, 2005 e-mail touting the Company's Choice Flex product for "clients with issues."  These included 100% LTV loans for borrowers with FICO scores below 600, and 100% CLTV stated income loans for borrowers with credit scores of 600.  Similarly, as set forth above in ¶¶91 and 94, the Company's Choice Investor loans permitted the issuance of loans to borrowers with credit scores as low as 500, and borrowers who had other "derogatory credit" as evidenced by the May 27, 2005 e-mail touting the flexibility of that product.  In addition, as set forth above in ¶¶171-72, by mid-2005 the Company was already experiencing a dramatic increase in repurchase demands, with a quarter of the loans the Company sold being returned to it.

343.    Moreover, the statements concerning the quality of the Company's loan and MBS portfolio in that press release and on the July 19 conference call were materially false and misleading because, rather than reflecting "selectivity," that portfolio contained scratch & dent loans and other loans of poor quality that were unsalable at full value.  Indeed, Defendant Strauss had personally directed that scratch & dent loans be retained in the REIT rather than being sold at a loss.  The statements concerning the growth in the Company's originations was materially false and misleading because, in truth, such growth resulted from loose underwriting guidelines and the failure to enforce those guidelines that resulted in the issuance of highly risky loans.

344.    Defendant Strauss' statements on the July 19, 2005 conference call were also materially false and misleading because, in response to a direct question he failed to disclose the Company's extensive use of low and no documentation loans, instead touting the quality of American Home's loans by comparing the Company to prime mortgage lenders.

345.    On September 15, 2005, Defendant Strauss spoke at a Lehman Brothers Financial Services Conference and reiterated the quality of the Company's mortgage loans and its loan and MBS portfolio.  Specifically, Strauss stated that "American Home originates and invests in Prime Mortgage Loans."  Indeed, Strauss went on to say that the Company had "mitigated many of [the] risks in our business" and "avoided taking on credit risk."  In addition, Strauss again touted the selectivity and quality of the Company's loan portfolio, claiming that American Home sold "loans that we don't want to keep in our portfolio."

346.    Defendant Strauss' statements at the September 15, 2005 Lehman Brothers conference were materially false and misleading because, as set forth above, the Company issued highly risky loans to borrowers with poor credit, and was thus not a "prime" lender.  In addition, the Company held those risky, low quality loans in its portfolio, including scratch & dent loans

that were unsalable or not salable for full value.  Indeed, Defendant Strauss himself directed that such loans be held in the REIT rather than being sold at a loss.

347.    On September 21, 2005 – shortly after Defendant Strauss stressed the selectivity of the Company's portfolio at the Lehman Brothers conference – Bear Stearns commenced coverage of American Home and issued an initial report rating American Home as a stock that would likely outperform its peers, citing that selectivity:

> In addition, a new investment strategy, which includes cherry-picking "select assets" from the roughly $40 billion of loans that it originates annually, and substituting them for lower return mortgage backed securities (MBS) that it currently owns, is expected to result in some net interest margin expansion.

348.    On October 26, 2005, the Company issued a press release announcing financial results for the third quarter ended September 30, 2005, including net income of $53.2 million, a three month gain on sale of mortgage loans and MBS of $150 million and total assets of $14.1 billion, including MBS of $9.2 billion, loans held for sale of $1.9 billion (net), loans held for investment of $1.4 billion and MSRs of $300.7 million.  The press release was filed that day with the SEC as an exhibit to a Form 8-K, which was signed by Defendant Hozie.

349.    Defendant Strauss was quoted in the October 26, 2005 press release again touting growth in the Company's loan originations.  Specifically, Strauss stated:  "Earnings were driven by record high loan production of $13.7 billion due to a record market share of 1.81% of national originations based on Freddie Mac estimates."   Strauss reiterated the selectivity of the loan portfolio, stating that American Home "retained only a selected portion of the ARM loans we originated, while selling the balance."   During a conference call with analysts that day, Defendant Hozie noted that loans originated by American Home constituted 51% of the Company's MBS portfolio.

350.    During that conference call, Defendant Strauss was asked by an analyst whether the Company would consider expanding into subprime lending through an acquisition.  In response, Strauss stated "No, we would not.  We feel fortunate that we are in the segment of the market that we are in.  We feel it's the best opportunity today."

351.    On November 11, 2005, American Home filed with the SEC a Form 10-Q for the third quarter ending September 30, 2005.  The 3Q05 Form 10-Q was signed by Defendants Strauss and Hozie and contained certifications by Defendants Strauss and Hozie pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002.  The 3Q05 Form 10-Q repeated the financial results reported in the Company's October 26, 2005 press release.  Further, it stated that the Company's repurchase liability was "immaterial," and quoted a fair value for residual assets of $318 million.

352.    The statements contained in the Company's 3Q05 Form 10-Q and October 26, 2005 press release were materially false and misleading because, for the reasons set forth above, the Company's net income, gain on sale and assets were materially overstated, and its repurchase liability was understated.  Moreover, the statements concerning the quality of the Company's loan and MBS portfolio were materially false and misleading because, rather than reflecting "selectivity," 51% of the MBS constituted loans originated by American Home that included scratch & dent loans and other loans of poor quality that were unsalable at full value.

353.    In addition, Defendant Strauss' statements as to the Company's lack of interest in entering the subprime market were materially false and misleading in light of the poor quality of the Company's loans, many of which were comparable in credit quality and performance to subprime loans.  Indeed, as set forth above in ¶¶99-101, according to the Company's October 2005 "Credit Update" and "Risk Management Update," American Home's underwriting

guidelines did not require the verification of income on stated income loans and permitted the issuance of high-risk loans to borrowers with poor credit, including borrowers with recent bankruptcies or foreclosure experience or who had no housing history.

354. On November 23, 2005, Citigroup issued a report echoing the Company's assertion that it was a "prime" quality lender, stating "AHM is primarily a prime quality lender with non-prime originations only accounting for 3% of total originations." The Citigroup report also reported Strauss' assertion that the Company was not interested in entering the subprime market, stating "AHM is reluctant to purchase a company who competes on price, pays high sale commissions or originates low quality loans." (Emphasis added).

355. Notwithstanding Defendant Strauss' insistence, echoed by Citigroup, that the Company was not in and would not enter the subprime market, in January 2006, shortly after Strauss made those comments, the Company acquired Waterfield, which, as set forth above, was laden with extremely risky, unsalable loans that American Home employees referred to as "swamp loans" and which were, or were comparable to, subprime loans.

### The Secondary Market For The Company's Loans Tightened As American Home Continued to Issue Highly Risky Subprime Loans In 2006

356. On January 12, 2006, American Home issued a press release to announce that its profits and gain on sale for the fourth quarter ended December 31, 2005 would be lower than expected. The press release attributed the decline in profits to market conditions, stating "American Home was adversely affected by a rapid reduction in the value of its mortgage loans held for sale and its investment portfolio due to changing market conditions." Seeking to mitigate the impact of the disclosure, the press release also touted that the Company had achieved "record market share for the Company of approximately 1.9%" based on loan production of $13.6 billion.

357.   The same day, the Company convened a conference call with analysts to explain its fourth quarter results.  During that call, Defendant Strauss described a "sharp drop in prices" and a "general malaise in the mortgage market" that caused the Company to retain loans it had intended to sell.  While Strauss stressed that self-originated loans added to the Company's portfolio would "drive future net interest income" he conceded, in response to analysts' questions about the products responsible for the loss, that it was the Company's non-conforming loans that performed most poorly.  Specifically, Strauss stated:

> The loans that held up the best were agency eligible.  And then I guess I would say that the widening followed the credit spectrum.  So hybrid jumbo ARMs that have very strong credit characteristics materially deteriorated, but not so severely.  And then as you moved into your high Alt-A, otherwise sometimes thought of as enhanced, that deteriorated a little bit more.  And then your – the straight Alt-A deteriorated still considerably more.  And finally, we do write some closed end seconds, and they experienced significant deterioration.

358.   In response to these disclosures, American Home stock dropped more than 10%, falling from $33.6 per share to close at $30 per share on January 12, 2006.  While partially disclosing the impact of the Company's deviation from high quality prime loans into "Alt-A" loans that were actually of a low quality, the Company's and Defendant Strauss' statements in the January 12, 2006 press release and conference call were materially false and misleading in that they obscured the true credit quality of the non-conforming loans for which the Company found no market in the fourth quarter of 2005.  Moreover, the statements concerning the Company's "record" market share were false and misleading because the growth in loan originations resulted from the issuance of low quality loans to borrowers with poor or unverified credit, often in violation of the Company's own underwriting standards.

359.   On January 13, 2006, the Company issued a press release relating to the Company's acquisition of Waterfield, a copy of which was filed with the SEC on January 17, as

an exhibit to a Form 8-K signed by Defendant Strauss. The press release stated: "Waterfield's primary assets are newly originated loans carried at the lower of cost or market which American Home expects to sell shortly after the acquisition is consummated." The statements in that press release were materially false and misleading because the mortgages that the Company obtained through its acquisition of Waterfield were low quality "swamp loans" that were unsalable, or which could not be sold for full value.

360. On January 26, 2006, the Company issued a press release announcing financial results for the fourth quarter and full year ended December 31, 2005. For the fourth quarter, the Company reported net income of $16.7 million and a three month gain on sale of mortgage loans and MBS of $136.8 million and, for 2005, the Company reported net income of $260.8 million and gain on sale of mortgage loans and MBS of $580.3 million. The Company reported total assets of $17.8 billion, including MBS of $10.6 billion, $2.2 billion of loans held for sale, $3.5 billion of loans held for investment and MSRs of $319.7 million. The press release was filed that day with the SEC as an exhibit to a Form 8-K, which was signed by Defendant Hozie. The financial results reported in the Company's January 26, 2005 press release were materially false and misleading because, for the reasons set forth above, the Company's net income, gain on sale and assets – including the MBS and loans held for sale and for investment and MSRs were materially overstated.

361. The press release quoted Defendant Strauss describing the "risk reduction" strategies the Company was implementing to improve its financial results:

> We are also selling our loans more frequently to reduce the risk that changing market conditions will affect our inventory of loans held for sale. To reduce the risk of further write-downs in the value of our company's investment portfolio, in the third quarter of 2005 we began carrying the self-originated securitized loans being added to our portfolio at the loans' cost rather than the resultant securities' market value. We also are

classifying all market-purchased securities as available for sale rather than trading. I believe these actions are appropriate responses to the market changes that have affected our recent results.

362.     The same day, the Company held a conference call with analysts during which Defendant Strauss offered an upbeat assessment of the Company's prospects for 2006 by focusing on the quality of the loans being added to the Company's portfolio, stating:

> Our Company's 2006 financial performance is likely to be most affected by our portfolio net interest income, our loan production volume, our gain on sale margins and any necessary write-down of our assets … Specifically, we are adding relatively high amounts of the loans we favor to our portfolio.

363.     Defendant Strauss' statements in the January 26 press release and conference call were materially false and misleading.  The increased sale of loans would not protect the Company's inventory of loans because, in light of the poor quality of the loans originated by American Home, the Company would be forced to repurchase the loans it sold in violations of representations and warranties and which were subject to early payment defaults.  For example, as set forth in ¶¶171-72, loans that American Home sold in the secondary market in early 2006 experienced problems immediately.  The statements concerning the selection of loans for the Company's portfolio were false and misleading because the Company dumped scratch & dent loans into that portfolio.  In addition, American Home misled investors by stating that carrying self-originated loans at their cost basis rather than their market value made it unlikely that impairment from those loans would materially affect the Company's financial results.  In fact, the change from market value to cost basis merely shifted the accounting for impairments to the loans and did not protect American Home from losses to the loans' value.

364.     During the January 26, 2006 conference call, Defendant Strauss also touted the Company's acquisition of Waterfield, stating "I believe that the acquisition will produce favorable results because of the experience and quality of the Waterfield origination franchise

that is joining American Home."  Indeed, Strauss stressed the quality of the loans being acquired from Waterfield, stating that Waterfield's product mix was "similar to ours.  <u>A lot of prime conforming</u> and also some Alt A and what they call expanding."  Those statements were materially false and misleading because, as set forth above, neither the Company's product mix nor the loans obtained through the acquisition of Waterfield were prime or high quality loans.

365.  On March 16, 2006, American Home filed with the SEC its annual report on Form 10-K for fiscal year 2005 ending December 31, 2005.  The 2005 10-K was signed by Defendants Strauss and Hozie, as well as several of the Company's directors.  The 2005 10-K also included certifications by Defendants Strauss and Hozie pursuant to Sections 302 and 906 of the Sarbanes Oxley Act of 2002.  The 2005 10-K reiterated the Company's standard misrepresentation about the credit quality of its loan originations:  "<u>Most of our portfolio consists of securitized adjustable-rate mortgage loans, or ARM loans, that are of prime quality</u>."  (Emphasis added.)

366.  The 2005 10-K repeated the same financial results first reported in the Company's January 26, 2006 press release, which were materially false and misleading for the reasons set forth above.  Moreover, it reported residual assets of $276 million, which, for the reasons set forth above, was materially overstated, and understated the Company's repurchase liability, which it described as "immaterial."

367.  The 2005 Form 10-K also reiterated that the Company was a high-quality lender, stating "We offer a broad array of mortgage products and <u>primarily make loans to borrowers with good credit profiles</u>."  (Emphasis added).

368.  The 2005 10-K also falsely represented that the Company's Alt-A and second lien loans were of high quality, stating that American Home's second lien loans "are designed for

borrowers with high-quality credit profiles" and that "From a credit risk standpoint, alternate 'A' loan borrowers present a risk profile comparable to that of conforming loan borrowers, but entail special underwriting considerations, such as a higher loan to value ratio or limited income or asset verification."

369. Moreover, the 2005 10-K specifically represented that "non-prime" loans represented "0.3%" of the Company's total originations for 2005, by dollar amount, with the Company having originated just $134 million in non-prime loans, defined as loans to borrowers who "may have impaired or limited credit profiles, high levels of debt service to income, or other factors that disqualify them for prime loans."

370. With regard to the underwriting of the Company's loans, the 2005 10-K stated:

> Our primary goal in making a decision whether to extend a loan is whether that loan conforms to the expectations and underwriting standards of the secondary mortgage market. Typically, these standards focus on a potential borrower's credit history (often as summarized by credit scores), income and stability of income, liquid assets and net worth and the value and the condition of the property securing the loan.

371. The 2005 10-K further represented that the Company had in place quality control systems sufficient to ensure that the underwriting guidelines were being enforced, including "monthly quality control testing" that included "checks on the accuracy of the borrower's income and assets and the credit report used to make the loan, reviews whether the loan buyer's underwriting standards were properly applied and examines whether the loan complies with government regulations." Significantly, that 10-K further stated that "[t]o date, those reports have not identified any material quality control concerns…" Moreover, the 2005 10-K claimed that the Company's computer system "assures that the Company's underwriting policies are adhered to."

372.     The statements in the 2005 10-K regarding the credit quality of the loans originated by American Home were materially false and misleading because, as set forth above, a materially significant volume of the loans the Company originated were high risk, and were issued to borrowers with poor or unverified creditworthiness.  These included the stated-income, stated-asset and other low and no documentation loans and various ARM loans discussed above.  The 2005 10-K failed to disclose that the Company's underwriting guidelines permitted the issuance of no documentation loans and stated income and stated asset loans without proper verification.  Indeed, as set forth above in ¶¶79-118, internal Company e-mails and presentations from January, May and October 2005 establish that the Company was targeting borrowers with poor credit, including borrowers with credit scores as low as 500 and borrowers with recent bankruptcy and foreclosure experience.  The limited disclosure in the 2005 10-K that some Alt-A loans might be made with "limited income or asset verification" was materially false and misleading because it failed to fully disclose the Company's origination of loans without verification of the borrower's creditworthiness.  For example, as set forth above in ¶¶99-101, as the October 2005 "Credit Update" specified that verification of income on stated income loans was not required.   The Company failed to properly underwrite such loans to verify the borrower's credit, including failing to conduct reasonability tests on stated income loans and underwriting ARMs using teaser rates.

373.     On April 5, 2006 – shortly after the Company released its 2005 10-K – A.G. Edwards recommended American Home as a buy, citing the Company's purportedly strong investment portfolio.   An A.G. Edwards report issued that day stated "Of the loans in the portfolio, 99% were considered prime quality, with the remaining 1% categorized as Alt-A

(nonconforming loans to prime-quality borrowers)… Overall, <u>we would expect very few credit losses</u> on AHM's portfolio." (Emphasis added.)

374. On April 26, 2006, the Company issued a press release announcing financial results for the first quarter ended March 31, 2006, including net income of $54.5 million, a three month gain on sale of mortgage loans and MBS of $171.1 million and total assets of $17.1 billion, including MBS of $9.6 billion, $1.6 billion of loans held for sale (net), $4.3 billion of loans held for investment and MSRs of $372 million. For the reasons set forth above, those financial results overstated the Company's net income, gain on sale and assets, including MBS, MSRs and loans held for sale and investment. The press release was filed that day with the SEC as an exhibit to a Form 8-K, which was signed by Defendant Hozie.

375. The press release trumpeted the Company's increased market share, stating that American Home "reached a record 2.55% of US originations in the first quarter," and quoted Defendant Strauss stating that the Company had "regained its financial footing." The statement concerning the Company's originations was materially false and misleading because it failed to disclose that the growth in originations resulted from the Company's willingness to originate low quality loans to borrowers with poor credit, in violation of its underwriting guidelines.

376. Also on April 26, 2006, American Home conducted a conference call with analysts. During that call, Defendant Strauss was directly questioned about the "regulatory crackdown on [interest only] and option ARMs and asked about the implications for American Home. In response, Strauss acknowledged that regulators would likely require lenders to underwrite such loans "at the full index rate and avoid[] low credit score option ARMs and interest only ARMs" but stressed that such regulation would not impact American Home:

> From our point of view, we don't make low credit score option ARMs or interest only ARMs in general. I don't believe that the regulatory

strictures will affect the larger participants in the market very much in regards to their [interest only] and option ARM lending practices.  I believe most of those practices are already consistent with the regulators' communications.

377.    Defendant Strauss' statements on the April 26, 2006 conference call were materially false and misleading because the Company did, in fact, issue option ARMs and interest only ARMs to borrowers with poor credit, and because the Company underwrote such loans using teaser or minimum payment rates rather than fully indexed rates and, as such, its undisclosed underwriting practices would be directly impacted by the regulation being discussed.

378.    On May 10, 2006, American Home filed with the SEC Form 10-Q for the first quarter ending March 31, 2006, which was signed by Defendants Strauss and Hozie and contained certifications by Defendants Strauss and Hozie pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002.  The 1Q06 10-Q repeated the financial results reported in the April 26, 2006 press release, reported residual assets of $261 million and stated that the Company's repurchase liability was "immaterial."  As set forth above, those financial results overstated the Company's net income, gain on sale and assets, including MBS, MSRs, residual assets and loans held for sale and investment.  The 1Q06 10-Q materially understated the Company's liability for repurchases, in light of the true quality of the Company's loans.

379.    The 1Q06 10-Q also provided a breakdown of the assets and liabilities acquired in connection with the Waterfield acquisition, and stated that the net value of mortgage loans held for sale were $559 million.  That statement was materially false and misleading because it overstated the true value of the loans acquired from Waterfield, which were low quality "swamp loans" that were unsalable or not salable for full value.

380.    On July 26, 2006, the Company issued a press release announcing financial results for the second quarter ended June 30, 2006, including net income of $72.4 million, a three

month gain on sale of mortgage loans and MBS of $224.5 million and total assets of $17.3 billion, including MBS of $9.3 billion, $1.2 billion of loans held for sale (net), $5.3 billion of loans held for investment and MSRs of $434 million.  The press release was filed that day with the SEC as an exhibit to a Form 8-K, which was signed by Defendant Hozie.  For the reasons set forth above, the July 26, 2006 press release materially overstated the Company's net income, gain on sale and assets, including MBS, MSRs, and loans held for investment and sale.

381.    The July 26, 2006 press release quoted Defendant Strauss touting the Company's achievement of several records, stating "our portfolio net interest income reached a record $33.9 million, while our production business experienced record originations, record market share, a strong gain on sale margin and improved warehouse income."  Those statements were materially false and misleading because, as set forth above, the "record" originations and market share were achieved by abandoning the Company's underwriting guidelines and conservative lending posture, and the "record" gain on sale was, in fact, materially overstated.

382.    On a conference call with analysts that same day, Defendant Strauss was directly questioned as to how the Company could achieve the performance it had reported without sacrificing credit quality.  Specifically, an analyst from Friedman, Billings Ramsey asked "A few people asked me this morning on calls, 'how is he doing it and how is he doing it with good – I mean, is he doing it with good credit?  Is he being too aggressive?'  Can you just address that concern?"  In response, Defendant Strauss did not, of course, concede that the Company's growth was in fact drive by the issuance of highly risky loans to borrowers with poor credit, but rather stated "its not so much that we are in a – we are trading off credit for return as we are acquiring our assets at low cost."  In his response, Strauss also stressed the performance of the loan origination business, stating "I think the mortgage-origination business was an important

reason why we were able to outperform somewhat this quarter … our mortgage origination business experienced higher gain on sale altogether."

383.    Defendant Strauss' statements on the July 26, 2006 conference call were materially false and misleading because the Company's growth and performance was, in fact, driven by highly aggressive lending practices through which American Home issued high-risk mortgages to borrowers with poor credit.  Directly contrary to Strauss' statements, the Company was "trading off credit for return" by violating its underwriting guidelines to increase growth. Indeed, during 2006, a substantial percentage of the loans originated by American Home were subprime, demonstrating that the Company had in fact become highly aggressive in order to maintain its growth.  Moreover, as set forth above in ¶122, by July 2006 American Home was "under water" with loan repurchase demands as teams of Company underwriters in New York were reviewing hundreds of loans that the Company was being forced to repurchase that should never have been issued in the first place.

384.    On August 9, 2006, American Home filed with the SEC a Form 10-Q for the second quarter ending June 30, 2006, which was signed by Defendants Strauss and Hozie and also contained certifications by Defendants Strauss and Hozie pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002.  The 2Q06 10-Q repeated the financial results reported in the Company's July 26, 2006 press release.  In addition, the 2Q06 10-Q reported residual assets of $234.8 million and stated that the Company's repurchase liability was "immaterial."  For the reasons set forth above, the 2Q06 10-Q materially overstated the Company's net income, gain on sale and assets, including MBS, MSRs, residual assets and loans held for investment and sale, and materially understated American Home's repurchase liability.

385.    In a further effort to quell the "concerns" raised on the Company's July 26, 2006 analyst call, Defendant Strauss authored an article, published October 1, 2006, in <u>Mortgage Banking, the Magazine of Real Estate Finance</u>, entitled, "Achieving Growth Through Responsible Lending."   In that article, he assured readers that American Home was not aggressive in its loan originations and, instead, focused on the needs of its borrowers, writing "[w]hile different loan products have different features, they are not designed to enable clients to make a purchase they cannot afford."

386.    On September 21, 2006, Defendant Strauss participated in a presentation at the RBF Financial Institutions Conference and repeated the Company line that "our borrowers are prime borrowers."   Asked to discuss the U.S. housing market, Strauss described a "general weakening" and acknowledged that American Home's delinquency and foreclosure experience had increased.   Strauss tempered that disclosure, however, by stressing that American Home focused on "high credit quality, very high FICO loans."   In response to a question from the moderator, Strauss downplayed the default risk associated with option ARMs, again emphasizing the Company's "high FICO lending" and other steps taken to mitigate such defaults.

387.    Defendant Strauss' statements at the September 21, 2006 conference were materially false and misleading because the Company's loans were not of "high credit quality" and the FICO scores of American Home borrowers were misleading due to the Company's failure to adhere to its underwriting guidelines and verify critical elements of creditworthiness, such as income, employment and assets.   Strauss' statements concerning option ARMs were similarly misleading because the Company failed to properly underwrite such loans at the fully indexed rate, thus significantly increasing the risk of default.

388.    On October 26, 2006, the Company issued a press release announcing financial results for the third quarter ended September 30, 2006, including net income of $72 million and a three month gain on sale of mortgage loans and MBS of $220.5 million and total assets of $17.5 billion, including MBS of $9 billion, $1.4 billion of loans held for sale (net), $5.8 billion of loans held for investment and MSRs of $460.9 million.  The press release was filed that day with the SEC as an exhibit to a Form 8-K, which was signed by Defendant Hozie.  For the reasons set forth above, the October 26, 2006 press release materially overstated the Company's net income, gain on sale and assets, including MBS, MSRs, and loans held for investment and sale.

389.    The October 26 press release quoted Defendant Strauss lauding the Company's "record portfolio net interest income, record loan production and record servicing."  Strauss also represented that the performance of the Company's loan and MBS portfolio benefitted from the addition of more loans originated by American Home, stating "Contributing to the improvement in net interest margin was an increase in the portfolio's proportion of self-originated loans held for investment."

390.    Defendant Strauss' statements in that press release were materially false and misleading because the growth in the Company's loan production reflected undisclosed issuance of high-risk loans to borrowers with poor credit in violation of underwriting guidelines.  Moreover, the statements concerning the Company's net interest income were misleading because that income derived from the Company's loan portfolio, a material portion of which consisted of high-risk loans originated by American Home, including scratch & dent loans, that carried a high risk of default.

391.    On a conference call with analysts that day, Defendant Strauss faced a series of pointed questions from analysts concerned about the Company's ability to weather a downturn in

the housing market.  In response to an analyst's question about the Company's interest in subprime lending, Strauss reiterated that American Home was a prime lender, stating "We are not focused on subprime opportunities."  Asked specifically whether an increase in the Company's reported "non-performing assets" indicated that American Home had experienced increased repurchase demands, Strauss downplayed the extent of the repurchase demands, representing that additional non-performing assets were in the Company's portfolio. Specifically, Strauss stated "Well, there is some amount of buybacks, but it's mostly from the portfolio."  Strauss went on to minimize the significant of the non-performing loans in the portfolio, stating "our loans held for investments change in non-performing assets, is the alarming, because of the percentage change.  But on a dollar MTA growth basis it is not far out of line, for example the loans underlying our residuals."  Strauss explicitly rejected the notion that non-performing assets would significantly impact the Company's performance.

> It's hard to imagine a condition under which it would become more serious event. … I do believe that because of conditions in the housing market it's going to continue to trend negatively.  But I do not believe that it will have a significant impact on our overall financial results.

392.    Defendant Strauss' statements on the conference call were materially false and misleading in light of the significant percentage of the Company's loans issued in 2006 that were subprime.  Moreover, by late 2006 the Company was already experiencing increasing rejections of its low quality loans by secondary market investors.  Moreover, as set forth above in ¶393, by May 2006, Citigroup had increased its diligence of American Home loans due to their low quality, and was reviewing 100% of the loans it purchased from the Company.

393.    In the wake of the Company statements in the October 26, 2006 press release and conference call, A.G. Edwards issued a report that day stating that credit problems were unlikely to impact American Home's earnings, stating "Overall, credit risk at AHM does not remain an

overwhelming concern for us as long as the economic environment remains strong."  The report noted the strength of the Company's Option ARMs:  "pay-option ARMs were not mentioned as a product experiencing credit losses below expectations."

394.    On November 9, 2006, American Home filed with the SEC a Form 10-Q for the third quarter ending September 30, 2006, which was signed by Defendants Strauss and Hozie and contained certifications by Defendants Strauss and Hozie pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002.  The 3Q06 10-Q repeated the financial results reported in the Company's October 26, 2006 press release, and stated that the Company's repurchase liability was "immaterial."  Further, it quoted a fair value for residual assets of $224.3 million.  For the reasons set forth above, the 3Q06 10-Q materially overstated the Company's net income, gain on sale and assets, including MBS, MSRs, residual assets and loans held for investment and sale, and materially understated American Home's repurchase liability.

**As the Subprime Market Collapsed In Early 2007, American Home Reassured Investors That Its Loans Were Not Subprime**

395.    On January 25, 2007, the Company issued a press release announcing financial results for the fourth quarter and full year ending December 31, 2006, including quarterly net income of $64.7 million and a three month gain on sale of mortgage loans and MBS of $206.2 million, with 2006 net income of $263.5 million and gain on sale of mortgage loans and MBS of $822.3 million for the year.  The press release reported total assets of $18.8 billion, including MBS of $9.3 billion, $1.5 billion of loans held for sale (net), $6.3 billion of loans held for investment and MSRs of $506.3 million.  The press release was filed that day with the SEC as an exhibit to a Form 8-K, which was signed by Defendant Hozie.  For the reasons set forth above, the January 25, 2007 press release materially overstated the Company's net income, gain on sale and assets, including MBS, MSRs, and loans held for investment and sale.

396.   The press release quoted Defendant Strauss emphasizing the Company's continued growth, as evidenced by new record market share achieved during the fourth quarter: "Loan origination volume was a record $15.5 billion due to our company achieving a record market share of 2.48% of national originations."

397.   Also on January 25, the Company held a conference call with analysts to discuss fourth quarter and year end results.  During the call, Defendant Strauss was directly questioned as to how American Home would fare differently in a declining housing market than subprime lenders, by an analyst who asked "Why aren't you going to have the same trouble with subprime as most people feel?"  In response, Strauss once again insisted that American Home was a prime lender, and stressed the quality of the Company's originations:

> Our borrowers have a history of paying their obligations and our average FICO score for loans originated or for loans sold last period was about 716…. So it's a different quality of borrower, and I would view the likely outcome as prime loans, the difference between the performance of prime loans, Alt-A loans and subprime loans will be magnified as the credit cycle of the housing market weakens. And so I would expect that prime loans will perform marginally worst than they traditionally do. Alt-A loans a bigger difference between their traditional performance and their actual performance in a difficult housing market, but subprime loans a quite a bit different. … And so I think that's quite different than in the subprime market.

398.   Pressed by analysts to identify American Home products showing "credit deterioration," Strauss conceded that "the limited documentation Alt-A loans are performing the worst."

399.   Asked specifically by an analyst whether the Company had adequate controls in place to manage the Company's growth, Strauss assured investors that American Home had extensive, high-quality internal controls, stating "we use technology to control our process and specifically, in our lending practices, interest rate risk roll-up, credit standards, compliance standards, accounting roll-ups, all come out of our core systems automatically."

400.    Defendant Strauss' statements on the January 25, 2007 conference call were materially false and misleading because American Home was not, in fact, a high-quality lender and the Company issued high-risk loans to borrowers with poor credit.  Indeed, the Company has now admitted that during 2006 more than 22% of the loans it originated were subprime.  The Company also failed to verify the creditworthiness of its borrowers, in violation of its underwriting guidelines.  Moreover, Strauss' statements concerning the Company's "limited documentation" loans were misleading in that he failed to disclose that the Company issued no documentation loans, and failed to apply a reasonability test to stated income loans.

401.    As noted above, after the close of trading on February 7, 2007, New Century Financial Corp. disclosed a fourth-quarter loss.  The New Century announcement went far beyond the conditions at that one Company, and cited an "increasing industry trend of early-payment defaults and, consequently, loan repurchases [that] intensified in the fourth quarter of 2006."  Investors understood that disclosure to reflect the tightening of secondary markets for all mortgage originators, including American Home.  As a result, the price of American Home shares fell nearly $3 on February 8, 2007, dropping from $35.99 per share to close at $33.06.

402.    On March 1, 2007, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ending December 31, 2006, which was signed by Defendants Strauss and Hozie, among others, and also contained certifications by Defendants Strauss and Hozie pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002.  The materially false and misleading statements in the 2006 10-K are set forth above.

403.    On March 6, 2007, RBC Capital Markets issued an "outperform" rating on American Home stock, writing that "disruptions caused by smaller, weaker mortgage banks are actually creating market share opportunities for larger, stronger originators like AHM."  The

report stressed that the Company is not a subprime lender, stating: "AHM has been unfairly clumped together with the sub-prime originators… A Friendly Reminder: AHM IS NOT A SUB-PRIME LENDER. Less than one percent of its origination volume is sub-prime, and there is negligible sub-prime exposure on AHM's balance sheet."

404. In response to the downturn in the credit market that was affecting other lenders, on March 6, 2007, American Home issued a press release to assure investors that the Company was not a subprime lender. Specifically, in order to address purported "confusion [that] may have arisen regarding the types of loans it holds and originates," the press release included a detailed table breaking out the types and the specific characteristics of loans the Company issued and retained. Critically, that press release represented that non-prime loans held for investment and sale constituted just 0.3% of the Company's portfolio. Moreover, the press release reiterated that the Company did not originate subprime loans, stating that origination of non-prime mortgages constituted "0.0%" of the Company's total originations in 2006.

405. That press release was materially false and misleading because, in truth, more than 22% of loans the Company originated in 2006 were subprime. Moreover, the press release concealed the extent of the Company's subprime lending by listing the Company's Pay Option ARMS and Alt-A loans separately from "non-prime" loans, thus representing that those products were high-quality loans. Moreover, the entire thrust of the press release was to reassure investors that American Home was a high-quality lender, which was materially misleading. In addition, the Company's position was not distinct from other issuers of high risk loans, as evidenced by the fact that, in January and February 2007 the Company was "hit hard" with increased repurchase demands from secondary market investors, some of whom had ceased

purchasing American Home loans by the end of 2006.  A copy of that press release was filed with the SEC that day as an exhibit to a Form 8-K signed by Defendant Hozie.

406.    On April 6, 2007, with the markets closed for Good Friday, the Company issued a press release announcing lower earnings for the first quarter and reduced guidance for 2007 from $3.75 to $4.25 per diluted share, which the Company attributed to "conditions in the secondary mortgage and mortgage-backed securities markets."  Specifically, the press release announced that "the Company's first quarter results will be adversely affected by lower gain on sale margins," and by "ongoing high delinquency related charges due to the Company establishing additional reserves for increases in non-performing loans."  Defendant Strauss was quoted in the press release attributing the Company's disappointing performance to market conditions, stating "During March, conditions in the secondary mortgage and mortgage securities markets changed sharply.  In particular, these markets were characterized by far few buyers offering materially lower prices, both for loan pools and for "AA", "A", "BBB" and residual mortgage securities."  The press release further stated that, during the quarter, the Company had ceased originating the loans that it has been forced to repurchase.  The April 6, 2007 press release, while partially disclosing the Company's precarious financial condition, was nonetheless materially false and misleading in that it attributed the weakened market for American Home loans to general market conditions, rather than the poor quality of the Company's loans.  The press release was filed that day with the SEC as an exhibit to a Form 8-K, which was signed by Defendant Hozie.

407.    Analysts accepted the Company's explanation that market conditions, rather than the quality of American Home's loans, were to blame for the Company's first quarter performance.  On April 9, 2007, RBC Capital Markets issued a report parroting American Home's statements that the Company's problems were the result of market conditions rather than

the Company's deteriorating fundamentals, writing "our reduction in earnings/dividends expectations driven by a deterioration in secondary market conditions in the second half of the month is clearly disappointing."

408.    Despite the difficulty attributed to the decreased demand for the Company's loans in the first quarter, Defendant Strauss assured investors that the Company was able to maintain its credit lines.  An April 9, 2007, report by an analyst at Citigroup Global Markets cited to a conversation he had with Strauss in which Strauss "did state that AHM is not under pressure from any of its warehouse lenders."

409.    The Company's effort to shift the blame for its performance, echoed by analysts, helped mitigate the impact of the April 6 disclosure.  Nonetheless, when the markets reopened on Monday, April 9, 2007, American Home shares dropped nearly $4 per share, or almost 20%, falling from the prior closing price of $25.84 per share to $21.92.  Despite the partial disclosure of the Company's true condition, the April 6, 2007 press release was materially false and misleading in that it blamed market conditions for the Company's performance and thus failed to disclose the Company's underwriting practices that gave rise to increased delinquencies and the need to increase reserves.

410.    The Company continued to reassure investors that the Company was stable.  An April 11, 2007, report by A.G. Edwards, which recommended investors buy American Home stock, cited a conversation with Strauss wherein Strauss stated that "there are no liquidity concerns surrounding AHM's lines of credit. AHM has been in full discussion with its creditors and has not received any concerns regarding liquidity."  The A.G. Edwards report also accepted the Company's representation that it had terminated its riskier loan products, stating "We expect early payment defaults to decline as AHM is ceasing the sales of its more risky products."

141

411.  On April 30, 2007, American Home issued a press release announcing financial results for the first quarter ending March 31, 2007.  The press release reported net income of $30.7 million and a three month gain on sale of mortgage loans and MBS of $122.6 million – down from over $200 million during the prior quarter – and total assets of $20.6 billion, including MBS of $7.6 billion, $955.5 million of loans held for sale (net), $6 billion of loans held for investment and MSRs of $525.6 million.  The press release was filed that day with the SEC as an exhibit to a Form 8-K, which was signed by Defendant Hozie.  For the reasons set forth above, the April 30, 2007 press release materially overstated the Company's net income, gain on sale and assets, including MBS, MSRs, and loans held for investment and sale.

412.  In a conference call with analysts held that day, Defendant Strauss assured investors that the Company's quarterly performance did not indicate lower quality products, stating that the "high loan-to-value stated income loans" at the heart of the problem "underperformed even though they were granted to borrowers with high credit scores."  Strauss reiterated that the Company had stopped issuing the high LTV stated income loans and, in addition, "established substantial additional reserves to cover the losses" such loans issued previously might cause.  Moreover, because origination of such loans had ceased, Strauss insisted the Company was in a "tail period" and that delinquencies would <u>decrease</u> going forward.

413.  Defendant Strauss' statements on the April 30 conference call were materially false and misleading because the Company's exposure to risky loans was not limited to "high loan-to-value stated income loans" and termination of those loans would not protect the Company from repurchase demands.  Moreover, because repurchase demands based on EPDs did not need to be made immediately, the "tail period" cited by Strauss was misleading.

142

414.     On May 10, 2007, American Home filed with the SEC a Form 10-Q for the first quarter 2007 ending March 31, 2007, which was signed by Defendants Strauss and Hozie and also contained certifications by Defendants Strauss and Hozie pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002.  The 1Q07 10-Q repeated the financial results reported in the Company's April 30, 2007 press release, which were materially false and misleading for the reasons set forth above.  Further, it reported a fair value for the Company's residual assets of $182.9 million which, for the reasons set forth above, was materially overstated.  The 1Q07 10-Q also repeated the assertions made in the 1Q06 Form 10-Q as to the fair value of the assets acquired and the liabilities assumed with regard to the Waterfield acquisition, which were materially false and misleading for the reasons set forth above.

415.     In addition, with regard to the Company's credit facilities, the 1Q07 10-Q stated "The facilities contain various covenants pertaining to maintenance of net worth, working capital and maximum leverage.  At March 31, 2007, the Company was in compliance with respect to the loan covenants."  That statement was materially misleading in that it failed to disclose that, during the first quarter, the Company was subject to a margin call by Lehman Brothers.

416.     The 1Q07 10-Q also stressed the Company's compliance with its underwriting guidelines, stating "We have implemented strict procedures to ensure quality control and conformity to underwriting standards and minimize the risk of being required to repurchase loans."  For the reasons set forth above, that statement was materially false and misleading.

## XII.     THE TRUTH IS REVEALED

417.     Despite the mounting pressure facing the Company, on June 15, 2007 American Home declared a quarterly cash dividend of $0.70 per share to holders of common stock as of July 9, 2007, to be paid on July 27, 2007.  That dividend was expected to cost the Company $35 million in cash.

418.     On June 28, 2007, American Home stated that it would take "substantial charges" for credit related expenses in the second quarter.  The Company said it was likely to experience a second quarter loss, and it reduced its guidance for the third time in the year, stating that credit-related expenses had been caused by the three-month "timely payment" warranty that the Company granted to purchasers of certain of its loans – that is, by early payment defaults resulting in forced repurchases from secondary market investors.  Specifically, a press release issued that day stated:

> As has been previously described, the Company's credit-related expenses have been primarily caused by the three month "timely payment" warranty the Company granted to loan buyers who purchased stated income loans with high loan to value ratios from the Company. The Company has stopped making these types of loans. Consequently, the Company believes that the high credit-related charges resulting from prior loan sales will diminish as the three month "timely payment" warranty expires.

Defendant Strauss attempted to minimize the impact of this disclosure by assuring investors that the early payment defaults arose from a single product that had been discontinued.  The press release quoted him as saying "As we put the impact from the discontinued products behind us, the positive contributions from our portfolio, mortgage origination franchise and loan servicing business will again drive our results."

419.     Despite Strauss' effort to mitigate the impact of the Company's disclosure, in response to the June 28 announcements American Home stock declined from $20.91 per share to $18.38 per share on extremely heavy trading volume.  The Company's June 28 press release was a materially false and misleading partial disclosure of the Company's true condition because it failed to reveal the true extent of American Home's exposure low-quality loans.

420.     On July 9, 2007, RBC Capital Markets endorsed the Company line that American Home had only limited, and declining, exposure to high-risk loans in a report that stated "'Clean-Up' Charges Should Lead To Improved Credit Performance in the Second Half of 2007."

421.   Despite the Company's assurances, American Home stock fell again on July 11, 2007 after Bloomberg News reported layoffs at the Company, and Standard & Poor's warned on July 10, 2007 of upcoming downgrades to mortgage-backed securities.   Specifically, the Company's stock fell over $2 from its close of $17.27 per share on July 10 to close at $15.15 on July 11, a drop of 12%.

422.   On July 13, 2007, Standard & Poor's downgraded 498 classes of bonds backed by subprime mortgages and 418 classes of bonds backed by home equity loans.   According to Confidential Witness 12, these downgrades destroyed the secondary market for the Company's loans and MBSs.  "After the S&P downgrades, we weren't able to sell anything.  Everyone shut down on us.  No one wanted these loans anymore.  The warehouse lenders knew that we couldn't sell anything, so they shut down our credit lines.  The result was a liquidity crisis."

423.   Confidential Witness 30 confirmed this, explaining that, in mid-2007 the secondary market investors significantly tightened their purchasing guidelines and began rejecting loans offered by American Home, and demanding increased repurchases by the Company of previously sold loans.  As Confidential Witness 30 described it, the rejections and repurchase requests came in "like a tidal wave."  Indeed, according to Confidential Witness 1, in July 2007, Countrywide, a major purchaser of AHM loans, demanded immediate repurchase of $72 million in loans.  According to Confidential Witness 31, towards the end of July 2007, AHM was not able to satisfy repurchase demands because of a severe shortage of cash.

424.   On July 17, 2007, Lehman made a margin call, which the Company contested, and which was not disclosed to investors.  On July 19, 2007, American Home's shares fell in value by more than 20%, due – according to a report on Bloomberg News – to "speculation that Lehman Brothers Holdings Inc. might pull its credit facility."  Company shares fell from a

closing price of $13.59 on July 18, 2007 to a closing price of $10.76 on July 19, 2007 for a loss in value of $2.83 per share on heavy trading volume.

425.    Defendant Hozie spoke with analysts in an effort to quell those rumors and assure investors that the Company's credit facilities were secure.  A July 19, 2007 report by JMP Securities cited a conversation with Hozie, stating "I did not get the impression from talking with them that they were having any difficulty with their credit facilities."  A report issued that day by Keefe, Bruyette & Woods stated that Hozie assured that the rumors of a credit line being pulled were false.  "[Hozie] denied it pretty flatly, and said there is no liquidity issue."  The next day, Mary Feder, American Home's Vice President for Investor Relations, stated to MarketWatch that "No warehouse lines have been pulled."

426.    On July 23, 2007, Lehman made another margin call, demanding immediate payment of $3.8 million.  The Company contested the basis of the margin call, yet made the requested payment.  On July 26, 2007, Lehman made yet another margin call, this time demanding immediate payment of $6.9 million.  The Company did not satisfy this margin call.

427.    On Friday, July 27, 2007, after the close of the market, American Home issued a press release announcing that its Board of Directors had determined to delay payment of its quarterly cash dividend in order to "preserve liquidity" in the face of "unprecedented" disruptions in the credit markets that caused major write-downs of the Company's loan and security portfolios, which in turn "caused significant margin calls with respect to its credit facilities."

428.    On Monday July 30, 2007, the New York Stock Exchange halted trading in American Home Mortgage stock before the market opened in response to the Company's announcement that it would delay payment of its dividend.

429. Analysts were swift to question the Company's continued viability. A July 30, 2007 report by RBC Capital Markets downgraded the Company's stock to Sector Perform-Speculative Risk, and asked, "Can the Company survive? We think the answer is yes, but now have to acknowledge that this is not a foregone conclusion." Additionally, the report cautioned, "We believe management credibility in question," noting that

> management appears to have either been caught entirely off guard…, has not accurately conveyed the potential impact of these operating challenges to the investment community, or both. The company's dividend delay confessional at 10:20 PM on a Friday night makes us think that both of these points may have merit.

430. On Tuesday, July 31, 2007, American Home announced that its lenders had initiated margin calls in response to the decline in the collateral value of certain of its loan and securities held in its portfolio. Specifically, American Home disclosed that it had "[r]eceived and paid very significant margin calls in the last three weeks and has substantial unpaid margin calls pending," that it was unable to borrow on its credit facilities or fund its lending obligations of approximately $300 million for June, and that it did not anticipate funding approximately $450-$500 million of lending obligations for July. The Company also disclosed that it had retained advisors "with respect to the sourcing of additional liquidity including the orderly liquidation of its assets."

431. In response to these disclosures, in a report issued on July 31, 2007, Deutsche Bank suspended its price target for American Home, noting "the possibility that the company will need to file for bankruptcy if it does not receive a capital infusion."

432. Once trading resumed on July 31, 2007, American Home shares, which had closed at $10.47 per share before trading was halted, opened at just $5.51 per share and quickly collapsed to close at $1.04 per share.

433.    In response, an August 1, 2007 report by RBC Capital Markets sounded the death knell, admonishing, "Warehouse lines are the linchpin of every mortgage production business – if they go away, the business ceases to function, so this represents an extremely damaging turn of events."  RBC again questioned the veracity of management's communications to the public, and observed that "the pulling of warehouse lines, as was rumored but steadfastly denied by company management two weeks ago, has clearly erupted into a liquidity crisis for the company."  RBC concluded that "bankruptcy protection is now just as likely, if not more likely than sale of the company, in which case the common shares could be worthless, in our view."

434.    American Home ceased taking mortgage applications on August 1, 2007, and the Company filed for Chapter 11 Bankruptcy protection on August 6, 2007, when its stock closed at just $0.15.

435.    On August 12, 2007, Newsday published an in-depth article that discussed American Home's failure to adhere to its own underwriting policies.  The article reported that "Some American Home employees also said that the drive to fulfill Strauss' mission of becoming the nation's top mortgage bank created such pressure to resell loans that some loan documents could not be thoroughly scrutinized to ensure their validity."  Similarly, Newsday quoted industry experts who found that "American Home based its underwriting standards on the premise that home prices would keep rising" – a clearly unreasonable assumption.  And, Newsday reported that Company insiders "realized in February that the company was having trouble moving the loans it wanted to sell" and that over the six months prior to its bankruptcy filing the Company was "finding it harder and harder to resell anything."

436.    On October 3, 2008, Newsday reported that the FBI and federal prosecutors were investigating American Home, including possible charges of securities fraud.  According to

Newsday, that investigation included an examination of "whether all documentation behind mortgages was legitimate, and whether the company began to cut corners as the mortgage market began to collapse."

437.    On January 29, 2008, The Wall Street Journal expanded on the federal investigation of American Home, reporting that the FBI and the U.S. Department of Justice had launched separate investigations that are focused on American Home and other mortgage industry participants, the majority of which were unnamed.  Specifically, the Department of Justice is investigating whether Company officials made misrepresentations in securities filings about American Home's financial position and the quality of its mortgage loans, including failing to disclose a rising number of loan defaults.  The FBI probe is looking at every stage of the loan and securitization process, but, according agents cited by the Journal, the focus is on loan origination, specifically, loans that were issued with little or no documentation.

## XIII.    LOSS CAUSATION

438.    Defendants' unlawful conduct alleged herein directly caused the losses incurred by Plaintiffs and the Class.  The false and misleading statements set forth above were widely disseminated to the securities markets, investment analysts and to the investing public.  Those statements caused and maintained the artificial inflation of the price of American Home shares, which consequently traded at prices in excess of their true value.  Several partial disclosures of the Company's true condition, as set forth above, revealed elements of the Company's true condition.  By minimizing those corrective disclosures and making contemporaneous misstatements, the Company and its management mitigated the impact of those discloses and prevented the full truth about American Home from being revealed.

439.    As set forth above, the Company's undisclosed origination of high-risk loans, violations of its underwriting guidelines, failure to report its financial statements in accordance

with GAAP during the Class Period not only were material, but they also triggered foreseeable and grave consequences for the Company given its repurchase liability and highly leveraged balance sheet. Specifically, at all relevant times, American Home needed to borrow substantial sums of money to originate and purchase mortgage loans and support its operating activities, and was thus dependent upon credit facilities collateralized by the Company's loans.

440. The deterioration in the quality of the Company's loans subjected American Home to margin calls by its creditors, who could demand cash as additional collateral, and to repurchase demands by the secondary market purchasers of the Company's loans. In addition, that deterioration resulted in the secondary market for American Home loans narrowing and, ultimately, collapsing.

441. The partial disclosures of the Company's true condition concerning the collapsing secondary market for its loans and securitizations, increased repurchase demands and the status of its credit facilities caused the price of American Home's shares to decline, eliminating a portion of the inflation in the price of those securities. That decline in value caused Plaintiffs and the Class economic harm.

## COUNT VII

### AGAINST STRAUSS AND HOZIE
### FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT

442. Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein. This Count is asserted against the Defendants Strauss and Hozie (the "Officer Defendants") for violations of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

443. Throughout the Class Period, each of the Officer Defendants, in concert with others, individually and in concert, directly and indirectly, by the use of means or

instrumentalities of interstate commerce and/or of the mails and a national securities exchange, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs and the Class; made various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading; made the above statements with a severely reckless disregard for the truth; and employed devices, and artifices to defraud in connection with the purchase and sale of securities, which were intended to, and, during the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, regarding, among other things, American Home's financial results, including but not limited to American Home's income and assets; (ii) artificially inflate and maintain the market price of American Home shares; and (iii) cause Plaintiffs to purchase American Home shares at artificially inflated prices.

444.   The Officer Defendants, as the top executive officers of American Home, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers of American Home, the Officer Defendants were able to control and did control the content of the public statements contained herein and, with knowledge or in reckless disregard of the massive risk of borrower default on mortgages originated by American Home, they caused the above complained of public statements to contain misstatements and omissions of material facts as alleged herein.

445.   In addition, the false and misleading statements made in the Company's published documents (including but not limited to its press releases and SEC filings) constitute "group published information," which Defendants Strauss and Hozie were responsible for creating. During their respective terms of employment at American Home Defendants Strauss and Hozie

had direct involvement in the daily business of the Company and participated in the preparation and dissemination of American Home's "group published information."

446.   More particularly, Defendants Strauss and Hozie are personally liable for the following materially false and misleading statements that were contained within "group published information" during the Class Period:

a)   The false and misleading statements in AHM's 2005 quarterly reports on Form 10-Q filed with the SEC on July 29, 2005 and November 9, 2005;

b)   The false and misleading statements in AHM's 2005 annual report on Form 10-K filed with the SEC on March 16, 2006;

c)   The false and misleading statements in AHM's 2005 Prospectus Supplement filed with the SEC on August 10, 2005;

d)   The false and misleading statements in AHM's 2006 quarterly reports on Form 10-Q filed with the SEC on May 10, 2006, August 9, 2006 and November 9, 2006;

e)   The false and misleading statements in AHM's 2006 annual report on Form 10-K filed with the SEC on March 1, 2007;

f)   The false and misleading statements in AHM's 2007 Prospectus Supplement Supplement and Registration Statement on Form 424B2 filed with the SEC on May 2, 2007; and

g)   The false and misleading statements in AHM's Form 8-Ks, and the press releases attached thereto, filed with the SEC on July 19, 2005, October 26, 2005, January 13, 2006, January 17, 2006, January 26, 2006, April 26, 2006, July 26, 2006, October 26, 2006, January 25, 2007, April 6, 2007 and July 2, 2007, as well as AHM's Form 8-K/A filed with the SEC on April 30, 2007.

447.   In addition to his liability for the materially false and misleading statements that were contained within "group published information," Defendant Strauss is also liable for the following materially false and misleading statements that he personally made during the Class Period:

a) His false and misleading statements in the press releases attached to AHM's Form 8-Ks filed with the SEC on July 19, 2005, October 26, 2005, January 13, 2006, January 17, 2006, January 26, 2006, April 26, 2006, July 26, 2006, October 26, 2006, January 25, 2007, April 6, 2007 and July 2, 2007;

b) His false and misleading statements in AHM's conference calls with analysts on July 19, 2005, October 26, 2005, January 12, 2006, January 26, 2006, April 26, 2006, July 26, 2006, October 26, 2006, January 25, 2007 and April 30, 2007;

c) His false and misleading statements at the RBF Financial Institutions Conference on September 21, 2006;

d) The false and misleading statements attributed to him in the analyst reports by Citigroup Global Markets, dated November 23, 2005 and April 9, 2007, and by A.G. Edwards, dated April 11, 2007; and

e) His false and misleading statements in the October 1, 2006 article authored by him that appeared in Mortgage Banking, the Magazine of Real Estate Finance, entitled, "Achieving Growth Through Responsible Lending."

448. In addition to his liability for the materially false and misleading statements that were contained within "group published information," Defendant Hozie is also liable for the following materially false and misleading statements that he personally made, during the Class Period:

a) His false and misleading statements in AHM's Form 8-Ks, signed by him and filed with the SEC on July 19, 2005, October 26, 2005, January 13, 2006, January 26, 2006, April 26, 2006, July 26, 2006, October 26, 2006, January 25, 2007 and April 6, 2007, as well as AHM's Form 8-K/A filed with the SEC on April 30, 2007;

b) His false and misleading statements in AHM's October 26, 2005 conference calls with analysts; and

c) The false and misleading statements attributed to him in the analyst report by JMP Securities, dated July 19, 2007.

**THE OFFICER DEFENDANTS ACTED WITH SCIENTER**

449.    The above allegations establish a strong inference that Defendants Strauss and Hozie acted with scienter in misrepresenting the quality of the Company's loans and underwriting and, consequently, the financial condition of the Company during the Class Period.

450.    As a mortgage lender, the Company's underwriting guidelines and the enforcement thereof defined the Company's risk profile and were of critical importance to its operations.  The quality of the Company's loans directly impacted the reported value of the Company's income and assets.  Moreover, as a lender that sold a significant proportion of the loans it originated subject to stringent repurchase obligations, the quality of the Company's loans subjected American Home to significant repurchase liability.  Similarly, because those loans were used to collateralize the credit facilities on which the Company's operations were dependent, the quality of the Company's loans was the single most important aspect of its business and operations.  Accordingly, American Home's loan originations constituted the Company's core operations and formed the heart of its business.

451.    As such, the Company's underwriting guidelines and the performance of the Company's loans were extensively documented throughout the Class Period.  As set forth above in ¶¶79-118, numerous internal Company documents discussed in detail every aspect of the Company underwriting guidelines, and evidenced the fact that it was American Home's intention to target borrowers with poor credit quality.  It was also documented Company policy to originate no documentation loans and limited documentation loans, and to encourage loan officers to obtain as little documentation as possible.  Critically, these were established Company policies that were implemented through official American Home directives from its executives.

452.    Accordingly, Defendants Strauss and Hozie knew or were reckless in not knowing that the Company's relaxed underwriting standards targeted borrowers with poor credit causing

American Home to issue high risk loans. Similarly, the violations of the Company's underwriting guidelines reflected the consistent application of Company policy to issue loans to "virtually any borrower," and, accordingly, Defendants Strauss and Hozie knew or were reckless in not knowing of those violations.

453.    In addition, Defendants Strauss and Hozie were privy to the numerous internal reports, described above at in ¶154, that closely tracked the performance of the Company's loans including EPDs and repurchase demands. Those reports clearly revealed the deterioration in the quality of American Home's loans and, accordingly, Defendants Strauss and Hozie knew or were reckless in not knowing of that quality deterioration and the concomitant increase in the Company's repurchase liability.

454.    Moreover, given the importance of the Company's credit facilities to its ongoing operations, both Defendant Strauss and Defendant Hozie knew or were reckless in not knowing of the Lehman margin call in March 2007, the basis therefore and the strong likelihood of additional margin calls given the poor quality of the loans used to collateralize the Company's credit facilities.

455.    Finally, the fact that American Home is being investigated by the FBI and Department of Justice for accounting fraud, among other things, supports the inference that the Company's two most senior executives who signed its financial statements acted with scienter.

### ADDITIONAL FACTS ESTABLISHING THAT DEFENDANT STRAUSS ACTED WITH SCIENTER

456.    Defendant Strauss founded and ran American Home and closely monitored its core business and operations. As Confidential Witness 15 put it, "Strauss is a control freak. Nothing gets done without his authority, including whenever an employee gets approved for a raise. Everything passed through Michael Strauss."

457.   As alleged above, Strauss closely reviewed internal reports tracking loan performance, often requesting multiple versions of such reports.   Among other reports, Strauss insisted on receiving and did receive thorough weekly reports listing details regarding the Company's loan inventory, any repurchase demands by investors, and the size and deficiencies of the individual loans being handled by the Company's Loan Workout Group.   Strauss also participated in monthly Credit Risk meetings.

458.   Strauss also knew of the Company's underwriting failures.   As set forth above, Strauss replaced the Senior Vice President of Post Closing because he refused to approve loans over the vetoes of underwriters.   In addition, according to Confidential Witness 15, Strauss knew the Company was being fined for overcharging borrowers and violating the Truth-In-Lending Act.   "Strauss had aneurisms over it.   You could hear the man screaming in his office."   Confidential Witness 15 reported similar reactions by Strauss to the Company's inability to timely repay warehouse lenders because of loans that were rejected or returned to the Company.   "Strauss watched the warehouse lines of credit intimately.   Strauss would come out of his office with a list of loans on the warehouse line and yell 'why aren't they sold.'"

459.   Strauss was directly involved in the formation of the Loan Workout Group and personally directed that scratch & dent loans be dumped into the REIT, rather than being sold for a loss.   Confidential Witness 2 explained that "Strauss's idea behind creating the REIT was to find a channel for all the garbage and exceptions.   The REIT was like a garbage pail; all the scraps went in there."   In an April 13, 2004 e-mail to Strauss, copied to McDonagh, Executive Vice President and Treasurer Craig Pino and Confidential Witness 2, Bob Johnson asked Strauss whether certain loans should be transferred to the REIT:

> Mike/Tom – As you know we have put together a list of capital loans that
> we can potentially sell to the REIT.  Some of these loans have deficiencies

which have prevented sale in the traditional secondary market at reasonable prices. Matt Swift's group is in the process of reviewing these loans. What level of review would you like his group to do. A full review of each file will take a couple of days. I guess what I am asking is, do we transfer everything that is current or are there some loans that you would like to keep on the capital line at the mtge co level.

Please advise. Thanks…….

In response, Strauss directed that "Anything that is current that we own we should transfer."

460.    Confidential Witness 2 explained this exchange by stating that the reference to "capital loans" meant that these were loans for which the warehouse lenders had already been repaid, and, as such the loans were backed by the Company's own capital line. According to Confidential Witness 2, Strauss viewed any loss on a loan held on the capital line as coming from "out of his pocket." Confidential Witness 2 stated that the implication of Strauss's instruction that any loan owned by AHM – i.e., a loan held on the capital line – should be transferred to the REIT if the borrower's payments were current was that no review would be done to determine whether the loans were investment quality. Confidential Witness 2 explained that the Company "shouldn't transfer to the REIT things they didn't do a history for. In my past experience in the business, you didn't put anything in a REIT that wasn't investment quality, that you didn't do a full review for."

461.    Confidential Witness 2 stated that he advised Strauss and his senior executives, including Johnson, McDonagh, Kwaschyn and Loeffler, against transferring scratch & dent loans to the REIT. In response, Strauss explained that he intended to only hold the loans in the REIT for twelve months, hoping that, if the borrowers made consistent payments for a full year, the loans would be salable to Fannie Mae or Freddie Mac, which Strauss believed would not closely examine the loan files. Internal Company documents corroborate this account, including a LWG spreadsheet with notes concerning scratch & dent loans that indicates, as to certain loans,

"holding file until 12 months clean, then sell FNMA [Fannie Mae] per M. Strauss."  Confidential

Witness 2 argued against this plan as both improper and unfeasible, given that the loans would

still be subject to repurchase for violations of representations and warranties if the Company ever

managed to sell them.

462.     When Confidential Witness 2 approached Strauss about the first proposed sale of

scratch & dent loans out of LWG to Global at a loss, he showed Strauss the information he had

provided to Global about those loans.  Strauss was "very pissed off" at Confidential Witness 2

when he reviewed the spreadsheet Confidential Witness 2 had provided to Global and learned

that Confidential Witness 2 had disclosed to Global the problems with the loans.  "When Strauss

saw the spreadsheet, he flipped out at me."  Strauss questioned why Confidential Witness 2 had

disclosed the loan deficiencies and stated "You don't tell the investor all of that.  Its too much

information.  Let them figure it out."  Strauss explained that, if investors did not identify the

deficiencies in the loans being sold by American Home, "it was their problem."

463.     Other internal Company documents show the extent to which Strauss was

involved in the review of scratch & dent loans.  LWG spreadsheets discussing numerous loans

that were not salable due to a variety of deficiencies – borrowers who had been in bankruptcy,

borrowers with credit scores below 600, property types unacceptable for sale – as being "held for

securitization per M. Strauss."

464.     Confidential Witness 2 stated that Defendant Strauss was fully aware of

Johnson's means of disposing of such loans:  "Bob Johnson advised Strauss on what to do and

how to make the most out of bogus loans that didn't fit anywhere else."  Confidential Witness 2

explained that, when he asked Strauss about loans that had disappeared from the Loan Workout

Groups portfolio – either transferred to the REIT or resold to investors – Strauss replied "That

was Bob" or "Bob is taking care of it."  Johnson, in turn, told Confidential Witness 2 that Strauss had wanted him to make such transfers of loans out of the Loan Workout Group.

465.    According to Confidential Witness 2, Johnson was one of Strauss's "golden boys" and acted as his right hand man.  Confidential Witness 32 confirmed that Johnson acted as Strauss's and Hozie's liaison with the executives handling the sales of loans, stating "Bob Johnson had virtually all of the contact with Strauss and the chief financial officer."

466.    In addition, Defendant Strauss was also highly motivated to generate short term growth in order to inflate his personal compensation.  During the Class Period, American Home made regular income distributions to shareholders, while Defendant Strauss owned substantial amounts of American Home stock. As a result, Defendant Strauss received substantial payments whenever the Company made income distributions.  Defendant Strauss thus had a powerful incentive to increase the Company's short-term earnings by originating and purchasing huge quantities of risky loans and to materially misrepresent the Company's financial condition.  The table below illustrates American Home's income distributions, the shares held by Defendant Strauss and the payments made to him based on his stock ownership during the Class Period:

|  | Cash Distributions Per Share | Shares Held by Strauss | Cash Distributed to Strauss |
|---|---|---|---|
| 2004 | $ 2.43 | 4,242,106 | $ 10,308,317.58 |
| 2005 | $ 3.24 | 4,242,106 | $ 13,744,423.44 |
| 2006 | $ 3.94 | 4,542,106 | $ 17,895,897.64 |
| Q1 2007 | $ 1.12 | 4,542,106 | $  5,087,158.72 |
| Total | $ 10.73 |  | $ 47,035,797.38 |
|  |  |  |  |

467.    Defendant Strauss was also motivated to grow the Company by any means, including the undisclosed issuance of high risk loans.  Beginning in 2004 and throughout the Class Period, Defendant Strauss' compensation was tied to his ability to grow the Company's

market share.  Defendant Strauss responded to this shift in his compensation incentives, and aggressively sought to increase the Company's market share by, among other things, increasing the Company's loan origination volume through underwriting huge numbers of risky loans in violation of the Company's underwriting guidelines.  Defendant Strauss was well compensated for doing so – the table below illustrates the sharp increases in Defendant Strauss' compensation during the Class Period:

|      | Salary    | Bonus       | Option Awards | Sum of Salary, Bonus and Option Awards. |
|------|-----------|-------------|---------------|------------------------------------------|
| 2003 | $350,000  | $  600,000  |               | $           952,003                      |
| 2004 | $593,095  | $  600,000  |               | $         1,195,099                      |
| 2005 | $841,035  | $2,000,000  |               | $         2,843,040                      |
| 2006 | $907,185  | $2,637,000  | $    337,414  | $         3,883,605                      |

 * Sources: American Home Mortgage's Schedule 14As filed on April 29, 2004, May 1, 2006 and April 27, 2007.

### ADDITIONAL FACTS ESTABLISHING THAT DEFENDANT HOZIE ACTED WITH SCIENTER

468.    Defendant Hozie was the Company's Chief Financial Officer throughout the Class Period and, as such, was the individual responsible for the accuracy of the Company's publicly issued financial statements.  As a long-term veteran of the mortgage industry, Defendant Hozie was keenly aware of the critical importance of loan underwriting to the accuracy and reliability of a mortgage company's public statements.  Specifically, prior to joining American Home as CFO in 2002, Hozie as a senior finance executive with Fleet Mortgage Group and Mellon Mortgage Company.  A Certified Public Accountant, Defendant Hozie had previously worked for the predecessor of American Home's auditor, Deloitte.

469.    Throughout the Class Period, Defendant Hozie was responsible for the preparation of the false financial statements set forth above, and repeated the contents therein to

the market.  In addition to signing each of the Company's Forms 10-Q, 10-K, and 8-K set forth above, Hozie also signed false certifications attesting to the accuracy of the financial information contained therein pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002.  The relevant GAAP that was violated by American Home and which rendered the Company's financial statements materially false was simple and clear-cut, and well-established.

470.    Defendant Hozie was privy to the extensive internal reporting at American Home, discussed above, that tracked the quality and performance of the Company's loans.  According to Confidential Witness 32, Robert Johnson, who manipulated the LWG by dumping scratch & dent loans into the REIT or resold them without disclosure to investors, reported directly to Hozie and Defendant Strauss, directly involving Hozie in the manipulation of the Company's investment portfolio.  Hozie was motivated to capitulate or collaborate in that manipulation because he was entirely beholden to Defendant Strauss for his compensation.

471.    Specifically, Defendant Hozie's employment agreement established that Defendant Strauss had sole discretion to determine whether, and how much, bonus compensation Defendant Hozie received.  If Defendant Strauss determined that Hozie qualified for any bonus compensation, the minimum bonus would double Hozie's annual base salary.  Accordingly, Hozie had a tremendous motivation to facilitate Strauss' objectives which, as set forth above, included spurring the Company's growth through the issuance of low-quality loans.

472.    Defendant Hozie's actual reported bonus compensation demonstrates that, rather than ensuring the accuracy of the Company's accounting as required by his position, he was instead focused on supporting Defendant Strauss by collaborating in the concealment of the Company's true risk profile in exchange for increased compensation.  Specifically, in 2005 Defendant Hozie received a discretionary annual bonus of $600,000 – $100,000 more than the

high end of the range of $162,500 to $487,500 "targeted" by his Employment Agreement – in addition to his base salary of $512,500.  In 2006, Defendant Hozie received a discretionary bonus of $750,000 – more than $250,000 above his bonus range – in addition to base salary of $595,833.

## COUNT VIII

### AGAINST THE OFFICER DEFENDANTS
### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT

473.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.  This Count is asserted against the Officer Defendants for violations of Section 20(a) of the Exchange Act.

474.    American Home committed a primary violation of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, by making the false and misleading statements of material facts, identified above, in connection with the purchase or sale of securities, which constituted a fraud on the market and were, therefore, presumed to have been relied upon by Plaintiffs and the Class.  At the time that it made these false and misleading statements, the Company either knew of, or recklessly disregarded, their falsity.

475.    Each of the Officer Defendants had direct control and/or supervisory involvement in the operations of the Company prior to and during the Class Period, and therefore had the power to control or influence the particular transactions giving rise to the violations of the Exchange Act by the Company as alleged herein, and exercised the same.

476.    By reason of their status as officers of American Home during the Class Period, the Officer Defendants are "controlling persons" of American Home within the meaning of Section 20(a) of the Exchange Act because they had the power and influence to cause the

Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Officer Defendants were able to, and did, directly or indirectly, control the conduct of American Home's business, the information contained in its filings with the SEC, and public statements about its business.

477. Each of the Officer Defendants was provided with or had access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. Specifically, the Officer Defendants had access to the documents identified in ¶¶167-69. The Officer Defendants also had access to each of the internal American Home documents identified herein.

478. As set forth above, each of the Defendants named in this Count controlled American Home, which violated Section 10(b) of the Exchange Act and Rule l0b-5 promulgated thereunder by its acts and omissions as alleged in this complaint. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate cause of the wrongful conduct set forth in this Count, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## XIV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

    a)    Declaring this action to be a proper class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

    b)    Declaring and determining that the Defendants violated the federal securities laws as charged above;

    c)    Awarding Plaintiffs and the Class compensatory damages;

d)     As to the claims set forth under the Securities Act (§§11, 12(a)(2) and/or §15), awarding rescission or a recessionary measure of damages;

e)     Awarding Plaintiffs and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

f)     Awarding such other relief as this Court may deem just and proper.

## XV.     <u>JURY TRIAL DEMAND</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

Dated: June 3, 2008                    Respectfully submitted,

                                       **BERNSTEIN LITOWITZ BERGER**
                                       **& GROSSMANN LLP**


                                        /s/ Steven B. Singer
                                       Steven B. Singer (SS-5212)
                                       Avi Josefson
                                       Matthew C. Moehlman
                                       1285 Avenue of the Americas, 38th Floor
                                       New York, New York 10019
                                       Telephone: 212-554-1400
                                       Facsimile:  212-554-1444

                                       **BERMAN DEVALERIO PEASE TABACCO**
                                       **BURT & PUCILLO**
                                       Jeffrey C. Block (JCB-0387)
                                       Kathleen M. Donovan-Maher
                                       Autumn W. Smith
                                       One Liberty Square
                                       Boston, MA 02109
                                       Telephone: (617) 542-8300
                                       Facsimile: (617) 542-1194

                                       *Attorneys for Lead Plaintiffs and*
                                       *Co-Lead Counsel for the Class*


                                       **MURRAY, FRANK & SAILER LLP**
                                       Marvin L. Frank (MF-1436)
                                       275 Madison Avenue, 8th Floor
                                       New York, New York 10016
                                       Telephone: (212) 682-1818
                                       Facsimile: (212) 682-1892

                                       **SUSMAN HEFFNER & HURST LLP**
                                       Arthur T. Susman
                                       Matthew T. Heffner
                                       Matthew T. Hurst
                                       Two First National Plaza, Suite 600
                                       Chicago, Illinois 60603
                                       Telephone: (312) 346-3466
                                       Facsimile: (312) 346-2829
                                       *Attorneys for Plaintiffs Marlin, Karol and Mika*